# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| City of Chicago; City and County of Denver; and Pima County, | |
| Plaintiffs, | Case No. |
| v. | |
| United States Department of Homeland Security; Kristi Noem, in her official capacity as Secretary of the United States Department of Homeland Security; United States Federal Emergency Management Agency; and David Richardson, in his official capacity as Acting Administrator of the United States Federal Emergency Management Agency, | |
| Defendants. | |

## COMPLAINT

Plaintiffs City of Chicago, City and County of Denver, and Pima County file this Complaint to enjoin Defendants from categorically freezing grant funding under the Shelter and Services Program and terminating the Program altogether, usurping Congress's constitutional authority in enacting and funding the Program. In support of this Complaint, Plaintiffs allege as follows:

1.    The United States experienced a surge in migrant crossings at the southern border beginning in 2019. Following the onset of the Covid-19 pandemic, the U.S. Department of Homeland Security ("DHS") limited the number of migrants detained in DHS facilities to minimize the spread of illness. DHS instead increasingly processed migrants and, if DHS deemed it appropriate, released them in United States border towns pending resolution of migrants' applications for asylum or other immigration status.

2.    Many of these migrants arrived penniless and—lacking legal authority to work— in need of immediate shelter, food, clothing, and medical care. To address this humanitarian crisis,

1

Plaintiffs—three local governments—expended substantial resources providing these basic necessities while helping migrants become self-sufficient.

3.      For example, to prevent new arrivals from immediately becoming homeless upon release by DHS, Plaintiff Pima County coordinated directly with DHS to transition migrants out of DHS custody and into local services.

4.      Meanwhile, the State of Texas protested DHS's release policy by busing migrants to Chicago, Denver, and a few other cities. From mid-2022 through 2024, Chicago welcomed more than 50,000 migrants transported by Texas and others while Denver welcomed more than 40,000 migrants.

5.      Since the first Trump Administration, Congress has appropriated funds to reimburse non-federal entities for costs incurred helping migrants whom DHS processed and released into the United States. Congress continued this bipartisan support in 2022 by enacting the Shelter and Services Program, appropriating funds for that purpose and requiring the Federal Emergency Management Agency ("FEMA") to administer the Program.

6.      FEMA allocated Shelter and Services Program funds by awarding grants to Plaintiffs and many other states, local governments, and non-profit organizations. FEMA repeatedly disbursed these funds to grantees that provided services to migrants released by DHS— i.e., services necessitated by the federal government's immigration policies.

7.      All that changed on February 10, 2025, when Elon Musk tweeted that FEMA had violated President Donald Trump's executive orders by disbursing Shelter and Services Program funds to New York City to shelter "illegals," promising to "clawback" the funds.

8.      FEMA's then-Acting Administrator Cameron Hamilton understood the assignment. That same day, Hamilton responded to Musk's tweet by stating that "Congress should have never

2

passed bills … asking FEMA to do this"; FEMA recouped the funds from New York City; and FEMA zeroed out all Shelter and Services Program grant balances—without informing grantees.

9.     More than one month later, FEMA attempted to put a legal gloss on what the agency had already done. Hamilton sent substantively identical letters informing Shelter and Services Program grantees that FEMA was withholding funding while the agency investigated whether grantees violated a federal law that criminalizes, under specified circumstances, harboring people who are in the United States unlawfully. This "investigation" was pure pretext. FEMA had already decided to eliminate the Shelter and Services Program. And the notion that grantees commit crimes by providing services that Congress authorized in enacting and funding the Shelter and Services Program is absurd. Congress does not fund illegal activity.

10.     Indeed, FEMA did not even await its self-imposed deadline for grantees to respond to the agency's "investigation" before sending substantively identical letters terminating all Shelter and Services Program grants. This time FEMA based its decision not on grantees' alleged violations of federal law, but rather on FEMA's determination that the grants do not effectuate the agency's new priorities. These terminations deprive Plaintiffs of tens of millions of dollars in reimbursement for services that Plaintiffs provided in reliance on FEMA's grants.

11.     Defendants' actions are unconstitutional. The United States Constitution assigns Congress the responsibility to enact laws and appropriate funds, while requiring the President to execute those laws. Although Defendants believe that "Congress should have never passed" the Shelter and Services Program, the Constitution prohibits Defendants from overriding Congress's judgment by eliminating the Program and withholding funding appropriated by Congress.

12.     Defendants also violated the Administrative Procedure Act ("APA") in multiple respects. For example, Defendants failed to offer a reasoned basis for their actions. On the contrary,

FEMA's explanation for withholding funding and terminating grants is that grantees used funds to effectuate Congress's purpose in enacting the Shelter and Services Program—a purpose with which Defendants simply disagree.

13.     Moreover, although FEMA's recent communications hold open the possibility that the agency might reimburse grantees on some unidentified future date, actions speak louder than words, and FEMA's actions show that it has eliminated funding for grantees. In violation of governing regulations, FEMA has sat on Chicago's most-recent drawdown requests for 99 days and counting and has sat on Pima County's drawdown request for 161 days and counting. Meanwhile, FEMA has eliminated grantee access to its online portal through which payment requests are processed while simultaneously demanding that grantees submit close-out documentation to facilitate its winding up of the program. In short, FEMA has decided that the Shelter and Services Program is gone, and grantees are simply left with the paperwork.

14.     Accordingly, Plaintiffs seek an order declaring that Defendants acted unlawfully, setting aside Defendants' unlawful actions, enjoining Defendants from implementing the across-the-board freeze on funding under the Shelter and Services Program as well as Defendants' termination of the Program, and requiring Defendants to allow future drawdown requests and process those requests pursuant to law.

**PARTIES**

15.     Plaintiff City of Chicago is a municipal corporation and home-rule unit organized and existing under the constitution and laws of the State of Illinois. Chicago is the third-largest city in the United States and is home to more than 2.5 million residents, including a diverse population of immigrant communities.

16.     Plaintiff City and County of Denver is a home rule municipality organized and

4

existing under the laws of the State of Colorado and home to more than 700,000 residents, including a diverse population of immigrant communities.

17.     Plaintiff Pima County is a political subdivision of the State of Arizona, and home to more than a million residents, including a diverse population of immigrant communities.

18.     Defendant United States Department of Homeland Security is a department within the executive branch of the United States government. *See* 6 U.S.C. § 111.

19.     Defendant Kristi Noem is the Secretary of DHS and that agency's highest-ranking official. Secretary Noem is charged with the supervision and management of all decisions and actions of DHS. *See id.* § 112. She is sued in her official capacity.

20.     Defendant United States Federal Emergency Management Agency is part of DHS. *See id.* § 313.

21.     Defendant David Richardson is the Senior Official Performing the Duties of the Administrator ("Acting Administrator") of FEMA and that agency's highest ranking official. Acting Administrator Richardson is charged with the supervision and management of all decisions and actions of FEMA. *See id.* §§ 313-14. He is sued in his official capacity.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346 because this action arises under the laws of the United States, including the Constitution and the APA, 5 U.S.C. §§ 701-706.

23.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(e)(1) because (a) substantial events giving rise to this action occurred therein and (b) Chicago is located therein and no real property is involved in this action.

## FACTUAL BACKGROUND

I.      **Border Crossing Surges Led Congress to Allocate Funds to Support Federal-Local Partnerships Providing Migrant Shelter and Services.**

     A.      **Border Crossings Surged from 2019-2023.**

24.      Starting in 2019,[1] the United States experienced a surge in migrant crossings at the U.S.-Mexico border. This increase was driven in part by an uptick in Central and South Americans fleeing oppression and hardship for a chance at asylum in the United States.[2]

25.      For these asylum seekers, it generally takes months to make the journey to the United States border. Some migrants pay human smugglers for help, while criminal gangs target migrants for extortion or robbery. As a result, many migrants are penniless when they reach the southern border.

26.      DHS processes migrants at the border and determines whether to detain them in federal facilities or release them into neighboring towns pending resolution of their immigration claims.[3] Unlike non-asylum seekers, whose claims can be resolved relatively quickly, migrants arriving in the United States under a claim of asylum or similar humanitarian programs may not receive an ultimate determination on their claims for years.[4]

27.      Non-governmental organizations, local governments, and others stepped up to provide temporary shelter to migrants whom DHS released, often coordinating with federal authorities to do so. This coordinated effort to house newly arrived migrants and reduce "street

---

[1] AM. IMMIGRATION COUNCIL, FEMA'S ROLE IN MIGRANT ASSISTANCE: EXPLORING THE SHELTER AND SERVICES PROGRAM, https://www.americanimmigrationcouncil.org/sites/default/files/research/femas_role_in_migrant_assistance_-_exploring_the_shelter_and_services_program_0.pdf.

[2] U.S. DEP'T OF HOMELAND SEC. OFFICE OF IMMIGRATION STATISTICS, FISCAL YEAR 2020 ENFORCEMENT LIFECYCLE REPORT (Dec. 2020), https://ohss.dhs.gov/sites/default/files/2023-12/2020_enforcement_lifecycle_report.pdf.

[3] *Id.*

[4] *Id.*

releases" has been ongoing for years in border towns across the United States, including during the first Trump administration.[5]

28.     From March 2020 to May 2023, DHS significantly limited the number of individuals detained in immigration facilities to limit the spread of Covid-19.[6]

29.     Simultaneously, the number of people crossing the southern border continued to surge, resulting in record-high numbers of encounters at the border.[7] As a result, the nation experienced a significant increase in the number of people whom DHS processed at the border and released from federal-detention facilities.[8]

30.     Plaintiff Pima County was one such local government that stepped up to serve migrants released from DHS custody. Pima County served more than 10,000 new arrivals who were released from DHS custody in April 2023. By December 2023, that number had ballooned: Pima County served over 39,000 legally processed asylum seekers that month, an average of 1,250 people each day. Pima County continued to serve approximately 25,000 migrants each month through May 2024.

**B.     Texas and Other Jurisdictions Bused Migrants to Chicago and Denver.**

31.     In 2022, in the midst of this jump in migrants released by DHS, the State of Texas

---

[5] *See, e.g.*, Robert Moore et al., *Border agents once again release migrants in Downtown El Paso*, EL PASO MATTERS, May 15, 2022, https://elpasomatters.org/2022/05/15/ice-once-again-releases-immigrants-in-downtown-el-paso/.

[6] U.S. DEP'T OF HOMELAND SEC., FY23 ENFORCEMENT LIFECYCLE REPORT, https://ohss.dhs.gov/topics/immigration/immigration-enforcement/enforcement-lifecycle-reports/fy23-enforcement-lifecycle#table-data-heading; OFFICE OF INSPECTOR GEN. OF DEP'T OF HOMELAND SEC., ICE'S MANAGEMENT OF COVID-19 IN ITS DETENTION FACILITIES PROVIDES LESSONS LEARNED FOR FUTURE PANDEMIC RESPONSES (Sept. 7, 2021), https://www.oig.dhs.gov/sites/default/files/assets/2021-09/OIG-21-58-Sep21.pdf.

[7] Colleen Putzel-Kavanaugh and Ariel G. Ruiz Soto, *Shifting Patterns and Policies Reshape Migration to U.S.-Mexico Border in Major Ways in 2023*, MIGRATION POLICY INST., Oct. 2023, https://www.migrationpolicy.org/news/border-numbers-fy2023#:~:text=The%20overall%20numbers%20and%20shifting,migration%20management%20program s%20more%20robust.

[8] FY23 ENFORCEMENT LIFECYCLE REPORT, *supra*.

began transporting migrants from border towns to cities run by Democratic mayors, including Chicago.[9] Many Texas local governments and Texas-based non-governmental organizations also bused migrants to Chicago.[10] In total, more than 50,000 migrants arrived in Chicago from Texas between August 31, 2022, and December 18, 2024.[11]

32.     As other cities became overwhelmed by the influx of new arrivals, they started paying for migrants' transportation to Chicago too. For example, New York City paid for one-way bus or plane tickets transporting migrants to Chicago.[12]

33.     Many of these migrants arrived without money to pay for their own housing, lacking basic items like shoes or winter coats, and in need of temporary shelter, food, clothing, and basic medical care.

34.     To address this humanitarian crisis, Chicago established a coordinated response called the New Arrivals Operation. The New Arrivals Operation established a network of temporary migrant shelters, which collectively served more than 51,000 people.[13]

35.     In addition to providing basic necessities such as shelter, food, and medical care, the New Arrivals Operation offered case-management services to help new arrivals resettle in long-term housing and become self-sufficient.

36.     To provide these services, Chicago contracted with vendors and collaborated with

---

[9] Kaanite Ayer, *What to know about Texas' efforts to bus migrants to other states*, CNN, Mar. 16, 2024, https://www.cnn.com/2024/03/16/politics/texas-migrant-buses-abbott/index.html.

[10] Ben Bradley & Andrew Smith, *El Paso mayor chartered buses of migrants to come to Chicago*, WGN, Sept. 26, 2023, https://wgntv.com/news/chicago-news/el-paso-mayor-chartered-buses-of-migrants-to-come-to-chicago/.

[11] City of Chi., *New Arrivals Situational Awareness Dashboard*, https://www.chicago.gov/city/en/sites/texas-new-arrivals/home/Dashboard.html.

[12] Wendy Wei & Oscar B. Castillo, *At a NYC Reticketing Site, Some Migrants Are Choosing Chicago*, SOUTH SIDE WEEKLY, Nov. 17, 2023, https://southsideweekly.com/at-a-nyc-reticketing-site-some-asylum-seekers-and-migrants-are-choosing/.

[13] *New Arrivals Situational Awareness Dashboard*, *supra*.

the State of Illinois to connect migrants to rental-assistance programs and other help.[14]

37.     The migrant crisis imposed an unprecedented financial strain on several cities, including Chicago.[15] In total, Chicago expended more than $600 million from August 2022 to January 2025 on the New Arrivals Operation.[16] The federal government, the State of Illinois, and Cook County have reimbursed Chicago for some, but far from all, of these costs.

38.     Denver, too, received over 40,000 migrants from December 2022 to November 2024. Denver spent $79 million on immigrant support and services during this time.

**C.     Congress Created the Shelter and Services Program.**

39.     Recognizing that local governments have incurred significant costs due to the influx of migrants processed and released from custody by DHS, Congress has specifically appropriated funds to offset some of those costs in each year since 2019.

40.     In July 2019, Congress passed—and President Trump signed—the Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern Border Act. That Act allocated federal funds to reimburse local governments and non-governmental organizations for some of the costs of sheltering migrants released from federal custody.

41.     From 2019 into 2023, FEMA funded and administered the humanitarian-relief program for migrants via FEMA's already existing Emergency Food and Shelter Program. FEMA and Congress referred to the migrant-specific Emergency Food and Shelter Program as "EFSP-

---

[14] Wei & Castillo, *supra*.

[15] Muzaffar Christi et al., *New York and other U.S. cities struggle with high costs of migrant arrivals*, RELIEFWEB, Sept. 27, 2023, https://reliefweb.int/report/united-states-america/new-york-and-other-us-cities-struggle-high-costs-migrant-arrivals.

[16] City of Chi., *Cost Dashboard*, https://www.chicago.gov/city/en/sites/texas-new-arrivals/home/cost-dashboard.html.

H," and Congress appropriated funds to the EFSP-H program each year.[17]

42.     In December 2022, Congress created the Shelter and Services Program. Like the Emergency Food and Shelter Program, FEMA administers the Shelter and Services Program by reimbursing non-federal entities for some of the cost of providing temporary shelter and support services to noncitizens released from DHS custody.

43.     As FEMA's website explains, Congress established and funded the Shelter and Services Program to "provide [] financial support to non-federal entities to provide sheltering and related activities to noncitizen migrants following their release from the Department of Homeland Security (DHS). The intent is to support [U.S. Customs and Border Protection] in the safe, orderly, and humane release of noncitizen migrants from short-term holding facilities."[18]

44.     Congress appropriated funds for the Shelter and Services Program in FY2023, directing "[t]hat $800,000,000 shall be transferred to 'Federal Emergency Management Agency—Federal Assistance' to support sheltering and related activities provided by non-Federal entities, including facility improvements and construction, in support of relieving overcrowding in short-term holding facilities of U.S. Customs and Border Protection." DHS Appropriations Act 2023, Pub. L. No. 117-328, Div. F, Title II.

45.     In November 2023, the U.S. Conference of Mayors called upon then-President Biden to renew the Shelter and Services Program. The Conference of Mayors explained: "While we welcome migrants to our cities, we need more help to provide them food, housing, services and

---

[17] Elizabeth M. Webster, *FEMA's Emergency Food and Shelter Program-Humanitarian Relief (EFSP-H) and the New Shelter and Services Program (SSP)*, CONG. RESEARCH SERV., Aug. 30, 2023, https://www.congress.gov/crs-product/IN12132.

[18] FEMA, *Shelter and Services Program,* https://www.fema.gov/grants/shelter-servicesprogram (last visited May 7, 2025).

access to employment."[19]

46.     Following this plea, Congress renewed the Shelter and Services Program in the DHS Appropriations Act 2024. That Act directed: "$650,000,000 shall be transferred to 'Federal Emergency Management Agency—Federal Assistance' to support sheltering and related activities provided by non-Federal entities, in support of relieving overcrowding in short-term holding facilities of U.S. Customs and Border Protection." Pub. L. No. 118-47, Div. C, Title II.

47.     These programs received bipartisan support from members of Congress representing communities across the country affected by the migrant crisis. For example, Texas Senator John Cornyn declared that "it's high time the federal government repays the Texas communities that have diverted their local taxpayers' funds to address this crisis."[20]

## II.     FEMA Awarded Multiple Shelter and Services Program Grants to Plaintiffs.

48.     FEMA allocated Shelter and Services Program funds to Plaintiffs through grants awarded between FY2023 and FY2024.

49.     FEMA provided most of that funding through "targeted" allocations via Notices of Funding Opportunity announcing the Shelter and Services Program – Allocated ("SSP-A"). In other words, FEMA limited SSP-A funds to recipients that FEMA had already deemed eligible. FEMA made its eligibility determinations for SSP-A awards based on U.S. Customs and Border Protection release-and-destination data as well as data from past EFSP-H requests.[21]

---

[19] U.S. Conference of Mayors, *More than 135 Mayors Demand Congress Include Funding for Border and Migrant Services As Part of Any Supplemental Spending Bill*, Nov. 7, 2023, https://www.usmayors.org/2023/11/07/more-than-135-mayors-demand-congress-include-funding-for-border-and-migrant-services-as-part-of-any-supplement-spending-bill/.
[20] El Paso Times Staff, *Border communities to get some federal reimbursement for migrant care from appropriations bill*, EL PASO TIMES, Aug. 2, 2019, https://www.elpasotimes.com/story/news/2019/08/02/border-states-get-some-federalreimbursement-migrant-care/1901642001/.
[21] Webster, *supra*.

50.     In June 2023, FEMA issued a Notice of Funding Opportunity for an SSP-A award under the FY2023 Shelter and Services Program. Plaintiffs were each identified as eligible applicants.

51.     The 2023 Notice of Funding Opportunity stated that the Shelter and Services Program's objective was "to provide funding to non-federal entities that serve noncitizen migrants recently released from DHS custody to temporarily provide shelter, food, transportation, acute medical care, personal hygiene supplies, and labor necessary to manage cases to provide these services," as well as to increase non-federal entities' capacity to provide those services.

52.     In April 2024, FEMA issued two Notices of Funding Opportunity for the FY2024 Shelter and Services Program. One Notice of Funding Opportunity announced the SSP-A grant for 2024, and the other announced an SSP-Competitive ("SSP-C") grant.

53.     Each FY2024 Notice of Funding Opportunity described the Shelter and Services Program's purpose as "relieving overcrowding in short-term holding facilities of U.S. Customs and Border Protection," "bolstering the capacity of non-federal entities to receive noncitizens after they have been processed by U.S. Customs and Border Protection (CBP) and released from a DHS facility," and "ensuring appropriate coordination with and support for state, local, and community leaders to help mitigate increased impacts to their communities."

A.     **FEMA Allocated Funds to Chicago Under the Shelter and Services Program.**

i.     **Direct Grants**

54.     The City of Chicago received just over $38 million dollars in direct SSP awards.

55.     FEMA issued its first grant to Chicago under the FY2023 SSP-A in August 2023 ("2023 SSP-A Grant"), with an upward revision in September 2023, awarding a total of $12,546,098.03. FEMA has largely disbursed these funds to Chicago.

56.     FEMA issued its second grant to Chicago under the FY2024 SSP-A in July 2024

("2024 SSP-A Grant"). FEMA later revised this award upwards for a total award of $13,441,881.46.

57.    FEMA issued a third grant to Chicago through a competitive bid process under the SSP-C Notice of Funding Opportunity in September 2024 ("2024 SSP-C Grant"), awarding $12,288,565.

58.    This Complaint refers to the 2024 SSP-A Grant and the 2024 SSP-C Grant as the "Chicago 2024 SSP Grants." The three Shelter and Services Program grants that FEMA awarded to Chicago directly, rather than as pass-through awards to the State of Illinois, are the "Direct Chicago SSP Grants."

### ii.    Pass-Through Grants

59.    In addition to the three Direct SSP Grants, FEMA awarded two grants to the State of Illinois under the Shelter and Services Program. The State of Illinois disburses funds received under these grants to Chicago pursuant to contracts between Chicago and Illinois ("Pass-Through SSP Grants").

60.    FEMA awarded a Pass-Through SSP Grant to the State of Illinois in August 2023 and increased the amount of the grant in September 2023 for a total award of $19,366,204. The State of Illinois has awarded the full amount of this grant to Chicago.

61.    In collaboration with Chicago, the State of Illinois submitted an initial drawdown request under the 2023 Pass-Through SSP Grant in August 2024. FEMA responded by disbursing $1,760,587.50 to the State in September 2024. The State of Illinois transferred those funds to Chicago.

62.    FEMA awarded a 2024 Pass-Through SSP Grant to the State of Illinois in July 2024 for $9,632,300. Neither Chicago nor Illinois have submitted draw requests under this grant.

63. This Complaint collectively refers to the Direct SSP Grants and the Pass-Through SSP Grants as the "Chicago SSP Grants."

**B.     FEMA Allocated Funds to Denver Under the Shelter and Services Program.**

64. Like Chicago, Denver received three direct Shelter and Services Program grants from FEMA, for approximately $32 million in total.

65. FEMA issued its first grant to Denver under the FY2023 SSP-A in June 2023, award number EMW-2023-SP-05093, with an upward revision in September 2023, awarding a total of $9,009,328.23. FEMA has disbursed $7,960,404.69 to Denver under this grant. There is an outstanding draw request under this grant for the remaining $1,048,923.31.

66. FEMA issued its second grant to Denver under the FY2024 SSP-A in April 2024. FEMA later revised this award upwards for a total award of $10,770,059.50.

67. FEMA issued a third grant to Denver through a competitive bid process under the 2024 SSP-C Grant, awarding $12,670,592.

68. This Complaint refers to the three grants awarded to Denver, collectively, as the "Denver SSP Grants."

**C.     FEMA Allocated Funds to Pima County Under the Shelter and Services Program.**

69. As above, FEMA awarded to Pima County, directly, a total of $52,627,402.00 through three separate federal funding opportunities.

70. FEMA issued its first grant award to Pima County under the FY2023 SSP-A, award number EMW-2023-SP-05067, on August 15, 2023, awarding a total of $12,093,182.00.

71. FEMA issued its second grant award to Pima County under the 2024 SSP-A Grant on July 6, 2024, award number EMW-2024-SP-05022, for a total award of $21,827,581.00. Pima County has not yet submitted a reimbursement request for expenses related to this award.

72.     FEMA issued a third grant to Pima County in September 2024, award number EMW-2024-SP-05142, through the 2024 SSP-C Grant competitive bid process, awarding a total of $18,706,639.00. Pima County has not yet incurred any costs or submitted any reimbursement requests for expenses related to this award.

73.     This Complaint refers to three grants awarded to Pima County, collectively, as the "Pima SSP Grants."

III.    **Plaintiffs, in Consultation with FEMA, Sought Reimbursement for Approved Primary Services Under Shelter and Services Program Grants.**

A.      **Chicago**

74.     FEMA issued each of the Direct Chicago SSP Grants with a funding hold for the full amount awarded. This meant that before Chicago could submit a draw request for funds under the Direct Chicago SSP Grants, FEMA required Chicago to "provide a detailed cost breakdown and justification for the cost items" enumerated in the relevant grant's budget.

75.     In December 2023, Chicago submitted an amended budget for the 2023 SSP-A Grant. The budget sought $12,739,273 to pay a vendor for 6,800 migrants' meals for 90 days, with each migrant receiving three meals per day and each meal capped at $7. The following week, FEMA approved the budget amendment in full.

76.     FEMA conducted a "desk review" of Chicago's work under the 2023 SSP-A Grant in February and March 2024. As part of that desk review, FEMA requested that Chicago provide substantial financial and accounting records related to the grant, Chicago's audited financial statements and prior fiscal year revenue, and policies and procedures regarding the New Arrivals Operation, the Shelter and Services Program budget process, and Chicago's accounting practices.

77.     In April 2024, following Chicago's submission of the requested information, FEMA notified Chicago: "There were no findings that require corrective actions. We would like to take

15

this opportunity to thank you and the Office of Budget and Management staff for being very helpful and cooperative in providing [FEMA] with the information requested for conducting this desk review."

78.     In May 2024, FEMA paid Chicago $12,546,098.03 under the 2023 SSP-A Grant.

79.     Like the 2023 SSP-A Grant, FEMA provisionally approved each of the 2024 Direct SSP Grants' budget summaries pending Chicago's submission of supporting documentation.

80.     In December 2024, based on guidance from FEMA representatives about allowable costs, Chicago submitted a budget amendment seeking approval to allocate all the 2024 Direct SSP Grants to pay a vendor for janitorial, security, laundry, and shelter management staff. Chicago submitted the following documentation for FEMA's review: a summary chart of the people served, including each migrant's name, Alien Registration Number or "A-Number" (a unique seven-to-nine digit identifier that DHS assigns to non-citizens), date of release from DHS custody, and dates of service; the invoices upon which the budget amendment was based; and proof of payment.

81.     On February 5, 2025, FEMA notified Chicago that it had approved the budget amendment and authorized Chicago to submit its drawdown requests, releasing FEMA's holds on $10,857,525 of the 2024 SSP-C Grant and $11,873,241.46 of the 2024 SSP-A Grant.[22] FEMA sent two memos to Chicago memorializing this approval, both of which read: "The change to your grant was reviewed and is hereby approved as specified below. All other terms and conditions of the grant remain unchanged."

82.     On February 6, 2025, having received FEMA's approval of the budget amendment

---

[22] FEMA retained its hold on the remainder of each grant because FEMA determined that the 2024 Direct SSP Grants did not permit certain staffing costs that Chicago identified. Accordingly, alongside its budget amendment approval, FEMA issued a Request for Information explaining the corrective action that Chicago must take to receive the remaining funds under each grant, including submission of the most recent contract with the relevant staffing agency.

and authorization to submit draw requests, Chicago submitted drawdown requests for the above amounts. FEMA has failed to disburse the requested funds to Chicago.

83. In addition to Chicago's drawdown requests, the State of Illinois submitted a drawdown request under the 2023 Pass-Through SSP Grant on January 21, 2025, seeking $15,054,116.50. This drawdown request sought reimbursement for the cost of paying a vendor for janitorial, security, nursing, and shelter management staff from March to December 2023. To support this request, Chicago provided the required supporting documentation, including a summary list of individuals served, A-numbers, invoices, and proof of payment. FEMA has not disbursed any of the money sought in the January 21 drawdown request.

### B. Denver

84. Denver, too, received its awards with a funding freeze on the full amount of the award, which means that Denver was required to submit detailed cost breakdown and justification information to FEMA for pre-approval before it could submit draw requests.

85. Denver submitted several budget amendments under the FY 2023 Denver SSP-A Grant between September 2023 and December 2024. With each budget amendment submission, Denver provided additional information to FEMA to justify allocating portions of the award to four different types of services: food, labor, shelter, and transportation. The last budget amendment that was approved for SSP-A was approved on February 5, 2025. The final budget amendment submitted for SSP-C was submitted on February 14, 2025 and has yet to be approved.

86. Denver submitted three draw requests under the 2023 Denver SSP Grant. First, on September 6, 2024, Denver submitted a payment request for $7,617,071.83, based on the budget amendment submissions that had been approved to date. This request was approved, and payment made, on or about September 10, 2024.

87. Second, on September 17, 2024, Denver submitted an additional draw request under the 2023 Denver SSP Grant for $343,332.86, which FEMA approved, and paid, on or about October 4, 2024.

88. Finally, Denver submitted a drawdown request for $1,039,200.69, the full amount remaining under the 2023 Denver SSP Grant, on January 23, 2025. To date, FEMA has not responded to that drawdown request.

89. When FEMA initially issued the 2024 Denver SSP-A Grant, in July 2024, the initial award amount was $4,852,467. However, on December 20, 2024, Denver submitted a request for a budget amendment to both approve its shelter and food costs for drawdown, and to seek an increase of the award amount.

90. To support this budget amendment, Denver submitted summary spreadsheets, proof of purchase orders, and proof of payment for food and shelter costs; a management and administrative summary spreadsheet, invoices, proof of payment, and narrative to explain the administrative costs incurred; an A-number worksheet; a copy of an A-number and release date waiver received from FEMA; and a cover letter projecting the total amount of migrants expected during the performance period and how that justified an award increase.

91. On February 5, 2025, FEMA approved Denver's requested budget amendment, and increased the total award amount to $10,770,068.50.

92. That same day, Denver submitted a draw request for $10,458,865.65, which was the total amount of food and shelter services approved in the recently-approved budget amendment, but did not include any invoices for management or administrative costs.

93. To date, FEMA has not responded to Denver's draw request under this award.

94. On January 27, 2025, Denver provided FEMA with a draft budget amendment for

the FY2024 SSP-C Grant.

95.     On January 31, 2025, a representative from FEMA sent Denver a note with two final edits and indicated that once those were made, the amendment was sufficient and should be submitted in the grant portal, FEMA GO.

96.     On February 14, 2025, Denver submitted the final budget amendment request in the FEMA GO portal.

97.     To date, FEMA has not responded to Denver's requested budget amendment under this award.

**C.     Pima County**

98.     As above, Pima County was required to submit budget amendment requests prior to submitting drawdown requests.

99.     Between September 2023 and March 2024, Pima County submitted four budget amendment requests under the 2023 Pima SSP Grant, all of which were approved. These budget amendments reflected Pima County's use of the Shelter and Services Program funds for food and labor for primary services. In addition, Pima County used a portion of the 2023 Pima SSP Grant to pay (a) costs related to transportation for migrants coming from neighboring counties and (b) for shelter and utilities.

100.    Pima County has submitted multiple draw requests under the 2023 Pima SSP Grant pursuant to the approved budget amendments. First, in August 2024, Pima County submitted a reimbursement request. Pima County subsequently resubmitted that draw request due to a calculation error in the original request, for a total amount of $3,092,423.08.

101.    To support this draw request, Pima County submitted all required documentation with the reimbursement request through FEMA GO, which included the list of A-numbers for all migrants served by Pima County during the period associated with the request, as well as a

complete listing of the itemized expenses and required back-up documentation and invoices for expenses to be reimbursed. The invoices included information about personnel, utilities, and shelter maintenance costs.

102.    FEMA approved payment for $3,092,423.08 on October 18, 2024.

103.    In November 2024, Pima County received a notice from FEMA, via email, of a "Pima County SSP intent to monitor." The email indicated that FEMA would conduct a financial and programmatic monitoring site visit on January 15, 2025, and requested documents be sent to them for review by December 23, 2024.

104.    On December 6, 2024, Pima County submitted a second reimbursement request for the 2023 Pima SSP Grant for $5,771,917.04.

105.    Pima County submitted to FEMA all requested documentation on December 23, 2024.

106.    On January 6, 2025, FEMA informed Pima County via email that the programmatic monitoring site visit scheduled for January 15, 2025 would now be a "desk review" held on March 12, 2025. FEMA also requested additional documentation, which Pima County submitted.

107.    On January 24, 2025, FEMA again wrote to Pima County requesting further documentation. Pima County submitted all requested materials in February 2025.

108.    In late February 2025, a Pima County employee contacted FEMA to inquire about the status of the upcoming desk review. In response, a FEMA representative wrote, "Thank you for your patience. We hope to have additional information for you soon."

109.    Since February 2025, Pima County has received no additional communication related to the desk review. March 12, 2025 came and went, with no additional correspondence from FEMA related to the impending review.

110. In early May 2025, almost six months after submitting its second reimbursement request and close to seven months since FEMA indicated that it would be conducting additional monitoring, Pima County sent a follow-up email to again check on the status of the review and payment. To date, Pima County has not received a response to this inquiry.

111. Pima County has not submitted requests for reimbursement under the 2024 Pima SSP-A Grant. If it had the opportunity to do so, Pima County could provide documentation sufficient to support a reimbursement request of approximately $3,674,153.11.

## IV. The Trump Administration Ramps Up Its Assault on FEMA, "Sanctuary Cities," and the Shelter and Services Program.

### A. President Trump and His Political Allies Spread Misinformation About the Shelter and Services Program.

112. President Trump and his political allies have increasingly spread misinformation about the Shelter and Services Program, beginning even before the November 2024 election.

113. In October 2024, then-candidate Trump accused the Biden Administration of stealing "the FEMA money like they stole it from a bank so they could give it to their illegal immigrants that they want to have vote for them this season."[23]

114. Candidate Trump's running mate, current Vice President JD Vance, followed suit. Vance falsely claimed in October 2024 that the Shelter and Services Program constituted an unlawful theft of disaster relief funds from deserving Americans to bankroll "illegal" immigration. Vance stated: "I know beyond a shadow of a doubt that our own government is sending billions of dollars to illegal aliens."[24]

---

[23] Nikki McCann Ramirez, *Trump's Lies About the Hurricane Response Are Getting More Outrageous*, ROLLING STONE, Oct. 23, 2024, https://www.rollingstone.com/politics/politics-news/trump-fema-hurricane-helene-migrants-1235124342/.

[24] Anna Skinner, *JD Vance Calls Out Amount of Hurricane Funding After Skipping FEMA Vote*, NEWSWEEK, Oct. 4, 2024, https://www.newsweek.com/jd-vance-fema-funding-hurricane-disgrace-1964231.

115.     This hostility to the Shelter and Services Program did not dissipate once President Trump took office. For example, at Secretary Noem's confirmation hearing, Senator Ruben Gallego pressed Noem on whether the Shelter and Services Program would remain were she confirmed to run the agency. Secretary Noem responded in relevant part:

> My hope is that if given the opportunity to serve as secretary, that the federal government would no longer, and I believe as President Trump has promised the American people, facilitate an illegal alien invasion. ... I know we talked extensively about the SSP program and how you've utilized it, but getting these programs back to what they were intended is important to FEMA as a disaster response agency, and some of the facilities that have been utilizing these types of funds and dollars need to be reevaluated and to make sure that it's truly doing the service that is upholding our nation's laws.[25]

### B.     The Invasion Executive Order and its Implementation

116.     Immediately upon taking office, President Trump issued Executive Order 14,159, titled "Protecting the American People Against Invasion" ("Invasion Executive Order"). Although acknowledging that the increase in migrant border crossings "cost taxpayers billions of dollars at the Federal, State, and local levels," the Invasion Executive Order directed the DHS Secretary to ensure that "so-called 'sanctuary' jurisdictions ... do not receive access to Federal funds."

117.     On January 27, 2025, the United States Office of Management and Budget sent a directive to agency heads titled "Temporary Pause of Agency Grant, Loan, or Other Financial Assistance" ("OMB Directive"). The OMB Directive required federal agencies to "identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements," specifically including the Invasion Executive Order, and "pause all activities related to obligation or disbursement of all Federal financial assistance ... that may be implicated by" it.

118.     On January 28, 2025, Secretary Noem issued a "Memorandum for Component and

---

[25] Kristi Noem Confirmation Hearing, https://www.rev.com/transcripts/kristi-noem-confirmation-hearing.

Office Heads" titled "Direction on Grants to Non-governmental Organizations" ("First Noem Memo"). The First Noem Memo directed DHS employees to put "on hold, pending review" all "grant disbursements and assessments of grant applications that (a) go to non-profit organizations or for which non-profit organizations are eligible, and (b) touch in any way on immigration," specifically including the Shelter and Services Program.

119.    The same day, 22 States filed a lawsuit challenging the OMB Directive's across-the-board pause on federal funding disbursements. *See N.Y. v. Trump*, No. 25-cv-39 (D.R.I.) ("*New York v. Trump*"). The court temporarily restrained enforcement of the OMB Directive on January 31, 2025, and later issued a preliminary injunction. The court explained: "The OMB Directive essentially ordered agencies to effectuate the blanket pause and then decide later which funding streams they actually had lawful authority to withhold." *Id.*, Dkt. 161 at 34. The court observed that "Defendants have not proffered a rational reason for how their alleged goal of safeguarding taxpayer funds justified a de facto suspension of nearly all federal funding." *Id.* at 35.

120.    Undeterred, Secretary Noem issued another memo on February 19, 2025, titled "Restricting Grant Funding for Sanctuary Jurisdictions" ("Second Noem Memo"). The Second Noem Memo directed DHS agencies and offices to withhold funds from state and local governments that do not help federal immigration authorities enforce federal civil immigration law:

> If any government entity chooses to thumb its nose at the Department of Homeland Security's national security and public safety mission, it should not receive a single dollar of the Department's money unless Congress has specifically required it.

121.    On March 20, 2025, then-Acting Administrator Hamilton sent a memo to Secretary Noem titled "Approval of FEMA-Administered Grant Disbursements" ("Hamilton Memo"). The Hamilton Memo described the process by which FEMA would determine whether funding under a given program should be (a) paused pursuant to the First Noem Memo or (b) withheld pursuant

to the Second Noem Memo. The Hamilton Memo recommended that DHS "review for termination" every award issued under the Shelter and Services Program, even while acknowledging that the Shelter and Services Program's purpose is "to provide funds to non-federal entities for sheltering and related activities to aliens following their release from DHS. The intent is to support Customs and Border Protection in the safe, orderly, and humane release of aliens from short-term holding facilities."

122.    The States moved to enforce the preliminary injunction in *New York v. Trump*, including motions addressing FEMA's withholding of payments under a purported "manual review process" that the States argue is a *de facto* funding freeze by another name. *See* Dkt. 168 at 7-9. In support of the States' recent motion to enforce, the State of Colorado filed a declaration stating that Colorado submitted a drawdown request under the Shelter and Services Program on February 19, 2025, but the payment was either denied or is still pending. Dkt. 168-3 ¶ 17.

123.    The district court granted the States' motion, holding that FEMA "violate[d] the Court's preliminary injunction order" because the Hamilton and Noem Memos were "covertly based on the Invasion Executive Order—"which the Court enjoined in its preliminary injunction." Dkt. 175 at 10-13. The court therefore ordered: "FEMA must immediately comply with the plain text of the preliminary injunction order not to pause or otherwise impede the disbursement of appropriated funds to the States based on funding freezes dictated, described, or implied by Executive Orders issued by the President before the rescission of the OMB Directive, which includes sections 17 and 19 of the Invasion Executive Order." *Id.* at 14; *see also* Dkt. 182 (denying reconsideration).

### C.    FEMA Eliminated Funding Under the Shelter and Services Program Without Notice.

124.    In a declaration filed in *Does v. Musk*, No. 25-cv-462 (D. Md.), former FEMA Chief

Financial Officer Mary Comans stated that on February 5, 2025, she attended a meeting with FEMA and DHS leadership as well as members of the United States DOGE Service ("DOGE"). *Id*., Dkt. 36 at 51.

125.   Per Ms. Coman's declaration, DOGE team members asked FEMA's leadership to affirm that FEMA had stopped all payments under the Shelter and Services Program to non-governmental organizations. A FEMA representative affirmed that it had. *Id*. at 50.

126.   A DOGE team member then asked the FEMA representative whether payments to state and local governments under the Shelter and Services Program continued. When the FEMA representative responded that those payments were continuing, Ms. Comans averred, the DOGE team member said that was "the right answer." *Id*.

127.   On February 9, 2025, the DHS Deputy Chief of Staff directed Ms. Comans to give DOGE "full system access to FEMA's financial system," which she did. *Id*. at 51.

128.   On February 10, 2025, Elon Musk posted a tweet rehashing many of the same false statements that his political allies had been making for months, this time about New York City's supposed misuse of Shelter and Services Program funds:



129.    Two hours later, then-Acting Administrator Hamilton responded to Musk's tweet,

announcing that "these payments have all been suspended from FEMA":



130.    Then-Acting Administrator Hamilton followed up with a second tweet a few

minutes later:

26



131.    Though FEMA's disbursement to New York City apparently prompted these actions, DOGE's and FEMA's attention was not only directed at New York City.

132.    On February 10, 2025, FEMA's Director of the Office of Grants Administration instructed agency staff to place "hold toggles" and "financial holds" on "all [FEMA] awards."

133.    Moreover, data on USASpending.gov—the official repository of federal government spending data—indicate that someone with access to FEMA's financial systems "zeroed out" the available funds under the Direct Chicago SSP Grants on February 10, 2025.[26]

134.    USASpending.gov reflects that Chicago's 2024 SSP-C Grant was revised down by more than $12 million dollars, with $0 currently obligated under the grant. It appears that this change was made on February 10, 2025:



| Transaction History | | Sub-Awards 0 | Federal Account Funding | | | |
|---|---|---|---|---|---|---|
| Modification Number | Assistance Listing | Action Date | Amount | Action Type | Transaction Description | |
| -- | 97.141 | 02/10/2025 | -$12,288,565 | C: REVISION | SHELTER AND SERVICES PROGRAM | |
| 0 | 97.141 | 09/26/2024 | $12,288,565 | A: NEW | SHELTER AND SERVICES PROGRAM | |

[26] According to an explainer on USASpending.gov, transaction-level changes to federal grants—such as grant revisions—occur in the agency's financial system and are then reported by the agency to the USASpending.gov website.

| | |
|---|---|
| ● Outlayed Amount | $0.00 |
| ● Obligated Amount | $0.00 |
| ○ Non-Federal Funding | $0.00 |
| ○ Total Funding | $0.00 |

135.    Similarly, Chicago's 2024 SSP-A Grant was revised down by more than $13 million

on February 10, 2025, so that the current amount obligated under the award is also $0:



| Modification Number | Assistance Listing | Action Date | Amount | Action Type | Transaction Description |
|---|---|---|---|---|---|
| -- | 97.141 | 02/10/2025 | -$513,441,881 | C: REVISION | SHELTER AND SERVICES PROGRAM |
| 0 | 97.141 | 07/08/2024 | $9,632,300 | A: NEW | SHELTER AND SERVICES PROGRAM |
| 1 | 97.141 | 09/10/2024 | $3,809,581 | C: REVISION | SHELTER AND SERVICES PROGRAM |

| | |
|---|---|
| ● Outlayed Amount | $0.00 |
| ● Obligated Amount | $0.00 |
| ○ Non-Federal Funding | $0.00 |
| ○ Total Funding | $0.00 |

136.    Chicago did not receive notice or explanation of these downward revisions, which

occurred just four days after FEMA approved Chicago to submit draw requests totaling more than

$22 Million under its 2024 SSP Grants.

137.    The two Chicago Pass-Through SSP Grants were similarly revised downward from

more than $27 million on February 10, 2025, resulting in $0 in obligated funds left to draw upon:



| Modification Number | Assistance Listing | Action Date | Amount | Action Type | Transaction Description |
|---|---|---|---|---|---|
| -- | 97.141 | 02/10/2025 | -$9,632,300 | C: REVISION | SHELTER AND SERVICES PROGRAM |
| 0 | 97.141 | 07/08/2024 | $9,632,300 | A: NEW | SHELTER AND SERVICES PROGRAM |

28



| Modification Number | Assistance Listing | Action Date | Amount | Action Type | Transaction Description |
|---|---|---|---|---|---|
| -- | 97.141 | 02/10/2025 | -$17,605,617 | C: REVISION | SHELTER AND SERVICES PROGRAM |
| -- | 97.141 | 09/28/2023 | $2,647 | A: NEW | SHELTER AND SERVICES PROGRAM |
| -- | 97.141 | 08/11/2023 | $19,363,557 | A: NEW | SHELTER AND SERVICES PROGRAM |

138.    According to USASpending.gov, other recipients of Shelter and Services Program funds also had their grant awards zeroed out on February 10, 2025. For example, the FY2023 Shelter and Services Program grant award to Plaintiff Pima County was revised downward by over $9 million dollars on February 10, 2025, such that it appears that $0 remains to be disbursed:



| Modification Number | Assistance Listing | Action Date | Amount | Action Type | Transaction Description |
|---|---|---|---|---|---|
| -- | 97.141 | 09/28/2023 | $3,728,256 | B: CONTINUATION | SHELTER AND SERVICES PROGRAM |
| -- | 97.141 | 08/15/2023 | $8,364,926 | A: NEW | SHELTER AND SERVICES PROGRAM |
| -- | 97.141 | 02/10/2025 | -$9,000,759 | C: REVISION | SHELTER AND SERVICES PROGRAM |



| ● Outlayed Amount | $3,092,423.08 |
|---|---|
| ● Obligated Amount | $3,092,423.08 |
| ○ Non-Federal Funding | $0.00 |
| ○ Total Funding | $3,092,423.08 |

139.    An FY2024 Shelter and Services Program grant award to Plaintiff City of Denver was similarly revised downward on February 10, 2025, such that the amount obligated under the grant now appears to be $0:

| Modification Number | Assistance Listing | Action Date | Amount | Action Type | Transaction Description |
|---|---|---|---|---|---|
| -- | 97.141 | 02/10/2025 | -$12,670,592 | C: REVISION | SHELTER AND SERVICES PROGRAM |
| 0 | 97.141 | 09/24/2024 | $12,670,592 | A: NEW | SHELTER AND SERVICES PROGRAM |

| | |
|---|---|
| ● Outlayed Amount | $0.00 |
| ● Obligated Amount | $0.00 |
| ○ Non-Federal Funding | $0.00 |
| ○ Total Funding | $0.00 |

140. Indeed, every Shelter and Services Program grant award visible on USASpending.gov was zeroed out on February 10, 2025, such that there are no more obligated funds left for any recipient to draw on pursuant to *any* Shelter and Services Program grant. This Complaint refers to the zeroing out of all Shelter and Services Program grant balances as the "February 10 Funding Terminations."

141. When a grant award is revised downward in FEMA's financial system, this has the effect of "de-obligating" funds that FEMA was previously obligated to pay under the grant.

142. The February 10 Funding Terminations had the effect of making it impossible for grantees to draw down funds under these grants.

143. Money that was duly obligated pursuant to a federal appropriation must be maintained in the related appropriations account and must remain available for adjustments, or payments of obligations "properly chargeable to that account." 31 U.S.C. § 1553. Accounts containing obligated but unspent funds can only be closed out, and the remaining account balances canceled, five years after the obligation period for the account has ended. *See* 31 U.S.C. § 1552(a). Indeed, the government has acknowledged that DHS was obligated to maintain all accounts for the 2024 Shelter and Services Program grants until September 30, 2029. *See City of N.Y. v. Trump*, No. 25-cv-01510, Dkt. 17 at 18 (S.D.N.Y. Feb. 28, 2025).

144. Only Congress may authorize an agency to de-obligate funds and move them out of their designated accounts before the date set by Section 1552(a). *See Dabney v. Reagan*, 1985 WL 443 (S.D.N.Y. Mar. 21, 1985) (finding bank could only depart from the procedures set forth

in 31 U.S.C. §§ 1552 and 1553 because Congress specifically authorized the alternative procedure in statute). DHS did not obtain Congressional approval for the February 10 Funding Terminations.

145.    On February 11, 2025, then-Acting Administrator Hamilton averred in a sworn declaration that FEMA had, as of that date, "paused funding for the Shelter and Services Program based on significant concerns that the funding is going to entities engaged in or facilitating illegal activities." *N.Y. v. Trump*, Dkt. 102-1 ¶ 6. Hamilton suggested that *all* Shelter and Services Program grantees may violate a law that (as described more fully below) criminalizes knowingly sheltering or transporting a person who is in the United States "in violation of law." 8 U.S.C. § 1324. Hamilton asserted that "on its face, the program funds sheltering and transportation for unauthorized aliens." Dkt. 102-1 ¶ 10.

146.    Also on February 11, 2025, FEMA fired four employees, including Ms. Comans, for their alleged roles in disbursing Shelter and Services Program funds to New York City.[27] DHS issued a press release stating that FEMA fired Ms. Comans "for circumventing leadership to unilaterally make egregious payments for luxury NYC hotels for migrants." The press release asserted that "DHS will not sit idly and allow deep state activists to undermine the will and safety of the American people."[28] Mr. Musk then tweeted a picture of Ms. Comans and asserted that her actions were "criminal." Ms. Comans has sued DHS and FEMA. *See Comans v. Dep't of Homeland Sec.*, No. 25-cv-624 (D.D.C.).

147.    New York City also filed a lawsuit challenging (a) the clawback of more than $80 million dollars in Shelter and Services Program funds that FEMA had deposited in a New York

---

[27] Luis Ferré-Sadurní, *Top FEMA Official Is Fired Over Payments for N.Y.C. Migrant Shelters*, N.Y. Times, Feb. 11, 2025, https://www.nytimes.com/2025/02/11/nyregion/fema-fired-nyc-migrant-hotels.html.

[28] Statement from DHS Spokesperson on Termination of 4 FEMA Employees Who Made Payments to Luxury Hotels for Migrants, Feb. 11, 2025, https://www.dhs.gov/news/2025/02/11/statement-dhs-spokesperson-termination-4-fema-employees-who-made-payments-luxury.

City bank account and (b) FEMA's "suspension" of the Shelter and Services Program as well as FEMA's "use of a pretextual compliance review process to mask and provide legal cover to the suspension." *City of N.Y. v. Trump*, No. 25-cv-01510, Dkt. 44 ¶¶ 1, 19-20 (S.D.N.Y. Mar. 20, 2025).

148.     In a declaration filed in *City of New York v. Trump* on February 28, 2025, then-Acting Administrator Hamilton reiterated that he is "concerned that entities receiving payment" under the Shelter and Services Program "may be guilty of" violating 8 U.S.C. § 1324 because "on its face, the program funds sheltering and transportation for illegal aliens." *Id.*, Dkt. 17-1 ¶ 8.

## V.     After Eliminating Shelter and Services Program Grant Balances, FEMA First Froze Grant Funding and Later Terminated the Program Altogether.

### A.     FEMA Issued Noncompliance Letters that Failed to Identify Noncompliance.

149.     A full month after the February 10 Funding Terminations and more than 30 days after receiving drawdown requests under multiple of Plaintiffs' SSP awards, then-Acting Administrator Hamilton sent letters to Plaintiffs titled "Remedy for Noncompliance Letter, Shelter and Services Program (SSP)." On information and belief, FEMA sent substantively identical letters to other Shelter and Services Program grantees that same day, including Brownsville, Texas.[29] Although FEMA sent the letters on March 12, 2025, the letters are dated March 11, 2025, and are therefore called the "March 11 Letters."

150.     The March 11 Letters announced that "DHS/FEMA is temporarily withholding payments to your organization" under the Shelter and Services Program and forbids recipients from incurring additional costs under the grant until notified further.

151.     The March 11 Letters did not acknowledge that the grant payments the letters purported to "temporarily" withhold ***had already been zeroed out in FEMA's financial system***

---

[29] Uriel J. Garcia et al., *FEMA wants the names and addresses of migrants helped by Texas nonprofits and local governments that got federal grant money*, TEXAS TRIBUNE, Mar. 13, 2025, https://www.texastribune.org/2025/03/13/texas-fema-federal-grants-immigrants/.

more than a month earlier. Instead, the March 11 Letters provided various justifications for the so-called "temporary" withholding, none of which have a basis in either fact or law.

152. The March 11 Letters stated that this withholding is "pursuant to 2 C.F.R. § 200.339(a)," which the Letters said permits "a hold on funds" if FEMA finds "***potential*** or actual noncompliance" by the grantee. (Emphasis added). In fact, section 200.339(a) allows an agency to "temporarily withhold payments until the recipient or subrecipient takes corrective action … [w]hen the Federal agency ... determines that noncompliance cannot be remedied by imposing specific conditions." Section 200.339(a) thus does not permit agencies to withhold payments based on mere "potential" noncompliance.

153. The March 11 Letters did not identify actual noncompliance, much less assert an inability to remedy any noncompliance through the imposition of specific conditions. Instead, in a section titled "Findings," the March 11 Letters stated in relevant part:

> The Department of Homeland Security has significant concerns that SSP funding is going to entities engaged in or facilitating illegal activities. The Department is concerned that entities receiving payment under this program may be guilty of encouraging or inducing an alien to come to, enter, or reside in the United States in violation of law, 8 U.S.C. § 1324(a)(1)(A)(iv); transporting or moving illegal aliens, id. § 1324(a)(1)(A)(ii); harboring, concealing, or shielding from detection illegal aliens, id. § 1324(a)(1)(A)(iii); or applicable conspiracy, aiding or abetting, or attempt liability respecting these statutes.

154. The March 11 Letters' reliance on section 1324 does not permit FEMA to withhold funding for four independent reasons.

155. First, neither section 200.339(a) nor any other authority cited in the March 11 Letters allow FEMA to withhold funding based on mere "concerns."

156. Second, the premise of the March 11 Letters—that grantees violate section 1324 by engaging in activities that Congress authorized and funded through the Shelter and Services Program—is absurd. Congress does not fund activity that Congress declared illegal. Indeed, the

March 11 Letters' premise suggests that DHS employees who processed and released migrants into the United States, State of Texas employees and others who transported those migrants, and every grantee that helped those migrants committed crimes under section 1324. That is preposterous.

157.    Third, the March 11 Letters cited no evidence that grantees "knew" that the migrants they helped were in the United States "in violation of law"—"a qualification in each clause of § 1324(a)(1)(A))." *United States v. Borrero*, 771 F.3d 973, 977 (7th Cir. 2014). On the contrary, Chicago and Pima County received reimbursement under the Shelter and Services Program only for services provided to people whom DHS processed, provided A-Numbers, and released into the United States.

158.    Fourth, the March 11 Letters did not identify violations of the cited section 1324 provisions:

a.      Section 1324(a)(1)(A)(ii) imposes penalties against anyone who "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law." Chicago has not sought reimbursement under the Shelter and Services Program for the cost of transporting migrants, much less has any Plaintiff transported migrants with "guilty knowledge that [the] transportation activity furthers an alien's illegal presence in the United States." *United States v. Parmelee*, 42 F.3d 387, 391 (7th Cir. 1994).

b.      Section 1324(a)(1)(A)(iii) imposes penalties on anyone who in "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or

attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation." The Seventh Circuit has rejected the notion "that 'to harbor' just means to house a person." *United States v. Costello*, 666 F.3d 1040, 1043 (7th Cir. 2012). Rather, harboring requires "that the defendant intended to safeguard that alien from the authorities." *United States v. McClellan*, 794 F.3d 743, 751 (7th Cir. 2015). Far from safeguarding migrants from Defendants, Plaintiffs told FEMA where Plaintiffs housed each migrant. Pima County was even expecting to welcome FEMA on-site on the day this purported noncompliance letter was issued. *See Borrero*, 771 F.3d at 977 (noncitizens whom "the United States knows about … cannot be shielded from detection" under section 1324(a)(1)(A)(iii)).

c.      Section 1324(a)(1)(A)(iv) imposes penalties on anyone who "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law." Simply helping people in need does not violate this provision. *See Borrero*, 771 F.3d at 979 (section 1324(a)(1)(A)(iv) is "inapplicable to the provision of goods and services that are attractive to unauthorized aliens, legally residing aliens, and citizens alike"). Nor did the March 11 Letters suggest that grantees "intend[ed]" to encourage migrants to reside in the United States. *United States v. Hansen*, 599 U.S. 762, 782 (2023). On the contrary, Chicago asked Texas to stop busing migrants to Chicago.[30]

d.      Section 1324(a)(1)(A)(v) imposes penalties on anyone who "engages in any conspiracy to commit any of the preceding acts, or … aids or abets the commission of any of the preceding acts." The March 11 Letters did not identify any way in which grantees

---

[30] David Cohen, *Chicago's mayor urges Texas governor not to ship more migrants*, POLITICO, Apr. 30, 2023, https://www.politico.com/news/2023/04/30/lori-lightfoot-greg-abbott-migrants-00094588.

intentionally contributed to a violation of sections 1324(a)(1)(A)(ii)-(iv). *See Borrero*, 771 F.3d at 975, 977-79 (rejecting section 1324(a)(1)(A)(v) claim).

159.    Regulations omitted from the March 11 Letters confirm that FEMA cannot withhold funding based on supposed "concerns" about "potential" section 1324 violations. The governing regulations in effect when FEMA awarded grants under the Shelter and Services Program provided: "Unless otherwise required by Federal statutes, payments for allowable costs by non-Federal entities must not be withheld at any time during the period of performance unless" specified factors exist. 2 C.F.R. § 200.305(b)(6) (eff. Aug. 13, 2020). Beyond the March 11 Letters' unsupported "concerns" about "potential" section 1324 violations, the Letters did not identify any factor enumerated in 2 C.F.R. § 200.305(b)(6) that would permit FEMA to withhold funding.

160.    In addition, governing regulations provided that for non-State recipients of federal reimbursement dollars, "the Federal agency ... must make payment within 30 calendar days after receipt of the payment request unless the Federal agency ... reasonably believes the request to be improper." *Id.* § 200.305(b)(3). Plaintiffs did not receive payment within 30 days after submitting drawdown requests to FEMA, and the March 11 Letter did not identify a "reasonabl[e] belie[f]" that any of Plaintiffs' draw requests were "improper."

161.    Citing 2 C.F.R. § 200.208, the March 11 Letters also imposed two specific conditions on Shelter and Services Program Grants. Those conditions are inconsistent with FEMA's withholding of funding under 2 C.F.R. § 200.339(a), which allows an agency to withhold payments only after it "determines that noncompliance ***cannot*** be remedied by imposing specific conditions." (Emphasis added).

162.    Beyond this inconsistency, section 200.208(b) allows federal agencies to adjust specific conditions in grants based on an analysis of four listed factors, such as whether the grantee

36

"has inadequate financial capability to perform the Federal award." The March 11 Letters did not identify or discuss these factors. Nor did the March 11 Letters otherwise indicate that Defendants evaluated these factors when imposing the specific conditions.

163.    Moreover, before imposing specific conditions, a federal agency must notify the grantee "why the specific condition(s) is being imposed" and "[t]he nature of the action needed to remove the specific condition(s)." 2 C.F.R. § 200.208(d). Because the March 11 Letters failed to identify any facts that gave rise to the imposition of specific conditions, they provided no means by which grantees could correct any purported condition giving rise to their imposition.

164.    The first condition imposed by the March 11 Letters demanded that grantees either produce (a) "[a]ll documents" concerning people with whom the grantee, their "subrecipients," and their "contract[or]s" "interacted with in carrying out the scope of your SSP award, including their names and contact information; and a detailed and descriptive list of specific services provided, and proof of provision of these services" or (b) "a written statement" that the grantees "already submitted all of the information identified in the preceding request" ("Reporting Condition").

165.    The Reporting Condition seeks information that is largely already in FEMA's possession. For example, when Chicago submitted its request for a budget amendment related to its 2024 SSP Grants in December 2024, Chicago supplied the name and A-Number for people for whom Chicago sought reimbursement as well as proof of services rendered to those people.

166.    Defendants also likely have access to extensive migrant contact information in their own files and thus have no need for "all documents" regarding each migrant served by each Plaintiff. For example, Defendants should possess application forms for asylum (I-589), adjustment of legal status (I-485), and temporary protected status (I-821). Those forms require

applicants to provide multiple points of contact, including mailing addresses, phone numbers, contact information for family members, and sometimes an email address. This surpasses the limited contact information that Plaintiffs collected and maintained. And none of this information is relevant to FEMA's investigation into the agency's supposed "concerns" about "potential" criminal activity by "entities receiving payment under this program."

167. In recent months, the federal government has taken unprecedented steps to obtain immigrants' contact information in an apparent attempt to further the current Administration's "mass deportation" campaign. For example, the Internal Revenue Service has reportedly agreed to provide DHS with undocumented immigrants' contact information.[31] Based on these actions and the March 11 Letters' failure to identify a basis for demanding additional migrant contact information, Plaintiffs allege that FEMA made this demand for purposes unrelated to any legitimate investigation of grantees' conduct under the Shelter and Services Program.

168. In addition to the Reporting Condition, the March 11 Letters stated that FEMA "will be imposing" a second condition (the "Certification Condition") as follows: "to ensure compliance with all applicable federal laws and regulations in the execution of your SSP award, FEMA will be imposing an additional special condition that requires you, and the executive officers of any subrecipient or contractor that receives funding under the award, to sign an affidavit attesting that you and they have not participated in, and have no knowledge or suspicion that anyone in your or their organizations participated in, any crime cognizable under 8 U.S.C. §§ 1324(a)(1)(A)(iv); 1324(a)(1)(A)(ii); or 1324(a)(1)(A)(iii)."

169. The Certification Condition has no clear purpose, as it largely duplicates what

---

[31] Marshall Cohen & Renee Marsh, *IRS reaches data-sharing deal with DHS to help find undocumented immigrants for deportation*, CNN, Apr. 8, 2025, https://www.cnn.com/2025/04/08/politics/irs-dhs-sign-data-deal-undocumented-immigrants/index.html.

Plaintiffs have already provided to FEMA.

170. For example, in its most recent drawdown requests under the Chicago Direct SSP Grants, Chicago certified "that all entities represented by this application have, or will have, internal controls and processes in place to clearly identify migrants who will be receiving services to be funded by SSP dollars and to ensure said migrants were processed and released from DHS apart from other populations served." Chicago also certified that "all entities represented by this application have or will have verified status and release dates of served noncitizen migrants by Alien Registration Number (A-number) or evidence of DHS processing (e.g., I-94, I-385, I-860, I-862) for any A-numbers being submitted with this application."

171. These certifications provide assurances that Chicago has used Shelter and Services Program funds only to help migrants whom DHS processed and determined appropriate for release into the United States.

**B. FEMA Terminated the Shelter and Services Program Grants Before the Deadline to Answer the March 11 Letters Elapsed.**

172. On April 1, 2025, then-Acting Administrator Hamilton sent substantively identical letters to Plaintiffs, as well as to the State of Illinois, this time terminating each of Plaintiffs' Shelter and Services Program awards, including Chicago's Pass-Through SSP Grants, "effective immediately." On information and belief, Hamilton sent substantively identical letters to all other Shelter and Services Program grantees on April 1, 2025 (together, "April 1 Letters").

173. Hamilton sent the April 1 Letters without awaiting responses to the March 11 Letters, which demanded responses by April 10, 2025.

174. Whereas the March 11 Letters withheld funding based on purported concerns about compliance with 8 U.S.C. § 1324, the April 1 Letters justified FEMA's termination decision by citing a different reason: that the grants "'no longer effectuate [] the program goals or agency

priorities.'" (Quoting 2 C.F.R. § 200.340(a)(2) (2020)). The April 1 Letters asserted that FEMA took this action "pursuant to the terms and conditions of the grant awards," which the Letters defined to include the applicable Notices of Funding Opportunity and 2 C.F.R. § 200.340(a)(2).

175. FEMA's assertion is a red herring. Neither the Notices of Funding Opportunity nor 2 C.F.R. § 200.340(a)(2) authorize FEMA to terminate *every* Shelter and Services Program award at once simply because the agency no longer approves of the program.

176. The Notices of Funding Opportunity do not permit FEMA to terminate all Shelter and Services Program grants based on changed "program goals or agency priorities." Rather, the Notices of Funding Opportunity for the grants identify only three permissible reasons for termination: (1) noncompliance; (2) on consent of the recipient; or (3) upon written notice from the recipient.

177. Nor does 2 C.F.R. § 200.340(a)(2) permit FEMA to terminate *each and every* Shelter and Services Program grant based on changed "program goals or agency priorities." Federal regulations require agencies to "make recipients aware, in a clear and unambiguous manner" of the "applicable termination provisions in the Federal awarding agency's regulations or in each Federal award." 2 C.F.R. § 200.211(c)(1)(v); *see also id.* § 200.340(b) (agencies "must clearly and unambiguously specify all termination provisions applicable to each Federal award, in applicable regulations or in the award, consistent with this section"). Nothing in either the Notices of Funding Opportunity or the applicable regulations contemplates a wholesale shutdown of every grant award at once.

178. Moreover, 2 C.F.R. § 200.340(a)(2) does not permit termination for the reason provided in the April 1 Letters, for at least three independent reasons.

179. First, agencies may terminate grants under section 200.340(a)(2) only when

"authorized by law." In enacting the Shelter and Services Program to reimburse non-federal entities for the cost of caring for migrants released by DHS, Congress did not authorize FEMA to terminate grants *en masse* based on FEMA's disagreement with the Program's purpose.

180.    Second, in amending section 200.340 to add subsection (a)(2), the Office of Management and Budget responded to concerns that "the proposed language will provide Federal agencies too much leverage to arbitrarily terminate awards without sufficient cause" by emphasizing that "agencies are not able to terminate grants arbitrarily." Guidance for Grants and Agreements, 85 Fed. Reg. 49506 (Aug. 13, 2020). The Office explained:

> The intent of this change is to ensure that Federal awarding agencies prioritize ongoing support to Federal awards that meet program goals. For instance, following the issuance of a Federal award, if additional evidence reveals that a specific award objective is ineffective at achieving program goals, it may be in the government's interest to terminate the Federal award.

*Id.* This explanation makes clear that an agency cannot terminate a grant based on mid-grant changes in the agency's ***own*** goals. Rather, section 200.340(a)(2) permits terminations only if the grantee is ineffective in advancing the ***program's*** original goals. The April 1 Letters performed no such individualized analysis. The April 1 Letters did not even argue that grantees have been ineffective in caring for migrants released by DHS, much less produce evidence to that effect.

181.    Third, even if section 200.340(a)(2) allowed FEMA to terminate individual grants based on changes in FEMA's own goals, FEMA failed to offer a reasonable explanation why terminating all Shelter and Services Program grants will further FEMA's stated goals.

182.    The April 1 Letters asserted that DHS's new priorities under "President Trump's direction" focus on "advancing the essential mission of enforcing immigration laws and securing the border." Grant programs that "support, or have the potential to support, illegal immigration through funding illegal activities or support for illegal aliens" are not "consistent with DHS's enforcement focus" and "do not effectuate the agency's current priorities." The April 1 Letters did

not, however, explain how coordinating with DHS to provide shelter and services to migrants processed by DHS and released from DHS custody is inconsistent with enforcing immigration laws or securing the border.

183.     The April 1 Letters also asserted that migrants receiving services under the Shelter and Services Program "often have no legal status and are in the United States unlawfully … this, in turn, provides support for illegal aliens and is not consistent with DHS's current priorities." That assertion contradicts the April 1 Letters' acknowledgement that the Shelter and Services Program limits funding to entities that provide services to migrants "released from DHS short-term holding facilities"—i.e., migrants whose status is known to DHS and who have *not* been found to be in the United States illegally.

184.     In fact, the April 1 Letters indicate that FEMA terminated Shelter and Services Program grants because grantees "carr[ied] out the purposes of the SSP identified in the awards' respective [Notices of Funding Opportunity]" by "provid[ing] shelter, food, transportation, acute medical care and personal hygiene supplies for individuals released from DHS short-term holding facilities." In other words, FEMA terminated the program because grantees accomplished the very purpose that Congress identified in enacting the Shelter and Services Program.

185.     The April 1 Letters require grantees to "complete all closeout procedures" by submitting specified information within 120 days. FEMA will then "determine the final allowable costs for your awards" by "evaluating whether all submitted costs incurred before [the March 11 Letters] are necessary, allocable, and reasonable." If "FEMA determines that the total allowable costs exceed the amount paid to date, then FEMA will make a final payment for that difference." If FEMA determines that "the payments made exceed the final allowable costs," however, then FEMA will require grantees "to promptly refund the difference." In other words, FEMA intends

to re-review payments that the agency already made and—if FEMA determines that it should not have made those payments—require grantees to return the money.

186. The closeout procedures described in the April 1 Letters are a sham insofar as they hold open the possibility that FEMA will pay grantees. Defendants' statements about the Shelter and Services Program, described above, make clear that Defendants will not pay drawdown requests absent a court order requiring Defendants to do so. Confirming this, FEMA zeroed out Shelter and Services Program grant balances through the February 10 Funding Terminations.

187. Grantees and subrecipients nevertheless must complete the closeout procedures described in the April 1 Letters. *See* 2 C.F.R. § 200.344(b) ("A recipient must submit all reports … no later than 120 calendar days after the conclusion of the period of performance. A subrecipient must submit all reports … to the pass-through entity no later than 90 calendar days after the conclusion of the period of performance of the subaward (or an earlier date as agreed upon by the pass-through entity and subrecipient).").

188. But this is not a normal close-out process, and, here too, Defendants are simply using the close-out process to put a legal gloss on their extralegal actions. Plaintiffs' Shelter and Services Program grants—and on information and belief all other Shelter and Services Program grants—are no longer visible in the FEMA portal that grantees would typically use to submit closeout information. Nor has FEMA acted on the draw requests that Plaintiffs submitted via that system, which, again, are no longer visible in the FEMA portal.

189. Instead, on April 24, 2025, Plaintiffs—and on information and belief all other Shelter and Services Program grantees—received closeout instructions from an unsigned FEMA email account. The instructions require Plaintiffs to submit their final closeout documentation via email.

190.     The documentation that FEMA requires includes a "Final Financial Report" using a standard form that is typically used to calculate the final amount of allowable costs incurred. But the April 24 instructions *also* require grantees to concurrently submit a "final request for payment." This makes it impossible to know what the final amount of allowable costs will be because FEMA will not have issued a determination on the final payment requests at the time the Final Financial Report is due. Moreover, because the March 11 Letters withheld funding based on "potential noncompliance," but did not state whether FEMA will find actual noncompliance, it is unclear whether grantees may submit final payment requests or may certify that their costs are allowable.

191.     Moreover, even if Plaintiffs submit all required documentation as directed by the April 24 instructions, there is no reason to believe that Plaintiffs will receive any further payments, because the funds that should be available to pay reimbursement requests have all been de-obligated in FEMA's financial system.

192.     Tellingly, the April 24 instructions do not provide a timeline for when FEMA will decide whether any "final request for payment" will be processed or paid out; the email simply states that once grantees have submitted their close-out documentation, "You will be notified when the award is closed." And once an award is closed, the likelihood of future payment grows even more remote. Once again, Defendants have dangled the possibility of future payment in front of grantees but otherwise acted as though the Shelter and Services Program has been eliminated—because it already has.

## CLAIMS FOR RELIEF

### COUNT I
### Separation of Powers

193.     Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

194.     The Constitution provides that "[a]ll legislative Powers herein granted shall be

vested in a Congress of the United States." U.S. CONST. art. I, § 1. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of N.Y.*, 524 U.S. 417, 438 (1998).

195.     Instead, the President, and the Executive Branch, must "take Care that the Laws be faithfully executed." U.S. CONST. Art. II, Sec. 3; *see Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Congress makes the laws and the President, sometimes acting through agencies … 'faithfully execute[s]' them"). The Executive Branch violates the Take Care Clause when it declines to execute or otherwise undermines statutes enacted by Congress or regulations implementing statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("the President is without authority to set aside congressional legislation by executive order"); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

196.     Moreover, the Constitution "grants the power of the purse to Congress, not the President." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. CONST. art. I, § 9, cl. 7 (Appropriations Clause); U.S. CONST. art. I, § 8, cl. 1 (Spending Clause).

197.     The Constitution's delegation of authority to Congress "provides institutional protection" from the "abuse" of power that could occur "should such power be concentrated in the executive branch, where one individual … determined to impose his or her policy preferences regardless of the will of Congress, could proceed unimpeded by the types of institutional checks present in the legislative body." *City of Chi. v. Barr*, 961 F.3d 882, 887 (7th Cir. 2020). "Such a concentration of power would allow tyranny to flourish, and our system of government is wisely set up by the Founders to foreclose such a danger." *Id.* "The executive branch has significant

powers of its own—particularly in matters such as immigration—but the power to wield the purse to alter behavior rests squarely with the legislative branch." *Id.*

198.    Congress enacted the Shelter and Services Program and repeatedly appropriated funds to carry out that Program. By enacting the Impoundment Control Act, Congress provided a procedure by which the Executive may propose that Congress rescind or defer funding. *See* 2 U.S.C. §§ 682 et seq. Rescissions require Congress's approval, *id.* § 683(b), while deferrals are permissible in three narrow circumstances and may not be made for policy reasons, *id.* § 684(b). President Trump has not sought Congress's approval for the funding rescissions challenged here, much less obtained it. And Defendants have made clear that they "deferred" funding under the Shelter and Services Program based on policy disagreements with Congress's stated purpose in enacting and funding the Program.

199.    Defendants therefore violated the Constitution's separation of powers by terminating all Shelter and Services Program funding through the February 10 Funding Terminations, freezing and conditioning all Program funding through the March 11 Letters, terminating all Program grants through the April 1 Letters, and terminating the Program. These actions unconstitutionally usurp Congress's powers in enacting and funding the Shelter and Services Program.

## COUNT II
## Spending Clause

200.    Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

201.    The Spending Clause of the United States Constitution provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States … ." U.S. Const. art. I, § 8, cl. 1.

202.    The Spending Clause requires fair notice of the terms that apply to the disbursement of funds. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981); *NFIB v. Sebelius*, 567 U.S. 519, 583-584 (2012). Funding conditions must be identified "unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

203.    Congress has not delegated its spending power to the Executive Branch with respect to the Shelter and Services Program and funds at issue here.

204.    Defendants violated the Spending Clause by terminating all Shelter and Services Program funding through the February 10 Funding Terminations, freezing and conditioning all Program funding through the March 11 Letters, terminating all Program grants through the April 1 Letters, and terminating the Program. These actions unconstitutionally usurp Congress's powers in funding the Shelter and Services Program.

## COUNT III
## Ultra Vires

205.    Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

206.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. at 320, 326-27 (2015). The Supreme Court has repeatedly invoked this power in awarding equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

207.    Defendants acted beyond their legal authority by terminating all Shelter and Services Program funding through the February 10 Funding Terminations, freezing and conditioning all Program funding through the March 11 Letters, terminating all Program grants through the April 1 Letters, and terminating the Program.

## COUNT IV
### Substantive APA Violation: Arbitrary and Capricious Under 5 U.S.C. § 706(2)(A)

208.    Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

209.    Defendants include agencies as that term is defined in the APA. 5 U.S.C. § 551(1).

210.    Terminating all Shelter and Services Program funding through the February 10 Funding Terminations, freezing and conditioning all Program funding through the March 11 Letters, terminating all Program grants through the April 1 Letters, and terminating the Program are all final agency actions subject to review under the APA.

211.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

212.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). The "reasoned explanation requirement of administrative law … is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. N.Y.*, 588 U.S. 752, 785 (2019).

213.    Defendants provided grantees no notice or basis for zeroing out Shelter and Services Program grant balances on February 10, 2025.

214.    Defendants provided no reasoned basis for conditioning or withholding funding for more than 30 days after receiving draw requests, except for the post-hoc and pretextual justifications in the March 11 Letters.

215.    Defendants' asserted reasons for freezing all funding under Shelter and Services Program grants and terminating those grants contradict the DHS Appropriations Act and Congress's goals in enacting the Program.

216.    To the extent that Defendants have even acknowledged that their termination of Shelter and Services Program grants are part of either a *de facto* or *de jure* elimination of the entire Program, Defendants have provided inconsistent and irrational explanations for this elimination, including the absurd suggestion that Congress passed a law that funds criminal activity.

217.    The April 1 Letters offered no reasoned basis for terminating Shelter and Services Program grants or eliminating the Program either, beyond the Letters' expressions of animus toward the Program itself. The only explanation that Defendants provided for terminating the grants is that grantees used funds to effectuate the stated purpose of the Shelter and Services Program, as described in the relevant DHS Appropriations Acts.

218.    An action is also arbitrary and capricious if the agency "failed to consider … important aspects of the problem" before it. *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). Where "an agency changes course ... it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Id.*; *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015) ("[T]he APA requires an agency to provide more substantial justification when its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account."). Defendants exhibited no consideration of grantees' reliance interests in changing the policies that Congress adopted in enacting and funding the Shelter and Services Program or that FEMA had sought to implement in awarding grants under the Program.

49

## COUNT V
### Substantive APA Violation: Contrary to Law Under U.S.C. § 706(2)(C)

219.    Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

220.    Courts must "hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(B)-(C).

221.    Federal agencies must "manage and administer the Federal award in a manner so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable Federal statutes and regulations ... and the requirements of this part." 2 C.F.R. § 200.300(a).

222.    For the reasons described above, Defendants violated "applicable Federal statutes and regulations" by terminating all Shelter and Services Program funding through the February 10 Funding Terminations, freezing and conditioning all Program funding through the March 11 Letters, terminating all Program grants through the April 1 Letters, and terminating the Program.

## COUNT VI
### Procedural APA Violations Under 5 U.S.C. § 706(2)(D)

223.    Plaintiffs repeat and reallege all paragraphs above as if fully set forth herein.

224.    Courts must "hold unlawful and set aside agency action, findings and conclusions found to be … without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

225.    Before the February 10 Funding Terminations, FEMA failed to provide grantees with the requisite notice of any agency determination of non-compliance, any specific conditions to be applied to Shelter and Services Program grants, or any grant suspension, pause or termination. *See* 2 C.F.R. §§ 200.208, 200.243, 200.305, 200.339-200.342. Nor did FEMA offer grantees any opportunity to contest any agency determinations before the February 10 Funding Terminations.

*See id.* § 200.342.

226.    FEMA violated applicable regulations by withholding payments under Shelter and Services Program grants for more than 30 days. *See* 2 C.F.R. § 200.305(b)(3). Moreover, FEMA issued the March 11 Letters, purporting to impose two "specific conditions" and withholding funding, ***before*** conducting a compliance review. FEMA thereby collapsed multiple steps in the administrative process and violated applicable regulations by failing to give grantees a meaningful opportunity to object. *See* 2 C.F.R. §§ 200.305(b)(6), 200.305(b)(7), 200.208, 200.342.

227.    The April 1 Letters likewise omitted an individualized explanation of the basis for FEMA's decision to terminate Shelter and Services Program grants, again precluding grantees from having a meaningful opportunity to appeal. *See id.*

## PRAYER FOR RELIEF

Plaintiffs request that the Court:

i.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2202, vacate and set aside the February 10 Funding Terminations, the March 11 Letters, the April 1 Letters, the termination of the Shelter and Services Program, and any actions taken by Defendants to implement or enforce those decisions;

ii.    Pursuant to 28 U.S.C. § 2201, issue a declaration that Defendants violated the Constitution, the APA, and acted ultra vires by eliminating Shelter and Services Program grant balances and de-obligating funds, withholding funding for more than 30 days, conditioning funding as described in the March 11 Letters, terminating Program grants, and ending the Program;

iii.    Preliminarily and permanently enjoin Defendants from eliminating and de-obligating Shelter and Services Program grant balances, withholding funding for more than 30 days, conditioning funding as described in the March 11 Letters, terminating Program grants,

requiring Plaintiffs to complete premature closeout procedures, and ending the Shelter and Services Program;

iv.    Issue a preliminary and permanent injunction requiring Defendants to undo the unlawful de-obligation of funds and remove impediments to grantees' ability to submit future drawdown requests under the Shelter and Services Program and to process future requests pursuant to law;

v.    Awards attorney's fees and costs to Plaintiffs to the fullest extent permissible by law; and

vi.    Grants any other relief that the Court deems proper.

Dated: May 16, 2025

Respectfully submitted,

Mary B. Richardson-Lowry
Corporation Counsel of the City of Chicago

By: /s/ Lucy Prather
Lucy Prather (IL Bar N. 6337780)
Rebecca Hirsch (IL Bar No. 6279592)
Chelsey Metcalf (IL Bar No. 6337233)
Stephen Kane (IL Bar No. 6272490)
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
Tel: 312-744-4294
lucy.prather@cityofchicago.org
rebecca.hirsch2@cityofchicago.org
chelsey.metcalf@cityofchicago.org
stephen.kane@cityofchicago.org
*Attorneys for Plaintiff City of Chicago*

LAURA CONOVER
PIMA COUNTY ATTORNEY

By: /s/ Samuel E. Brown
Samuel E. Brown* (AZ Bar No. 027474)
Bobby Yu* (AZ Bar No. 031237)
Kyle Johnson* (AZ Bar No. 032908)
Pima County Attorney's Office, Civil Division
32 N. Stone, Suite 2100
Tucson, Arizona 85701

Katie McLoughlin
Acting City Attorney, City and County of Denver

By: /s/ Matthew J. Mulbarger
Matthew J. Mulbarger* (CO Bar No. 51918)
(matthew.mulbarger@denvergov.org)
Denver City Attorney's Office
201 W Colfax Avenue
Denver, CO 80202

Tel: (520) 724-5700
sam.brown@pcao.pima.gov
bobby.yu@pcao.pima.gov
kyle.johnson@pcao.pima.gov
*Attorneys for Plaintiff Pima County*

Tel: 720-913-8050
*Attorneys for Plaintiff City and County of Denver*

\* - *Pro Hac Vice applications forthcoming*