**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| City of Chicago; | |
| City and County of Denver; and | |
| Pima County; | |
| *Plaintiffs,* | |
| vs. | |
| United States Department of Homeland Security; | |
| Kristi Noem, in her official capacity as Secretary of the Department of Homeland Security; | Case No. 25-cv-5463 |
| United States Federal Emergency Management Agency; | Hon. Matthew F. Kennelly |
| David Robinson, in his official capacity as Acting Administrator of the Federal Emergency Management Agency; | |
| *Defendants.* | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. ii

BACKGROUND ................................................................................................................. 4

   I.     Congress Responded To A Surge In Migration By Enacting SSP........................... 4

   II.    FEMA Awarded SSP Grants And Closely Monitored Grantees. ......................... 5

   III.   Defendants Terminated SSP Funding Without Telling Grantees. ....................... 6

   IV.   FEMA Sent Post-Hoc Letters Justifying The February 10 Funding Terminations............ 7

   V.    Defendants Have Allegedly Used SSP Funds For Other Purposes................................. 10

ARGUMENT ..................................................................................................................... 11

   I.     This Court Has Jurisdiction. ......................................................................... 12

   II.    Plaintiffs Will Likely Succeed On The Merits................................................. 16

      A.   Count I: Separation of Powers ................................................................. 16

      B.   Count III: Ultra Vires ............................................................................. 18

      C.   Counts IV-VI: APA Claims ....................................................................... 20

        1.   Defendants' Actions Are Contrary to Law. ............................................. 21

        2.   Defendants' Actions are Arbitrary and Capricious. ................................. 23

        3.   Defendants Committed Other Procedural Violations.............................. 26

   III.   Plaintiffs Will Be Irreparably Harmed Absent A Preliminary Injunction. ................... 26

   IV.   The Public Interest And The Equities Favor A Preliminary Injunction. ...................... 29

   V.    Plaintiffs Are Entitled To Preliminary Relief In The Form Requested. ............................ 30

CONCLUSION.................................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Aids Vaccine Advocacy Coal. v. United States Dep't of State*, 2025 WL 752378 (D.D.C. Mar. 10, 2025).................................................................................................................. 17, 20

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 2025 WL 833917 (D. Md. Mar. 17, 2025)...... 28

*Am. Civil Liberties Union v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ............................................ 33

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 2025 WL 1548611 (D. Mass. May 30, 2025)... 25

*Bennett v. Spear*, 520 U.S. 154 (1997)......................................................................................... 23

*Bowen v. Mass.*, 487 U.S. 879 (1988)........................................................................................... 17

*Cal. v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025) ............................................................. 18

*Chi. Women in Trades v. Trump*, 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025).................... passim

*City & Cnty. of S.F. v. Trump*, 2025 WL 1282637 (N.D. Cal. May 3, 2025) .......................... 21, 32

*City & Cnty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ............................................... 19, 20

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ............................................................................. 22

*City of Chi. v. Barr*, 961 F.3d 882 (7th Cir. 2020) ......................................................... 19, 30, 32

*City of Chi. v. Sessions*, 888 F.3d 272 (7th Cir. 2018) ........................................................... 19, 33

*City of Evanston v. Barr*, 412 F. Supp. 3d 873 (N.D. Ill. 2019).................................................. 32

*City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421 (D.C. Cir. 1994)........................... 30

*Climate United Fund v. Citibank, N.A.*, 2025 WL 1131412 (D.D.C. Apr. 16, 2025) .................. 30

*Clinton v. City of N.Y.*, 524 U.S. 417 (1998)................................................................................. 19

*Cmty. Legal Servs. v. United States Dep't of Health & Hum. Servs.*, 137 F.4th 932 (9th Cir. 2025) .................................................................................................................................... 16, 17

*Cnty. of Suffolk v. Sebelius*, 605 F.3d 135 (2d Cir. 2010)............................................................ 30

*Colo. v. U.S. Dep't of Health & Hum. Servs.*, 2025 WL 1426226 (D.R.I. May 16, 2025) ........... 16

*Columbus Reg'l Hosp. v. Fed. Emergency Mgmt. Agency*, 708 F.3d 893 (7th Cir. 2013)...... 16, 18

*Dabney v. Reagan*, 1985 WL 443 (S.D.N.Y. Mar. 21, 1985)........................................................ 21

*Dep't of Commerce v. N.Y.*, 588 U.S. 752 (2019) ......................................................................... 26

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1 (2020) ................................ 26, 29

*Department of Education v. California*, 145 S. Ct. 966 (2025)..................................................... 18

*Ezell v. City of Chi.*, 651 F.3d 684 (7th Cir. 2011) ...................................................................... 30

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ............................................................. 26

*Ferreiro v. United States*, 501 F.3d 1349 (Fed. Cir. 2007) .......................................................... 17

*Harmon v. Brucker*, 355 U.S. 579 (1958) .................................................................................... 21

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013)......................................................................... 20

*LeBlanc v. United States*, 50 F.3d 1025 (Fed. Cir. 1995) ............................................................. 15

*Martin Luther King, Jr. Cnty. v. Turner*, 2025 WL 1582368 (W.D. Wash. June 3, 2025) ........... 25

*Md. v. Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1585051 (D. Md. June 5, 2025) .................. 18, 24

*Me. v. United States Dep't of Agric.*, 2025 WL 1088946 (D. Me. Apr. 11, 2025) ...... 17, 18, 23, 32

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ............................................................ 15

*Metro. Transp. Auth. v. Duffy*, 2025 WL 1513369 (S.D.N.Y. May 28, 2025)............................... 25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ..................... 28

*N.Y. v. Trump*, 2025 WL 1009025 (D.R.I. Apr. 4, 2025)............................................................... 22

*N.Y. v. Trump*, 2025 WL 1098966 (D.R.I. Apr. 14, 2025) .......................................................... 18

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ................................................................................................................................................ 23

*Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, 2025 WL 368852 (D.D.C. Feb. 3, 2025) ................................................................................................................................ 29

*New York v. Trump*, 769 F. Supp. 3d 119 (D.R.I. Mar. 6, 2025) ...................................... 22, 23, 32

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................................................... 14

*Policy & Rsch., LLC v. United States Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62 (D.D.C. 2018) ............................................................................................................................ 28

*S.F. Unified Sch. Dist. v. AmeriCorps*, 2025 WL 1180729 (N.D. Cal. Apr. 23, 2025) ................. 15

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ............................................................................... 28

*Terry v. Astrue*, 580 F.3d 471 (7th Cir. 2009) .......................................................................... 24

*Tootle v. Sec'y of Navy*, 446 F.3d 167 (D.C. Cir. 2006) ............................................................ 16

*Train v. City of N.Y.*, 420 U.S. 35 (1975) ................................................................................. 19

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ............................................... 23

*Webster v. Doe*, 486 U.S. 592 (1988) ......................................................................................... 16

*Widakuswara v. Lake*, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) .............................................. 21

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ..................................................... 14, 32

## Statutes and Regulations

2 C.F.R. § 200.208 ............................................................................................................... 28, 29

2 C.F.R. § 200.243 ...................................................................................................................... 29

2 C.F.R. § 200.305 ................................................................................................ 16, 24, 29, 33

2 C.F.R. § 200.339 ................................................................................................................. 11, 24

2 C.F.R. § 200.340 ................................................................................................................. 12, 25

2 C.F.R. § 200.341 ...................................................................................................................... 29

2 C.F.R. § 200.342 ...................................................................................................................... 29

2 C.F.R. § 3002 .......................................................................................................................... 24

2 U.S.C. §§ 683-684 .................................................................................................................. 22

2023 DHS Appropriations Act, Pub. L. No. 117-328 ............................................................... 8, 12

2024 DHS Appropriations Act Pub. L. No. 118-47 ....................................................... 8, 12, 14, 20

28 U.S.C. § 1491 ........................................................................................................................ 15

31 U.S.C. § 1552 ........................................................................................................................ 21

31 U.S.C. § 1553 ........................................................................................................................ 21

5 U.S.C. § 704 ............................................................................................................................ 23

5 U.S.C. § 706 ........................................................................................................... 24, 26, 29

8 U.S.C. § 1324 ..................................................................................................................... passim

Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern Border Act, Pub. L. No. 116-26 ................................................................................ 7

Guidance for Grants and Agreements, 85 Fed. Reg. 49506, 49507 (Aug. 13, 2020).................. 25

## Constitutional Provisions

U.S. Const. art. I, § 1 ................................................................................................................ 19

U.S. CONST. art. I, § 8 .................................................................................................... 19

U.S. CONST. art. II, § 3 ................................................................................................... 19

**INTRODUCTION**

The United States experienced a surge in migrant crossings at the southern border from 2019 to 2023. Due to that surge and the need to minimize illness during the Covid-19 pandemic, the U.S. Department of Homeland Security ("DHS") increasingly processed migrants and, if DHS deemed it appropriate, released them into United States border towns pending resolution of migrants' applications for asylum. Many of these migrants arrived penniless and—lacking legal authority to work— in need of immediate shelter, food, clothing, and medical care. To address this humanitarian crisis, Plaintiffs expended substantial resources providing these basic necessities while helping migrants become self-sufficient.

Since the first Trump Administration, Congress appropriated funds to reimburse non-federal entities for costs incurred helping migrants whom DHS released into the United States. Congress continued this bipartisan support in 2022 by enacting the Shelter and Services Program ("SSP"), appropriating funds for that purpose and requiring the Federal Emergency Management Agency ("FEMA") to administer the program. FEMA allocated SSP funds by awarding grants to Plaintiffs and many other states, local governments, and non-profit organizations. FEMA repeatedly disbursed these funds to grantees that provided services to migrants released by DHS— i.e., services necessitated by the federal government's immigration policies.

All that changed on February 10, 2025, when Elon Musk tweeted that FEMA violated President Trump's executive orders by disbursing SSP funds to New York City to shelter "illegals," promising to "clawback" the funds. That same day, FEMA's then-Acting Administrator, Cameron Hamilton, responded to Musk's tweet by stating that "Congress should have never passed bills … asking FEMA to do this work." Later that day, as FEMA's then-Chief Financial Officer attests in

1

an attached declaration, FEMA "de-obligated" all SSP funds—i.e., terminated its obligation to pay congressionally appropriated funds—without informing grantees.

More than one month later, FEMA attempted to put a legal gloss on what the agency had already done. Hamilton sent substantively identical letters informing SSP grantees that FEMA was withholding funding while the agency investigated whether grantees violated a federal law that criminalizes, under specified circumstances, harboring people who are in the United States unlawfully. This "investigation" was pure pretext. FEMA had already decided to eliminate SSP. And the notion that grantees commit crimes by providing services that Congress authorized in enacting and funding SSP is absurd. Congress does not fund illegal activity.

Indeed, FEMA did not even await its self-imposed deadline for grantees to respond to the agency's "investigation" before sending substantively identical letters terminating all SSP grants. This time FEMA based its decision not on grantees' alleged violations of federal law, but rather on FEMA's determination that the grants do not effectuate the agency's new priorities.

Plaintiffs request that the Court preliminarily enjoin Defendants from freezing SSP funding and terminating the program, require Defendants to undo their illegal de-obligation of funds, and require Defendants to process pending and future reimbursement requests pursuant to law. As explained more fully below, Plaintiffs satisfy the preliminary injunction standard.

First, Plaintiffs will likely succeed on their claim that Defendants' actions are unconstitutional. The United States Constitution assigns Congress the responsibility to enact laws and appropriate funds, while requiring the President to execute those laws. Although Defendants believe that "Congress should have never passed" SSP, the Constitution prohibits Defendants from overriding Congress's judgment by eliminating SSP and withholding funding appropriated by Congress.

Plaintiffs also will likely succeed on their claims that Defendants violated the Administrative Procedure Act ("APA"). For example, Defendants have offered three different explanations for their actions: that grantees may have committed crimes under 8 U.S.C. § 1324; that Defendants' priorities have changed since Defendants awarded SSP grants; and that federal funding should be withheld from so-called "sanctuary" jurisdictions. The Court cannot evaluate whether Defendants reasonably explained their actions when Defendants themselves cannot agree why they took those actions. In addition, federal regulations require Defendants to reimburse grantees within 30 days unless they reasonably believe that a grantee's reimbursement request is improper. Defendants have sat on Plaintiffs' reimbursement requests—requests that Defendants pre-approved—for at least four-and-a-half months and counting, yet Defendants have never identified a reasonable belief that Plaintiffs' requests are improper.

Second, Plaintiffs will be irreparably harmed absent an injunction. Irreparable harm is presumed where, as here, the defendant has likely violated the Constitution's separation of powers. Beyond this, a United States Senator recently stated that Defendants transferred SSP funds to U.S. Immigration and Customs Enforcement ("ICE"). In addition to being likely illegal, any such transfers threaten to moot Plaintiffs' claims by exhausting the congressional appropriations that Defendants obligated to Plaintiffs. And Defendants' actions frustrate Plaintiffs' ability to budget because Plaintiffs do not know if they will receive tens of millions of dollars in SSP funds.

Third, the public interest and the equities favor a preliminary injunction. As this Court recently held, injunctions protecting the separation of powers are always in the public interest. And in addition to the harms imposed upon Plaintiffs, Defendants' funding freeze will harm the public at large by forcing Plaintiffs to cut services that their residents rely on and/or fire employees who provide those services.

## BACKGROUND

### I.  Congress Responded To A Surge In Migration By Enacting SSP.

Beginning in 2019, the United States experienced a surge in crossings at the Mexico border, driven by an uptick in Central Americans fleeing oppression and hardship for a chance at asylum here. Decl. of Lucy Prather ("Prather Decl."), Ex. 1 at 6-7, 19. At the same time, the pandemic led federal immigration officials to reduce the capacity of detention facilities to minimize the spread of illness. *Id.*, Ex. 2. Due to these factors, DHS processed large numbers of migrants—including many families with children—and released them into the United States. *Id.*, Exs. 1 at 15 n.14, 2.

During this period, DHS released migrants in Pima County and other areas along the border. In total, Pima County helped more than 520,000 migrants released by DHS. Decl. of Ken Walker ("Walker Decl.") ¶ 10. Meanwhile, in 2022, the State of Texas began busing migrants to interior cities such as Chicago and Denver. Prather Decl., Ex. 3. Between 2022 and 2024, Chicago received more than 50,000 migrants, and Denver received more than 40,000 migrants. Decl. of Annette Guzman ("Guzman Decl.") ¶ 4; Decl. of Nicole Doheny ("Doheny Decl.") ¶ 4.

Plaintiffs spent hundreds of millions of dollars providing these new arrivals with shelter, food, clothing, and other services. *E.g.*, Guzman Decl. ¶ 4, Doheny Decl. ¶ 5. Since 2019, Congress annually appropriated funds to offset a small fraction of these costs. *E.g.*, Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern Border Act, Pub. L. No. 116-26, Title III. In late 2022, Congress created SSP on a bipartisan basis, appropriating $800 million to FEMA "to support sheltering and related activities provided by non-Federal entities, including facility improvements and construction, in support of relieving overcrowding in short-term holding facilities of U.S. Customs and Border Protection." 2023 DHS Appropriations Act,

Pub. L. No. 117-328, Div. F, Title II. Congress renewed SSP in the 2024 DHS Appropriations Act, appropriating an additional $650 million. Pub. L. No. 118-47, Div. C, Title II.

## II.    FEMA Awarded SSP Grants And Closely Monitored Grantees.

FEMA provided most SSP funding through "targeted" allocations via Notices of Funding Opportunity announcing the 2023 and 2024 "Shelter and Services Program – Allocated." Prather Decl., Exs. 4, 6. In other words, FEMA pre-cleared grantees for specified amounts of funding and permitted only them to apply. *Id.*, Ex. 4 at 7-10, Ex. 6 at 7-16. The other method that FEMA used to award SSP funds was through the 2024 "SSP-Competitive" grant, which permitted any eligible entity to apply. *Id.*, Ex. 5.

The Notices of Funding Opportunity described SSP's purpose as ensuring "humane" treatment for migrants released by DHS and "'reliev[ing] overcrowding'" in federal holding facilities by funding non-federal entities to provide migrants with "shelter, food, transportation, acute medical care, personal hygiene supplies, and labor necessary to provide these services." *Id.* at 5-6; *accord id.*, Ex. 4 at 5-6, Ex. 6 at 5-6. The Notices were substantially similar, with each listing the activities FEMA would reimburse. *Id.*, Ex. 4 at 62-67, Ex. 5 at 64-69, Ex. 6 at 69-74.

FEMA awarded SSP grants to dozens of states, local governments, and non-profits. *Id.*, Ex. 9. Chicago received five SSP grants: three direct grants, totaling over $38 million, and two pass-through grants awarded through the State of Illinois, for over $28 million. Guzman Decl. ¶¶ 5-8, 20-25. Pima County received three direct grants, over $52 million in total. Walker Decl. ¶ 15. Denver received three direct grants, totaling $32 million. Doheny Decl. ¶¶ 6-9.

FEMA issued SSP grants with a funding hold for the amount awarded. Guzman Decl. ¶ 10. This means that before grantees could request reimbursement, FEMA required grantees to submit a budget amendment providing "a detailed cost breakdown and justification for the cost items."

*Id.* Plaintiffs did just that, submitting budget amendments to FEMA that justified using their SSP grants for services such as food, labor, shelter, or transportation. *E.g.*, *id.* ¶¶ 11, 16.

FEMA typically approved Plaintiffs' budget amendments based on their supporting documentation and approved Plaintiffs to submit corresponding reimbursement requests. *E.g.*, Doheny Decl. ¶ 13; Guzman Decl. ¶ 16. But FEMA's approval was not a rubber stamp. FEMA sometimes sought more information before approving budget amendments and reimbursement requests, and also has conducted more in-depth "desk reviews." Guzman Decl. ¶¶ 12-13.

Then, things changed. From December 2024 through February 2025, Plaintiffs submitted four reimbursement requests and the State of Illinois submitted one on Chicago's behalf under a pass-through grant, seeking a total of about $43.7 million. *Id.* ¶ 18; Doheny Decl. ¶¶ 16, 20; Walker Decl. ¶ 24; Decl. of José Ponce Martinez ("Ponce Decl.") ¶ 12. Although Defendants had approved budget amendments supporting these requests and authorized Plaintiffs to seek reimbursement, Defendants have not reimbursed Plaintiffs for any of these requests in the four-plus months that they have been pending. Guzman Decl. ¶¶ 17-18; Doheny Decl. ¶¶ 17, 21; Walker Decl. ¶¶ 32-33; Ponce Decl. ¶ 8-9, 12.

### III. Defendants Terminated SSP Funding Without Telling Grantees.

In a sworn declaration, former FEMA Chief Financial Officer Mary Comans states that on February 5, 2025, she attended a meeting with DHS leadership and members of the Department of Government Efficiency ("DOGE"). *See* Decl. of Mary Comans ("Comans Decl.") ¶ 2. During the meeting, a DOGE member asked whether FEMA was continuing to make SSP payments to state and local governments. *Id.* ¶ 4. When a FEMA representative said that those payments were continuing, the DOGE member said that was "the right answer." *Id.*

On February 9, 2025, however, DOGE flagged that FEMA recently paid New York City tens of millions of dollars under SSP. *Id.* ¶ 5. A DHS executive directed Ms. Comans to give DOGE "full system access to FEMA's financial system, and I directed my team to do so." *Id.*

On February 10, 2025, Elon Musk tweeted that FEMA paid millions of dollars "to luxury hotels in New York City to house illegal migrants …. That money is meant for American disaster relief and instead is being spent on high end hotels for illegals!" Prather Decl. ¶ 10. Two hours later, then-Acting FEMA Administrator Hamilton reposted Musk's tweet, announcing that "these payments have all been suspended from FEMA." *Id.* ¶ 11. Hamilton quickly followed up by tweeting: "@USCongress should have never passed bills in 2023 and 2024 asking FEMA to do this work. This stops now." *Id.* ¶ 12.

Ms. Comans spent February 10 recouping roughly $80 million in SSP funds that FEMA had sent to New York City, as well as an additional $2 million in SSP funds that FEMA had sent to the State of Colorado. Comans Decl. ¶ 7. Also that day, Ms. Comans' team manually de-obligated all SSP funds in FEMA's financial system. *Id.* ¶ 8. In other words, FEMA unilaterally terminated its obligation to pay congressionally appropriated funds, without telling SSP grantees.

USASpending.gov—the official repository of federal spending data—confirms that on February 10, 2025, FEMA de-obligated all SSP funds (the "February 10 Funding Terminations"). Prather Decl. ¶ 13 & Ex. 7. And on February 11, 2025, then-Acting Administrator Hamilton acknowledged in a sworn declaration that FEMA had "paused funding" for SSP. *Id.*, Ex. 14 ¶ 6.

## IV.    FEMA Sent Post-Hoc Letters Justifying The February 10 Funding Terminations.

Defendants sent multiple communications to Plaintiffs and other SSP grantees that attempted to give the February 10 Funding Terminations the air of legitimacy.

On or about March 11, 2025, then-Acting Administrator Hamilton sent form letters—titled "Remedy for Noncompliance Letter"—to SSP grantees ("March 11 Letter"). Ponce Decl., Ex. 1; Doheny Decl., Ex. 1; Guzman Decl. ¶ 26 & Ex. 1; Walker Decl., Ex. 1. The March 11 Letter informed grantees that "DHS/FEMA is temporarily withholding payments to your organization." *Id.* at 1. The March 11 Letter did not acknowledge that the funds that it "temporarily" withheld were already de-obligated more than a month earlier.

The March 11 Letter stated that the funding freeze was "pursuant to 2 C.F.R. § 200.339(a)," *id.*, which permits a federal agency to withhold grant payments when the agency "determines that noncompliance cannot be remedied by imposing specific conditions" upon the grantee. But the March 11 Letter did not say that grantees were "noncompliant" or include factual findings supporting such a determination, let alone conclude that noncompliance cannot be "remedied by imposing specific conditions." Indeed, the March 11 Letter is devoid of *any* factual findings. The most the March 11 Letter could muster is that DHS has "concerns" that unidentified "entities" receiving SSP funding "may" have violated 8 U.S.C. § 1324(a), which criminalizes knowingly sheltering or transporting a person who is in the United States "in violation of law." *Id.*

In addition to withholding funds due to "potential" noncompliance, the March 11 Letter imposed two conditions: first, a Reporting Condition, which required grantees to either submit extensive documentation to FEMA or certify that they had already done so; and second, a Certification Condition, which stated that FEMA would require grantees to certify that they lacked "suspicion" that any of their employees or subcontractors violated 8 U.S.C. § 1324(a). *Id.* at 2. The March 11 Letter sought a response to the Reporting Condition within 30 days. *Id.*

On March 20, 2025, then-Acting Administrator Hamilton sent a memo to DHS Secretary Kristi Noem recommending that "DHS Review for Termination" all 156 open SSP grants, which

had a balance of $887 million. Prather Decl., Ex. 9, Table A at 5. Hamilton based his recommendation on two internal memos from Secretary Noem. *Id.* at 1. The first Noem memo directed DHS staff to freeze "all" funding under grants "for which non-profit organizations are eligible" and that "touch in any way on immigration," specifically including SSP. *Id.*, Ex. 10 at 1. The second Noem memo directed DHS staff to "cease providing federal funding to sanctuary jurisdictions." *Id.*, Ex. 11 at 2. Secretary Noem approved Hamilton's recommendation on March 25, 2025. *Id.*, Ex. 9 at 4.

On April 1, 2025, before the deadline to answer the March 11 Letter's Reporting Condition had passed, FEMA sent another form letter to grantees ("April 1 Letter"). Ponce Decl., Ex. 2; Doheny Decl., Ex. 2; Guzman Decl., Ex. 2; Walker Decl., Ex. 2. This time, FEMA terminated SSP grants effective "immediately." *Id.* at 1.

The April 1 Letter provided an altogether different rationale than the March 11 Letter. While the March 11 Letter suggested that entities receiving SSP funds may have violated 8 U.S.C. § 1324, the April 1 Letter terminated SSP grants pursuant to 2 C.F.R. § 200.340(a)(2) (2020), which permits termination "to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* The only explanation the April 1 Letter offered was that grant programs that support, "or have the potential to support, illegal immigration through funding illegal activities or support for illegal aliens" are not "consistent with DHS's enforcement focus." *Id.* The April 1 Letter contrasted the prior administration's priorities (funding "non-federal entities to provide shelter, food, transportation, acute medical care, and personal hygiene supplies for individuals released from DHS short-term holding facilities")—i.e., substantially the same purpose identified by Congress in enacting the 2023 and 2024 DHS Appropriations Acts—with the current

administration's priorities ("advancing the essential mission of enforcing immigration laws and securing the border"). *Id.*

Although the April 1 Letter acknowledged that migrants served by SSP had been "released [by] DHS," the Letter asserted that these migrants "often … are in the United States unlawfully." *Id.* The April 1 Letter thus appears to claim that migrants whom DHS processed and released—the vast majority of whom are asylum seekers with unadjudicated claims—are "illegal aliens."

The April 1 Letter directed recipients to "closeout" their grants by submitting specified documentation. *Id.* at 2. Although the April 1 Letter holds open the possibility that FEMA may provide additional reimbursement—despite the unmentioned February 10 Funding Terminations—the Letter also states that FEMA will require grantees to "refund" money if FEMA determines that payments that the agency already made "exceed the final allowable costs." *Id.*

Following the April 1 Letter, grantees lost access to their SSP grants in the FEMA online portal through which grantees would typically submit closeout documentation. Guzman Decl. ¶ 28. Instead, on April 24, 2025, FEMA sent identical emails instructing SSP grantees to submit closeout materials via email. *Id.*, Ex. 3; Walker Decl., Ex. 3. Once again, the April 24 email dangled the possibility of future payment but omitted that FEMA already de-obligated all SSP funds. Tellingly, the April 24 email did not identify a date by which FEMA will resolve pending reimbursement requests or reimbursement requests submitted during closeout. Instead, the April 24 email stated only that grantees will be "notified when the award is closed." *Id.*

## V.     Defendants Have Allegedly Used SSP Funds For Other Purposes.

In May 2025, Senator Chris Murphy, the ranking member of the U.S. Senate Appropriations Subcommittee on Homeland Security, publicly stated during a hearing with Secretary Noem that DHS has diverted SSP funds to ICE:

> When Congress appropriates funds for a specific purpose, the administration has no discretion as to whether to spend or not spend that money, unless you go through a very specific process with this committee. Let me give you two of many instances of this illegal impoundment. The first is the Shelter and Services Program. Senator Britt may want to zero that account out, but that account is funded, and it was funded in a bipartisan way. … [I]t doesn't matter that you don't like the program. You cannot cancel spending in this program, *and you cannot use the funds, as you have, to fund other things, like ICE.*

Prather Decl. ¶ 18. Senator Murphy's remarks suggest that the Senate Appropriations Subcommittee has received a so-called "Section 503 Notice," which a federal agency must send to the relevant congressional committee if the agency seeks to reallocate appropriations from one fund to another. *See* Pub. L. No. 118-47, Div. C, Title V § 503.

On June 17, 2025, a press report stated that DHS "recently" transferred "nearly $500 million from within its own funds to support its immigration clampdown." Prather Dec., Ex. 12. The report did not say whether, or how much of, this money came from SSP. Raising concerns that DHS will continue using SSP funds for other purposes, the report stated that DHS "is already $1 billion over budget" with "more than three months left in the fiscal year." *Id.*

Chicago submitted a Freedom of Information Act request to DHS for all Section 503 Notices regarding SSP, which would help Plaintiffs evaluate whether to add a claim that Defendants unlawfully transferred SSP funds and/or seek more immediate temporary relief. Prather Decl. ¶ 23. Chicago has not received a final response. *Id.*

### ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[W]hen the Government is the opposing party," the last two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

I.        **This Court Has Jurisdiction.**

The Trump Administration has repeatedly argued that the Court of Federal Claims has exclusive jurisdiction over lawsuits challenging grant funding freezes or terminations. That argument would fail as applied to this case.

The Tucker Act vests the Court of Federal Claims with jurisdiction over actions "founded … upon" "contract[s] with the United States." 28 U.S.C. § 1491(a)(1). But as this Court observed, the Court of Federal Claims does not have "exclusive jurisdiction … simply because [an action] implicates a contract in some way." *Chi. Women in Trades v. Trump*, 2025 WL 1114466, at *8 (N.D. Ill. Apr. 14, 2025) ("*CWIT*"). Rather, the Tucker Act applies "only when the claim is 'at its essence' a contract claim." *Id.* (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)). "To determine the essence of an action, a court looks at 'both the source of the rights upon which the plaintiff bases its claims, and ... the type of relief sought (or appropriate).'" *Id.*

As for the "source" of Plaintiffs' claims, Count I alleges that Defendants violated the separation of powers by overriding Congress's decision to enact and fund SSP, Compl. ¶¶ 193-99; Count II alleges that Defendants violated the Spending Clause by, for example, attaching unlawful conditions to SSP grants, *id.* ¶¶ 200-04; and Count III alleges that Defendants acted without authority in freezing all SSP funding and terminating the program, *id.* ¶¶ 205-07. Claims under the "Spending Clause[] and the separation of powers … derive from the Constitution" and "are not claims for, or like, breach of contract." *CWIT*, 2025 WL 1114466, at *9.

If Plaintiffs cannot assert those claims here, they cannot do so anywhere because the Court of Federal Claims lacks jurisdiction to resolve them. *See S.F. Unified Sch. Dist. v. AmeriCorps*, 2025 WL 1180729, at *9 (N.D. Cal. Apr. 23, 2025); *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995). To "avoid the 'serious constitutional question' that would arise if a federal statute

were construed to deny any judicial forum for a colorable constitutional claim," Congress "must be clear" if it "intends to preclude judicial review of constitutional claims." *Webster v. Doe*, 486 U.S. 592, 603 (1988). The Tucker Act does not satisfy that "heightened showing." *Id.* Thus, "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006).

Counts IV-VI assert APA violations. In addition to alleging (like Counts I-III) that Defendants acted contrary to law, Compl. ¶¶ 219-22, Plaintiffs' APA claims challenge "the process the Government undertook when terminating the funding." *Colo. v. U.S. Dep't of Health & Hum. Servs.*, 2025 WL 1426226, at *8 (D.R.I. May 16, 2025). For example, Plaintiffs allege that Defendants violated 2 C.F.R. § 200.305(b)(3) by failing to resolve Plaintiffs' reimbursement requests within 30 days. Compl. ¶ 160. "Seeking to ensure compliance with statutory or regulatory commands is a matter beyond the scope of the Tucker Act's exclusive jurisdiction." *Cmty. Legal Servs. v. United States Dep't of Health & Hum. Servs.*, 137 F.4th 932, 938 (9th Cir. 2025); *see Columbus Reg'l Hosp. v. Fed. Emergency Mgmt. Agency*, 708 F.3d 893, 896-97 (7th Cir. 2013) (Tucker Act inapplicable to claim that statute entitled grantee to larger award).

Plaintiffs' APA claims also challenge other aspects of Defendants' process, such as their failure to explain why they zeroed out all SSP grants or tell grantees about alleged non-compliance before doing so. Compl. ¶¶ 213, 225. The "source" of Plaintiffs' claims is thus not "any contract, but the APA—particularly its provisions forbidding arbitrary and capricious action, action contrary to law, and action in excess of statutory authority and the Constitution's Spending Clause and underlying separation of powers principles." *Colo.*, 2025 WL 1426226, at *8. "These are precisely the type of claims that belong in district court." *Id.* Indeed, "it would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether

13

the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach." *Aids Vaccine Advocacy Coal. v. United States Dep't of State*, 2025 WL 752378, at *9 (D.D.C. Mar. 10, 2025), *appeal docketed*, No. 25-5098 (D.C. Cir.). Dismissal here would "conflict [] with the 'strong presumption favoring judicial review of administrative action' that is embodied in the APA." *Cmty. Legal Servs.*, 137 F.4th at 939.

As for the type of relief sought, Plaintiffs request declaratory and injunctive relief, not damages. *See* Compl., Prayer for Relief. This "highlights" that Plaintiffs are "not seeking relief that is in essence' monetary." *CWIT*, 2025 WL 1114466, at *9; *see Bowen v. Mass.*, 487 U.S. 879, 893 (1988) ("insofar as the complaints sought declaratory and injunctive relief, they were certainly not actions for money damages"). If the requested relief "effectively requires" Defendants to reimburse SSP grantees, *CWIT*, 2025 WL 1114466, at *9, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893; *see also Me. v. United States Dep't of Agric.*, 2025 WL 1088946, at *19 (D. Me. Apr. 11, 2025) (order declaring that defendants violated the APA by "fail[ing] to follow the proper procedure before freezing funding … will likely result in 'the payment of money,'" but "'this outcome is a mere by-product of [this] court's primary function of reviewing the Secretary's interpretation of federal law'") (quoting *Bowen*, 487 U.S. at 909-10).

Nor could the Court of Federal Claims provide the relief that Plaintiffs seek. For example, Plaintiffs request an order requiring Defendants "to process future [reimbursement] requests pursuant to law," Compl., Prayer for Relief ¶ iv, such as 2 C.F.R. § 200.305(b)(3). "An order compelling the government to follow its regulations is equitable in nature and is beyond the jurisdiction of the Court of Federal Claims." *Ferreiro v. United States*, 501 F.3d 1349, 1353 n.3 (Fed. Cir. 2007); *see Bowen*, 487 U.S. at 905 (Court of Federal Claims "has no power to grant

equitable relief"). Plaintiffs also seek to enjoin Defendants from freezing SSP funding and terminating the program. *See* Compl., Prayer for Relief ¶ iii. The Court of Federal Claims cannot award that relief either. *See Md. v. Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1585051, at *26 (D. Md. June 5, 2025) (Court of Federal Claims cannot "reinstat[e] terminated grants"); *N.Y. v. Trump*, 2025 WL 1098966, at *2 n.2 (D.R.I. Apr. 14, 2025) ("[t]he Court of Claims … would not have the powers" to enjoin a "categorical funding freeze"), *appeal docketed*, No. 25-1413 (1st Cir.).

Department of Education v. California, 145 S. Ct. 966 (2025), doesn't change the analysis. *California* stayed a TRO pending appeal in a short *per curiam* order on the Court's "emergency docket, without full briefing or hearing," making "its precedential value … limited." *Me.*, 2025 WL 1088946, at *19 n.8. Regardless, plaintiffs in *California* sought "'to enforce a contractual obligation to pay money,'" 145 S. Ct. at 968, so "the terms and conditions of each individual grant award" were "at issue." *Cal. v. U.S. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025). By contrast, "this case deals with the [] Defendants' implementation of a broad, categorical freeze on obligated funds" and termination of SSP. *N.Y.*, 2025 WL 1098966, at *2. As the February 10 Funding Terminations as well as the form March 11 and April 1 Letters all demonstrate, Defendants did not base their actions "on individualized assessments of any particular grant terms and conditions." *Id.* An order enjoining "the categorical funding freeze" and termination of SSP thus would not "enforc[e] a contractual obligation to pay money." *Id.*

Finally, plaintiffs' "only claim" in *California* was that the "termination of grants was arbitrary and capricious under the [APA]." *CWIT*, 2025 WL 1114466, at *10. Unlike this case, plaintiffs did not allege "infringement of a constitutional right." *Id.* Thus, "[o]nly" this Court "can serve as a forum for all of [Plaintiffs'] legal theories." *Columbus Reg'l Hosp.*, 708 F.3d at 897.

## II.        Plaintiffs Will Likely Succeed On The Merits.

### A.        Count I: Separation of Powers[1]

The Constitution gives Congress the exclusive power to legislate: "[a]ll legislative Powers herein granted shall be vested in a Congress." U.S. CONST. art. I, § 1. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of N.Y.*, 524 U.S. 417, 438 (1998). The "power of the purse" similarly "rests in the Legislative Branch." *City of Chi. v. Sessions*, 888 F.3d 272, 283 (7th Cir. 2018); *see* U.S. CONST. art. I, § 8, cl. 1. Although "[t]he executive branch has significant powers over immigration matters," "the power of the purse is not one of them." *City of Chi. v. Barr*, 961 F.3d 882, 887 (7th Cir. 2020). And "[b]ecause Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018); *see CWIT*, 2025 WL 1114466, at *16 ("[t]o abide by the separation of powers, the Executive Branch must respect congressional appropriations").

Plaintiffs are likely to succeed on their separation of powers claim because Defendants unlawfully usurped Congress's power in two distinct ways.

*First*, Defendants froze SSP funding and eliminated the program even though Congress, not the Executive Branch, has the power to repeal statutory appropriations. Failing to spend money that has been lawfully appropriated violates the appropriations acts. *See Train v. City of N.Y.*, 420 U.S. 35, 41 (1975). It is the Executive's duty to take care that the laws of the United States are faithfully executed, not to violate them. *See* U.S. CONST. art. II, § 3. So, "[a]bsent congressional

---

[1] Count II alleges a stand-alone claim under the Constitution's Spending Clause, which Plaintiffs primarily base on the Certification Condition. Because Defendants have not yet followed through on their promise to enforce the Certification Condition, Plaintiffs do not seek preliminary relief as to Count II.

authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *S.F.*, 897 F.3d at 1235.

Yet withholding properly appropriated funds, for their own policy reasons, is exactly what Defendants did. Through the February 10 Funding Terminations, FEMA zeroed out SSP accounts for the specific purpose of preventing future payments. Comans Decl. ¶ 8. This action was precipitated by tweets from then-Acting Administrator Hamilton stating that Congress "should have never passed bills … asking FEMA to do this work. This stops now." Prather Decl. ¶ 12. But Congress *did* pass laws directing FEMA to administer SSP, and Defendants must take care to execute those laws, even if they reflect policy decisions unpopular with the Executive Branch.

Defendants later confirmed that they terminated SSP based on policy differences with Congress. The April 1 Letter stated that "the agency's current priorities" contradict "previous agency priorities," which the Letter characterized as "provid[ing] funding to non-federal entities to provide shelter, food, transportation, acute medical care, and personal hygiene supplies for individuals released from DHS short-term holding facilities." *E.g.*, Guzman Decl., Ex. 2 at 1. The April 1 Letter's own characterization of "previous agency priorities" is essentially identical to the priorities identified by Congress in enacting and funding SSP: "to support sheltering and related activities provided by non-Federal entities, in support of relieving overcrowding in short-term holding facilities of U.S. Customs and Border Protection." Pub. L. No. 118-47, Div. C, Title II.

Defendants are thus "declining to spend appropriated funds based on policy objections." *Aids Vaccine Advoc. Coal.*, 2025 WL 752378, at *16. But "federal agencies may not ignore statutory mandates … because of [a] policy disagreement with Congress." *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kennedy, J.). Because Defendants' "termination of grants" and "unwillingness to expend funds in accordance with the congressional appropriations laws is a

17

direct affront to the power of the legislative branch," Defendants violated the separation of powers. *Widakuswara v. Lake*, 2025 WL 1166400, at *15 (D.D.C. Apr. 22, 2025), *appeal docketed*, No. 25-5144 (D.C. Cir.); *see Colo.*, 2025 WL 1426226, at *19 (agency's "unilateral determination" that appropriated funds "were no longer needed" "violated core Separation-of-Powers principals because Congress made its directives clear in the appropriations statutes"); *City & Cnty. of S.F. v. Trump*, 2025 WL 1282637, at *28 (N.D. Cal. May 3, 2025) (federal government likely violated the separation of powers by "freez[ing] the distribution of already-appropriated DOJ funds").

*Second*, through clandestine edits made within FEMA's financial system, Defendants unlawfully deviated from federal law governing appropriated funds. Money obligated pursuant to a federal appropriation must be maintained in the related appropriations account and "remain available" for payments on obligations "properly chargeable to that account." 31 U.S.C. § 1553(a). Accounts containing obligated but unspent funds can only be closed out, and the remaining account balances canceled, five years *after* the obligation period for the account has ended. *See* 31 U.S.C. § 1552(a). Deviation from this process must be approved by Congress. *See Dabney v. Reagan*, 1985 WL 443 (S.D.N.Y. Mar. 21, 1985). Yet Defendants de-obligated all remaining SSP funds, making them unavailable to grantees. In doing so, Defendants ignored the procedure that Congress established for safeguarding appropriated funds and thus violated the separation of powers.

### B.     Count III: Ultra Vires

Judicial relief is generally available "to one who has been injured by an act of a government official which is in excess of his express or implied powers." *Harmon v. Brucker*, 355 U.S. 579, 581-82 (1958). For "agencies charged with administering congressional statutes," as FEMA is under SSP, "their power to act and how they are to act is authoritatively prescribed by Congress."

18

*City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). When agencies act in violation of or in excess of statutory authority, they do so "ultra vires." *Id.*

In *New York v. Trump*, 769 F. Supp. 3d 119 (D.R.I. Mar. 6, 2025), the court held that federal agencies and agency heads—including DHS and Secretary Noem—acted ultra vires by freezing States' grant funding.. The court explained that the Impoundment Control Act permits the Executive Branch to defer or rescind congressionally appropriated funds in narrow circumstances and only if the President sends a "special message" to Congress detailing the proposed deferrals or rescissions. 2 U.S.C. §§ 683-684. Because the President did not send a "special message" to Congress detailing the funding freeze at issue in *New York*, the agencies likely acted "contrary to law." 769 F. Supp. 3d at 138. The court therefore preliminarily enjoined the agencies from implementing "a categorical pause or freeze of funding appropriated by Congress." *Id.* at 147.

The States later moved to enforce the preliminary injunction, arguing that the Hamilton and Noem memos, *supra* at 9, violated the injunction by freezing FEMA funding. In doing so, the States cited FEMA's failure to (among other things) timely reimburse Colorado under SSP. Prather Decl., Ex. 16 ¶ 17. The court granted the States' motion, agreeing that the Hamilton and Noem memos violated the preliminary injunction and ordering FEMA "not to pause or otherwise impede the disbursement of appropriated federal funds to the States." *N.Y. v. Trump*, 2025 WL 1009025, at *5 (D.R.I. Apr. 4, 2025).

In this case, Defendants likewise froze SSP funding. But the narrow circumstances under which the Executive Branch may defer or rescind congressionally appropriated funds do not exist here. *See* 2 U.S.C. §§ 683-684. Regardless, the President did not send a "special message" to Congress detailing the proposed deferrals or rescissions, as the Impoundment Control Act requires.

Therefore, as in *New York*, Defendants acted ultra vires by freezing SSP funding in violation of the Impoundment Control Act.

### C. Counts IV-VI: APA Claims

The APA permits review of "final agency action." 5 U.S.C. § 704. Final agency actions (a) "mark the 'consummation' of the agency's decisionmaking process" and (b) are those "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Courts apply a "'pragmatic'" approach to finality. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016). Plaintiffs challenge three discrete agency actions (the "challenged actions"), all of them final.

*First*, Plaintiffs challenge the February 10 Funding Terminations, a discrete action that consummated FEMA's decision to eliminate all remaining SSP funds. This action determined grantees' rights and imposed legal consequences by "de-obligating" all previously obligated SSP funds for the express purpose of preventing future payments. *See* Comans Decl. ¶ 8.

*Second*, Plaintiffs challenge the March 11 Letter's funding freeze and prohibition on incurring additional costs under the grant. Though the March 11 Letter purports to withhold SSP funds "temporarily," courts have repeatedly reviewed federal funding "pauses" under the APA. *E.g.*, *Me.*, 2025 WL 1088946, at *13, *20; *N.Y.*, 769 F. Supp. 3d at 135-37; *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 2025 WL 597959, at *13 (D.D.C. Feb. 25, 2025), *appeal docketed*, No. 25-5148 (D.C. Cir.). The result should be the same here. The March 11 Letter consummated FEMA's decisionmaking process and imposed legal consequences by withholding SSP funds indefinitely and forbidding grantees from incurring additional costs "until notified further." Guzman Decl., Ex. 1 at 2.

*Third*, Plaintiffs challenge the April 1 Letter's announcement that FEMA terminated SSP grants "effective immediately." *Id.*, Ex. 2 at 1. This announcement consummated FEMA's decisionmaking process and imposed legal consequences by terminating SSP. *See Md.*, 2025 WL 1585051, at *14 ("The decision to close [agency] programs was a final agency action.").

### 1.     Defendants' Actions Are Contrary to Law.

Because the challenged actions violate the Constitution and statutory law, they violate the APA too. *See* 5 U.S.C. § 706(2)(B)-(C). The challenged actions also violate uniform regulations governing federal grants that DHS has adopted. *See* 2 C.F.R. § 3002; *see also Terry v. Astrue*, 580 F.3d 471, 476 (7th Cir. 2009) ("An agency is bound by its own regulations.").

***Funding Freeze***. The uniform regulations provide that where, as here, "the reimbursement method is used, the Federal awarding agency … must make payment within 30 calendar days after receipt of the billing, unless the Federal awarding agency … reasonably believes the request to be improper." 2 C.F.R. § 200.305(b)(3) (2020). Defendants have withheld reimbursement 134 days (and counting) since Plaintiffs' most recent request. *See* Guzman Decl. ¶ 18. Nor have Defendants identified a "reasonabl[e] belie[f]" that Plaintiffs' reimbursement requests are improper.

Defendants did not even tell grantees about the February 10 Funding Terminations, let alone identify a reason for the Terminations. The March 11 Letter justified FEMA's funding freeze by citing 2 C.F.R. § 200.339(a), which permits an agency to withhold payments if it "determines that noncompliance cannot be remedied by imposing specific conditions" upon the recipient. But the March 11 Letter merely expressed "concerns" about "potential" noncompliance based on the notion that grantees "may" have violated 8 U.S.C. § 1324. Guzman Decl., Ex. 1 at 1-2. The March 11 Letter did not state that grantees actually violated Section 1324, much less that any such violations could not be remedied by imposing specific conditions.

*Grant Terminations*. The April 1 Letter terminated all SSP grants based on 2 C.F.R. § 200.340(a)(2) (2020), which permits termination "to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities." Defendants' interpretation of Section 200.340(a)(2), "which would undermine the security of all federal awards, is at odds with [its] plain meaning." *Metro. Transp. Auth. v. Duffy*, 2025 WL 1513369, at *28 (S.D.N.Y. May 28, 2025) (citing the current version of Section 200.340(a)(2), recodified at 2 C.F.R. § 200.340(a)(4)).

Section 200.340(a)(2) "'only allows'" termination "'to the extent authorized by law'" and thus "'cannot authorize actions that contravene statutory requirements'" or "'relieve [Defendants] of [their] duty to follow the law.'" *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 2025 WL 1548611, at *10 (D. Mass. May 30, 2025); *accord Martin Luther King, Jr. Cnty. v. Turner*, 2025 WL 1582368, at *15 (W.D. Wash. June 3, 2025), *appeal docketed*, No. 25-3664 (9th Cir.). No law gives Defendants the authority to terminate SSP grants *en masse*. Congress directed Defendants to administer SSP, not dismantle it.

The Office of Management and Budget clarified the limited scope of subsection (a)(2) when adding it to Section 200.340. Responding to concerns that subsection (a)(2) "will provide Federal agencies too much leverage to arbitrarily terminate awards," the Office emphasized that "agencies are not able to terminate grants arbitrarily." Guidance for Grants and Agreements, 85 Fed. Reg. 49506, 49507 (Aug. 13, 2020). The Office explained:

> The intent of this change is to ensure that Federal awarding agencies prioritize ongoing support to Federal awards that meet program goals. For instance, following the issuance of a Federal award, if additional evidence reveals that a specific award objective is ineffective at achieving program goals, it may be in the government's interest to terminate the Federal award.

*Id.* at 49509. This explanation makes clear that an agency cannot terminate a grant based on mid-grant changes in the agency's *own* goals. Rather, Section 200.340(a)(2) permits terminations only if the grantee is ineffective in advancing the *program's* goals. The April 1 Letter does not even try

to make that case. On the contrary, the April 1 Letter suggests that grantees *achieved* SSP's goals, Guzman Decl., Ex. 1 at 1, but FEMA no longer wishes to achieve that purpose.

### 2. Defendants' Actions are Arbitrary and Capricious.

An agency action is arbitrary or capricious under 5 U.S.C. § 706(2)(A) where it isn't "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The "reasoned explanation requirement … is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. N.Y.*, 588 U.S. 752, 785 (2019). "An agency must defend its actions based on the reasons it gave when it acted," not reasons provided for the first time after the fact. *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 24 (2020). Nor may agencies rely on explanations that are "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Commerce*, 588 U.S. at 785.

Plaintiffs are likely to prevail on their arbitrary and capricious claim for five reasons. *First*, Defendants have not reasonably explained their actions. Defendants have never even acknowledged the February 10 Funding Terminations, much less explained them.

As for the March 11 Letter, it "explains" that FEMA froze SSP funding due to "concerns" that unidentified grantees "may" have engaged in "potential" violations of 8 U.S.C. § 1324. Guzman Decl., Ex. 1 at 1-2. Agencies cannot withhold funding based on unsubstantiated "concerns," however, and the form March 11 Letter does not cite evidence that any particular grantee violated Section 1324. *See* Compl. ¶¶ 157-58 (describing Section 1324's elements). Then-Acting Administrator Hamilton, the author of the March 11 Letter, suggested in a declaration submitted in *New York* that such individualized evidence is unnecessary because SSP "***on its face*** … funds sheltering and transportation for unauthorized aliens." Prather Decl., Ex. 8 ¶ 10 (emphasis

added). Beyond the fact that SSP reimburses grantees that help migrants processed and released by DHS—not "unauthorized aliens"—Hamilton's declaration suggests that all grantees that implemented Congress's directive in enacting SSP committed crimes under Section 1324. That is absurd. Congress does not fund activity that Congress declared unlawful. Yet if Hamilton were right, DHS employees who released migrants into the United States, State of Texas employees who transported those migrants, and countless others committed crimes under Section 1324.

There is yet another problem with Hamilton's suggestion that grantees cannot comply with both Section 1324(a) and SSP: no additional monitoring or specific conditions could cure this flaw. The March 11 Letter nevertheless demanded documentation and assurances as part of an investigation into grantees' compliance with Section 1324. It makes no sense to impose specific conditions, or "temporarily" withhold payments, under a program that cannot be fixed.

The April 1 Letter also failed to reasonably explain why Defendants terminated SSP. The Letter stated that FEMA is now focused on "enforcing immigration laws and securing the border," Guzman Decl., Ex. 2 at 1, but does not explain why that focus is incompatible with reimbursing grantees for costs incurred helping migrants whom DHS itself released into the United States.

*Second*, Defendants' explanations are inconsistent. The March 11 Letter froze SSP funding and initiated an investigation based on concerns about grantees' compliance with Section 1324. The April 1 Letter did not mention Section 1324 or any investigation, instead citing FEMA's changed priorities in terminating SSP. And after Plaintiffs filed this lawsuit, a DHS employee stated that Defendants withheld SSP funds for yet another reason: "Sanctuary city policies … play Russian roulette with American lives." Prather Decl., Ex. 17. In addition to being inconsistent with the March 11 and April 1 Letters, this explanation makes no sense: many SSP grantees, including Pima County, lack so-called "sanctuary" laws. It is thus unclear—apparently even to Defendants—

why Defendants froze SSP funding and terminated the program. But "[i]t will not do for a court to be compelled to guess at the theory underlying the agency's action." *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947).

*Third*, Defendants did not consider individual SSP grantees' performance before freezing funding and terminating grants. *See Policy & Rsch., LLC v. United States Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 83 (D.D.C. 2018) (agency must "undertake the kind of reasoned analysis of potential causes [for grant termination] that the APA and its own regulations require"). Neither the March 11 Letter nor the April 1 Letter identify any grantee-specific facts, and Hamilton repeatedly averred that Defendants froze SSP funding *in toto*. Prather Decl. ¶ 12 & Exs. 8-9. Defendants' use of "template or boilerplate letter[s] issued to all Grant Recipients further strengthens Plaintiffs' argument that [Defendants] did not consider individual, or any, data." *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025).

*Fourth*, Defendants relied on "factors which Congress had not intended [them] to consider." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Congress created SSP to help relieve overcrowding in DHS facilities and facilitate the orderly release of migrants, particularly families, to non-federal entities while they await determination on their claims of lawful entry. Federal agencies must ensure that "specific Federal award conditions and performance expectations are consistent with the program design." 2 C.F.R. § 200.208(a). To that end, agencies may impose specific conditions on grantees based on four enumerated factors, all of which relate to the grantees' ability to perform under the grant. *Id.* § 200.208(b). Yet despite "instituting specific conditions … pursuant to 2 C.F.R. § 200.208," Guzman Decl., Ex. 1 at 1, the March 11 Letter did not discuss any of these factors. Instead, the record indicates that Defendants imposed specific conditions on SSP grantees because of policy disagreements related to

immigration, Prather Decl., Ex. 9-10, or hostility to so-called "sanctuary" jurisdictions, *id.*, Exs. 11, 15. Neither of those bases is relevant to the factors enumerated in Section 200.208(b).

*Fifth*, Defendants failed to consider the significant reliance interests at stake. "When an agency changes course, … it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Regents of Univ. of Cal.*, 591 U.S. at 30. In deciding to provide services to migrants released by DHS, many grantees no doubt considered FEMA's announced intent to provide reimbursement for costs incurred. Defendants have now shifted the goalposts by claiming that these exact same services support "illegal" immigration, pulling the rug out from under grantees after they devoted significant resources to fund the services that Congress and the Executive Branch encouraged via SSP. *See Nat'l Council of Nonprofits v. Office of Mgmt. & Budget*, 2025 WL 368852, at \*55 (D.D.C. Feb. 3, 2025) (federal funding freeze implicated reliance interests that "are all too real").

### 3. Defendants Committed Other Procedural Violations.

Courts must "hold unlawful and set aside agency action, findings and conclusions found to be … without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Before implementing the February 10 Funding Terminations, Defendants failed to provide grantees with the requisite notice of any determination of non-compliance, any specific conditions to be applied to SSP grants, or any grant suspension, pause, or termination. *See* 2 C.F.R. §§ 200.208, 200.243, 200.305, 200.339-200.342. Nor did Defendants offer grantees any opportunity to contest any agency determinations before the February 10 Funding Terminations. *See id.* § 200.342. In addition to the procedural violations described above, Defendants violated the APA for this reason too.

### III. Plaintiffs Will Be Irreparably Harmed Absent A Preliminary Injunction.

Absent a preliminary injunction, Defendants' actions will irreparably harm Plaintiffs in three independent ways.

First, "irreparable harm is presumed" when defendants violate constitutional provisions that protect "intangible and unquantifiable interests." *Ezell v. City of Chi.*, 651 F.3d 684, 699 (7th Cir. 2011). As this Court held, "[t]he separation of powers is one such interest." *CWIT*, 2025 WL 1114466, at *19. "By protecting against 'the concentration of power' that 'would allow tyranny to flourish,' it is 'one of the most vital of the procedural protections of individual liberty found in our Constitution.'" *Id.* (quoting *Barr*, 961 F.3d at 892). As explained above, Defendants violated "Congress's express direction" and committed "a clear separation of powers violation." *Id.* "Thus, no further showing of irreparable injury or inadequacy of legal remedies is required." *Id.*

Second, Defendants' de-obligation of SSP funds threatens irreparable harm to Plaintiffs. When an agency has exhausted appropriated funds that are at issue in litigation, courts may "lack authority to grant effectual relief." *Cnty. of Suffolk v. Sebelius*, 605 F.3d 135, 138 (2d Cir. 2010); *see City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426-27 (D.C. Cir. 1994). Public statements by Senator Murphy, quoted above, indicate that Defendants have reallocated at least some SSP funds to ICE. To make matters worse, DHS reportedly will run out of money imminently. Prather Dec., Ex 17. Because distributing the SSP funds at issue here to ICE, other DHS agencies, or third parties could preclude effectual relief, preliminary relief is necessary. *See Climate United Fund v. Citibank, N.A.*, 2025 WL 1131412, at *17 (D.D.C. Apr. 16, 2025).

In a lawsuit challenging FEMA's claw-back of $80 million in SSP funds, New York City similarly sought preliminary relief based on concerns that FEMA would redistribute the funds "to other recipients" before the court could resolve the case. Prather Dec., Ex. 13 at 19-20. The federal government responded that the "Purpose Statute, 31 U.S.C. § 1301(a), prevents the funds at issue

from being spent on anything other than ... 'support[ing] sheltering and related activities provided by non-Federal entities, in support of relieving overcrowding in short-term holding facilities of U.S. Customs and Border Protection.'" *Id.*, Ex. 14 at 9. That representation appears to be in tension with Senator Murphy's later statement that DHS reallocated SSP funds to ICE. The federal government also represented that "the funds DHS obligated to Plaintiff cannot be re-obligated to another entity," *id.* at 10, but did not disclose that FEMA had de-obligated the funds via the February 10 Funding Terminations, nor discuss whether DHS planned to reallocate funds via the Section 503 process (or if it had already). The court denied preliminary relief based on its understanding that the disputed funds remained obligated to New York City and couldn't be spent elsewhere. *Id.*, Ex. 15 at 38-39. The more complete factual record presented here supports a different outcome.

Third, the uncertainty created by Defendants upends Plaintiffs' ability to budget. Some Plaintiffs are now planning their FY2026 budgets. Doheny Decl. ¶¶ 32-33; Guzman Decl. ¶ 32. For example, Chicago's Mayor must propose a budget to the City Council by October 2025. Guzman Decl. ¶ 32. Facing large deficits already, losing $50 million in SSP funding would require cuts to services and/or employee layoffs. *Id.* ¶¶ 30-31. Chicago must know well in advance of the October 2025 budget deadline whether these actions will be necessary because Chicago must (a) comply with notice requirements in collective bargaining agreements if layoffs are required and (b) inform contractors that operate city programs if contracts must be terminated. *Id.* ¶ 32.

In preliminarily enjoining the freeze of funding to States, the *New York* court observed:

> It is so obvious that it almost need not be stated that when money is obligated and therefore expected (particularly money that has been spent and reimbursement is sought) and is not paid as promised, harm follows—debt is incurred, debt is unpaid, essential health and safety services stop, and budgets are upended. And when there is no end in sight to the Defendants' funding freeze, that harm is amplified because

> those served by the expected but frozen funds have no idea when the promised monies will flow again.

769 F. Supp. 3d at 142. The same logic applies here. *See also S.F.*, 2025 WL 1282637, at \*24 ("the [local governments] face looming budget deadlines without knowing whether they will receive reimbursements for funds already expended in the last fiscal year," causing "uncertainty" that "constitutes irreparable harm"); *Me.*, 2025 WL 1088946, at \*27; *City of Evanston v. Barr*, 412 F. Supp. 3d 873, 886 (N.D. Ill. 2019).

## IV. The Public Interest And The Equities Favor A Preliminary Injunction.

When deciding whether to grant an injunction, courts "'balance the competing claims of injury,'" "'the effect on each party of the granting or withholding of the requested relief,'" and "the public interest." *Winter*, 555 U.S. at 24. Absent an injunction, Plaintiffs will continue to incur harm from Defendants' constitutional violations, Defendants' apparent transfer of de-obligated SSP funds, and uncertainty impeding Plaintiffs' ability to budget. The public at large also will suffer harm absent an injunction because Defendants' funding freeze will force Plaintiffs to cut services and/or fire employees. By contrast, Defendants will likely assert primarily monetary harms.

As this Court held, "injunctions protecting the separation of powers … 'are always in the public interest.'" *CWIT*, 2025 WL 1114466, at \*19; *see Barr*, 961 F.3d at 918 (affirming the district court's ruling that "the public interest was served by an injunction in that it acts as a check on the executive's encroachment of congressional power that violates the separation of powers"). And where the movant establishes a likelihood of success on a separation of powers claim, "'the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional.'" *CWIT*, 2025 WL 1114466, at \*19 (quoting *Am. Civil Liberties Union v. Alvarez*, 679 F.3d 583, 589-

90 (7th Cir. 2012)). This principle applies here because Plaintiffs have shown that Defendants violated the Constitution's separation of powers. A preliminary injunction should thus issue.

**V.     Plaintiffs Are Entitled To Preliminary Relief In The Form Requested.**

Plaintiffs request that the Court order Defendants to (a) undo their February 10, 2025 de-obligation of SSP funds and (b) process pending and future requests for reimbursement under SSP in accordance with 2 C.F.R. § 200.305(b)(3) and other applicable law. Plaintiffs also request that the Court preliminarily enjoin Defendants, their officers, agents, servants, employees, and attorneys from (a) eliminating or terminating SSP, (b) de-obligating SSP funds during the pendency of this litigation, (c) withholding SSP funding for the reasons identified in the March 11 or April 1 Letters, and (d) terminating SSP grants for the reasons identified in the March 11 or April 1 Letters.

Plaintiffs request relief that is national in scope because this is "the type of case in which a district court should properly be able to apply an injunction nationwide." *Sessions*, 888 F.3d at 290. Defendants have taken identical actions and issued near-identical communications to SSP grantees, resulting in a "broad and uniform impact." *Id*. at 293. In addition, the issues presented here are "purely legal" in nature, and the harm to Defendants is minimal. *Id*.

**CONCLUSION**

Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction.

Dated: June 20, 2025                Respectfully Submitted,

Mary B. Richardson-Lowry,
Corporation Counsel of the City of Chicago

By: */s/ Lucy Prather*
Lucy Prather (lucy.prather@cityofchicago.org)
Rebecca Hirsch (rebecca.hirsch2@cityofchicago.org)
Chelsey Metcalf (chelsey.metcalf@cityofchicago.org)
Stephen Kane (stephen.kane@cityofchicago.org)
City of Chicago Department of Law

121 North LaSalle Street, Room 600
Chicago, Illinois 60602
Tel: 312-744-4294
*Attorneys for Plaintiff City of Chicago*

Laura Conover
Pima County Attorney

By: */s/ Kyle Johnson*
Samuel E. Brown (sam.brown@pcao.pima.gov)
Bobby Yu (bobby.yu@pcao.pima.gov)
Kyle Johnson (kyle.johnson@pcao.pima.gov)
Pima County Attorney's Office, Civil Division
32 N. Stone, Suite 2100
Tucson, Arizona 85701
Tel: (520) 724-5700
*Attorneys for Plaintiff Pima County*

Katie McLoughlin
Acting City Attorney, City and County of
Denver

By: */s/ Matthew J. Mulbarger*
Matthew J. Mulbarger
(matthew.mulbarger@denvergov.org)
Denver City Attorney's Office
201 W Colfax Avenue
Denver, CO 80202
Tel: 720-913-8050
*Attorneys for Plaintiff City and County of
Denver*