UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| City of Chicago, City and County of Denver, and Pima County,<br><br>Plaintiffs,<br><br>v.<br><br>United States Department of Homeland Security; Kristi Noem, in her official capacity as Secretary of the United States Department of Homeland Security; United States Federal Emergency Management Agency; and David Richardson, in his official capacity as Acting Administrator of the United States Federal Emergency Management Agency,<br><br>Defendants. | Case No. 1:25-cv-05463<br><br>Hon. Matthew F. Kennelly |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

Defendants unlawfully de-obligated grant funds awarded to Plaintiffs under FEMA's Shelter and Services Program ("SSP") and terminated the Program. Plaintiffs therefore filed this lawsuit and moved for a preliminary injunction. Plaintiffs explained that preliminary relief was necessary based in part on publicly available information suggesting that Defendants diverted SSP funds to ICE and planned to continue doing so, potentially mooting Plaintiffs' claims by expending SSP funds that FEMA had obligated to Plaintiffs.

Since then, DHS Secretary Kristi Noem stated that the State of Florida's new immigration detention facility—nicknamed "Alligator Alcatraz"—"will in large part be funded by FEMA's Shelter and Services Program." Another DHS official stated that the agency can allocate $625 million in SSP funds to reimburse Florida for costs related to Alligator Alcatraz—almost the entire $650 million that Congress appropriated to SSP in 2024. And just yesterday, Senator Chris Murphy

1

publicized that DHS notified Congress of the agency's intent to use SSP funds to reimburse states to "detain noncitizens," an apparent reference to Alligator Alcatraz. Senator Murphy's letter is alarming because DHS apparently provided this notice to start a 30-day clock before the agency may repurpose SSP funds—*a clock that expires tomorrow*. Plaintiffs expect DHS to re-obligate SSP funds to Florida as soon thereafter as possible, potentially mooting Plaintiffs' claims.

As Defendants' own counsel acknowledged, it would be illegal to re-obligate SSP funds to reimburse Florida for costs related to Alligator Alcatraz. Congress appropriated SSP funds to reimburse non-federal entities like Plaintiffs for some of the cost of providing humanitarian assistance to migrants processed and released by DHS into the United States. FEMA cannot repurpose this humanitarian funding to reimburse Florida for the cost of detaining the very same migrants whom Congress sought to help through SSP.

Plaintiffs have made extensive efforts over the last two weeks to avoid the need for a temporary restraining order, repeatedly asking Defendants to provide satisfactory assurances that they will not re-obligate SSP funds before the Court can adjudicate Plaintiffs' motion for a preliminary injunction. Defendants have failed to do so, necessitating this motion.

Senator Murphy asked: "if Trump can get away with violating the appropriations laws this brazenly, what stops him from ignoring the entirety of Congress's spending law?" The answer is this Court. Plaintiffs request that the Court enter a temporary restraining order barring Defendants from diverting SSP funds until the Court rules on Plaintiffs' motion for a preliminary injunction.

## I. STATEMENT OF FACTS

Plaintiffs' motion for a preliminary injunction recites the SSP's history and the actions that Plaintiffs contend are unlawful. *See* Dkt. 28 at 4-11. Plaintiffs incorporate that recitation here.

As is relevant here, Plaintiffs' motion for a preliminary injunction explained that FEMA de-obligated SSP funds that FEMA had obligated to Plaintiffs and other SSP grantees. *Id.* at 7. Plaintiffs' motion also noted that in May 2025, Senator Murphy stated that DHS had repurposed an unknown amount of SSP appropriations to fund ICE. *Id.* at 11. And Plaintiffs' motion cited a June 2025 press report stating that DHS had "recently" transferred "nearly $500 million from within its own funds" to support ICE, and that DHS was already "$1 billion over budget." *Id.* This information led Plaintiffs to suspect that DHS was reallocating de-obligated SSP grant funds to other purposes and forms one basis for Plaintiffs' position that a preliminary injunction is needed to avoid irreparable harm. *Id.* at 27-28.

Since Plaintiffs filed their motion, new information has revealed another threat to Plaintiffs' ability to obtain complete relief. On June 23, 2025, the New York Times reported that the State of Florida was constructing an immigration detention facility in the Everglades, nicknamed "Alligator Alcatraz." Decl. of Lucy Prather ("Prather Dec."), Ex. 1 at 1. The Times reported that the facility would cost about $450 million per year to operate, but "Florida can request some reimbursement from the Federal Emergency Management Agency, said Tricia McLaughlin, a spokeswoman for the Department of Homeland Security." *Id*. According to the article, "the FEMA money will be drawn from" SSP. *Id*. at 3. That same day, Secretary Noem posted a link to the New York Times story on X, praising the construction of Alligator Alcatraz and announcing that the facility "will in large part be funded by FEMA's Shelter and Services Program." *Id.* ¶ 4.

On June 27, 2025, Chicago emailed the New York Times story and Secretary Noem's tweet to counsel for Defendants, seeking assurances that SSP funds at issue in this lawsuit would not be used to reimburse Florida for Alligator Alcatraz. *Id.*, Ex. 2 at 5. Defendants' counsel called Chicago to say that "none of the [SSP] money is going" to Alligator Alcatraz because Defendants

3

are "not allowed to" legally redirect obligated funds. *Id.* ¶ 6.[1] Defendants' counsel also stated that despite evidence that Defendants de-obligated all SSP grants within FEMA's financial system, Plaintiffs' grants remain "legally" obligated. *Id.*

On the same day as the parties' call, Al Jazeera cited "[a] Noem spokesperson" in reiterating that Alligator Alcatraz "will largely be funded by FEMA's Shelter and Services Program." *Id.*, Ex. 3 at 3. A "DHS spokesperson" told Al Jazeera that "FEMA has roughly $625m in that programme's funds that can be allocated to build the 'Alligator Alcatraz' facility." *Id.* Florida Governor Ron DeSantis went even further, stating that Alligator Alcatraz "was requested by the federal government," and that the cost of building the facility "will be fully reimbursed by the federal government." Prather Dec. ¶ 8. An anonymous U.S. official echoed DeSantis on June 30, 2025, telling the AP that expenses related to Alligator Alcatraz "are to be incurred by Florida and reimbursed by the Federal Emergency Management Agency." *Id.*, Ex. 4 at 6.

On June 30, 2025, Chicago emailed the AP and Al Jazeera reports to counsel for Defendants, again requesting assurances about the status of SSP funds. *Id.*, Ex. 2 at 4-5. The next day, Defendants' counsel responded by email to "confirm [] that to the extent SSP funds are used for the Alligator Alcatraz project, no SSP funds from FY2023 or FY2024 will be used. Rather, the program will be funded with FY 2025 funds." *Id.* at 4. "This is consistent with my explanation on [June 27] that the FY2023 and FY2024 SSP appropriations remain available for five years to liquidate valid obligations and they cannot be used for any new obligations." *Id.*

On July 2, 2025, Chicago informed counsel for Defendants that Congress did not appropriate SSP funds in FY2025 and asked counsel to identify the FY2025 funds with which

---

[1] Nothing in this motion suggests that the opposing counsel with whom Chicago interacted knowingly deceived Plaintiffs. On the contrary, Plaintiffs appreciate opposing counsel's attempts—albeit unsuccessful—to obtain his clients' assurance that Defendants will not use SSP funds for other purposes.

DHS plans to reimburse Florida for Alligator Alcatraz. *Id.* ¶ 11. Counsel for Defendants acknowledged that he did not know which FY2025 funds DHS intended to use. *Id.* Chicago therefore requested a signed document from a DHS official attesting that SSP funds would not be diverted to Alligator Alcatraz. *Id.* Defendants' counsel said that he would inquire with his clients and reiterated that 2023 and 2024 SSP funds cannot legally be diverted to Alligator Alcatraz. *Id.*

On July 3, 2025, acting FEMA Administrator David Richardson submitted a declaration in litigation challenging Alligator Alcatraz's construction. Richardson stated that "DHS/FEMA announced $600 million in federal funding for the Detention Support Grant Program," and that Florida is "[t]he only eligible applicant." *Id.*, Ex. 5 ¶ 3. Richardson described the Detention Support Grant Program as "provid[ing] financial assistance through a federal award to support sheltering of illegal aliens in a detention environment and related activities to avoid overcrowding in U.S. Customs and Border Protection short-term holding facilities." *Id.* That description is substantially similar to Congress's description of SSP: "to support sheltering and related activities provided by non-Federal entities, in support of relieving overcrowding in short-term holding facilities of U.S. Customs and Border Protection." 138 Stat. 460, 598. Moreover, a federal government website listing federal grants uses the same "Account Identification" number for both the Detention Support Grant Program and SSP. Prather Dec., Ex. 6 at 5, 15. This suggests that DHS has simply renamed SSP as the Detention Support Grant Program.

On July 9, 2025, a press report cited "[i]nternal FEMA documents" showing that FEMA is awarding a $608.4 million grant to reimburse Florida for costs related to Alligator Alcatraz. *Id.*, Ex. 9 at 3. The report quoted a FEMA source saying that "they're taking the money intended for the SSP that Congress mandated via their old appropriations bill to a new grant program related to ICE so they can pay states." *Id.* That same day, Chicago informed Defendants' counsel about the

article and requested "something in writing from your client, explaining the source of the funds for this project and affirming that it is not, in fact, being funded by de-obligated SSP dollars." *Id.*, Ex. 2 at 3. Defendants' counsel responded that he would "do my best to get you something next week." *Id.* at 2.

On the afternoon of July 11, 2025, Senator Murphy sent a letter to Secretary Noem in which the Senator responded to a publicly unavailable letter that DHS sent to a Senate subcommittee's ranking members on June 13, 2025. *Id.*, Ex. 7 at 1. According to Senator Murphy, the June 13 notice asked to "transfer a total of $430,884,690 in funding pursuant to section 503 of the DHS annual appropriations act from a variety of sources across DHS," "repurpos[ing]" that money for ICE and other recipients. *Id.*; *see* Dkt. 28 at 11 (describing Section 503 notices). In an apparent reference to Alligator Alcatraz, Senator Murphy suggested that DHS seeks to transfer some of this money from SSP to "give to state[s]" to "detain noncitizens":

> [E]arlier this year DHS transferred $32 million from SSP to ICE, the full amount permissible under law, and has recently asserted that "shelter" means "detention" (so that the entire fund can be raided for detention beds), and as I understand it, has plans to fund various immigration enforcement efforts with these humanitarian funds. The clear purpose of the shelter and services fund is to support humanitarian services - food, housing, and medical care for example – to non-federal entities supporting noncitizens *released* from custody. Therefore, using these funds to detain noncitizens, or to give to state and local law enforcement to arrest and detain noncitizens, is a patently clear purpose violation. Firstly, the funds are plainly appropriated for noncitizens 'released' from CBP custody, and secondly, there is no reasonable interpretation that could equate the requirement to provide food, housing, and healthcare for those released from CBP's physical custody as permitting ongoing physical detention where a noncitizen is not free to leave. If true, it is an astounding violation of the law.

*Id.*, Ex. 7 at 3; *see also id.*, Ex. 8 at 1 (congressional letter opposing "the redirection of [SSP] funds earmarked for humanitarian assistance" to fund Alligator Alcatraz).

Also on the afternoon of July 11, 2025, Senator Murphy posted tweets rephrasing his letter to Secretary Noem in everyday language. Senator Murphy wrote that DHS is "brazenly stealing

the SSP money … to build facilities like Alligator Alcatraz" in a "stunning violation of the law." *Id.* ¶ 15. Senator Murphy asked "if Trump can get away with violating the appropriations laws this brazenly, what stops him from ignoring the entirety of Congress's spending law?" *Id.*

Late in the afternoon on July 11, 2025, Chicago emailed Defendant's counsel: "We intend to file for a temporary restraining order over the weekend unless we receive concrete assurance from you that this reprogramming [described in Senator Murphy's letter] will not occur, and 2023 and 2024 SSP funds will not be otherwise transferred or reprogrammed, within the next 60 days." *Id.*, Ex. 2 at 1. Defendants' counsel has not responded as of the time of this filing.

## II.    ARGUMENT

"The standard for issuing a temporary restraining order is identical to that governing the issuance of a preliminary injunction." *Mays v. Dart*, 453 F. Supp. 3d 1074, 1087 (N.D. Ill. 2020). A temporary restraining order is therefore warranted where the moving party establishes that (1) it "is likely to succeed on the merits," (2) it "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [the movant's] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Chi. Women in Trades v. Trump*, 773 F. Supp. 3d 592, 599 (N.D. Ill. 2025).

Plaintiffs' motion for a preliminary injunction explains that Plaintiffs satisfy this standard. *See* Dkt. 28 at 16-30. Plaintiffs incorporate that explanation here and add the following points.

### A.    Defendants Likely Violated the Constitution's Separation of Powers.

Defendants' plan to use SSP funds to reimburse Florida for the cost of constructing and maintaining Alligator Alcatraz further demonstrates that Plaintiffs will likely succeed on their separation-of-powers claim. *See id.* at 16-18. Congress appropriated funds to SSP "to support sheltering and related activities provided by non-Federal entities, in support of relieving

7

overcrowding in [DHS] short-term holding facilities." 138 Stat. 460, 598. Thus, as Senator Murphy observed, SSP's purpose "is to support humanitarian services - food, housing, and medical care for example – to non-federal entities supporting noncitizens *released* from custody." Prather Dec., Ex. 7 at 3. Using SSP funds "to detain noncitizens" is "a patently clear purpose violation" and "an astounding violation of the law." *Id.* Indeed, Defendants acknowledged in separate litigation that the "Purpose Statute" "prevents" SSP funds "from being spent on anything other than 'the objects for which the appropriations were made.'" Dkt. 29-14 at 9 (quoting 31 U.S.C. § 1301(a)).

Moreover, as Defendants also acknowledged in that separate litigation, "Congress stated that SSP funds would be available for obligation only 'for the fiscal year ending September 30, 2024.'" *Id.* at 10 (quoting Pub. L. No. 118-147 § 5, 138 Stat. at 461); *accord* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328 § 5, 136 Stat. 4459, 4462 (appropriating SSP funds "for the fiscal year ending September 30, 2023"). Defendants observed that this "time-limited appropriation" is "available to incur a new obligation only during the period of time designated by Congress." *Id.* (citing 31 U.S.C. § 1502(a)). "Because the time to obligate [SSP] funds expired on September 30, 2024, DHS cannot re-award those funds to another entity or potential grantee." *Id.*

"Absent congressional authorization"—which does not exist here—Defendants "may not redistribute or withhold properly appropriated funds" consistent with the Constitution's separation of powers. *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018); *see Chi. Women in Trades v. Trump*, 2025 WL 1114466, at *16 (N.D. Ill. Apr. 14, 2025) ("*CWIT*") ("[t]o abide by the separation of powers, the Executive Branch must respect congressional appropriations"). Therefore, as counsel for Defendants in this case correctly conceded, "FY2023 and FY2024 SSP appropriations … cannot be used for any new obligations," Prather Dec., Ex. 2 at 4—including to reimburse Florida for the cost of constructing and maintaining Alligator Alcatraz.

8

### B. Plaintiffs Will Likely Suffer Irreparable Harm Absent Preliminary Relief.

Defendants' plan to use SSP funds to reimburse Florida for costs related to Alligator Alcatraz also confirms that Plaintiffs will likely suffer irreparable harm absent preliminary relief. To begin with, Defendants' plan supports Plaintiffs' separation-of-powers claim, so "no further showing of irreparable injury or inadequacy of legal remedies is required." *CWIT*, 2025 WL 1114466, at *19; *see* Dkt. 28 at 27.

Moreover, as Plaintiffs' motion for a preliminary injunction observed, courts "may lack the authority to grant effectual relief" when an agency has exhausted appropriated funds that are at issue in litigation. Dkt. 28 at 27 (citing *Cnty. of Suffolk v. Sebelius*, 605 F.3d 135 (2d Cir. 2010)). In *Suffolk*, a county sued the Department of Health and Human Services, alleging that the county received less funding under a federal program than it should have under the statutory scheme. The district court denied the county's motion for a preliminary injunction preventing HHS from allocating the disputed grant funds while litigation was ongoing. The Second Circuit reversed, holding that the county would likely succeed on the merits. By that time, however, HHS had lawfully obligated all funds that Congress appropriated for that federal program and distributed those funds to other grantees. The Second Circuit concluded: "Where, as here, the congressional appropriations relating to the funds sought by private litigants have been lawfully distributed— and therefore exhausted—by a federal agency, courts lack authority to grant effectual relief in the context of an Article III case or controversy." *Suffolk*, 605 F.3d at 138. The county's claims were therefore "moot." *Id.*; *see also City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1425-27 (D.C. Cir. 1994) (agency mooted city's claim by de-obligating city's grant funds and obligating the funds to another grantee); *Climate United Fund v. Citibank, N.A.*, 2025 WL 1131412, at *17

9

(D.D.C. Apr. 16, 2025) (citing *Houston* for the proposition that "[a]ny transfer, re-allocation, or re-obligation of the[ disputed] funds would be an irreparable loss").

As in *Suffolk* and *Houston*, Defendants' reportedly imminent re-obligation creates a substantial risk that the disputed funds will be exhausted before the Court can adjudicate Plaintiffs' claims. To be sure, the Congressional appropriations at issue in *Suffolk* and *Houston* were "lawfully" exhausted before the litigation concluded, which is not true here. And as we note above, Defendants conceded in other SSP litigation that they cannot lawfully re-obligate SSP funds to other grantees because the time to do so has expired. *See* Dkt. 29-14 at 10.

It is unclear, however, whether the unlawful nature of Defendants' plan matters in determining whether the re-obligations of SSP funds moots Plaintiffs' claims. *Houston* held without qualification that "federal courts cannot order the expenditure of funds" that have been "fully obligated" because "there [are] no funds available from which [defendant] could lawfully repay [plaintiff]." 24 F.3d at 1424. By contrast, *Suffolk* suggested that the result may have been different had the agency's re-obligation of funds been unlawful. *Suffolk* limited its holding to "the facts of the case" because "[t]here is no indication in the record that HHS … disregarded any legal obligation to avoid dispensing the funds at issue." 605 F.3d at 142 n.9. Yet *Suffolk* suggested that application of its holding to those facts would be unfair but unavoidable: the court stated in dicta that even if the agency had acted unlawfully, "that is a matter that can only be addressed by resort to the political branches." *Id*. In the face of this uncertainty, Plaintiffs seek temporary relief to prevent Defendants from mooting Plaintiffs' claims.

Senator Murphy's July 11 letter to Secretary Noem suggests that Plaintiffs cannot wait until the Court adjudicates Plaintiffs' motion for a preliminary injunction. Senator Murphy's letter states that DHS sent a Section 503 notice to the Senate on June 13, 2025. Prather Dec., Ex. 7 at 1.

Section 503 provides: "None of the funds provided by this Act … shall be available for obligation or expenditure through a reprogramming of funds" that "eliminates a program" or "reduces funding for any program … by 10 percent or more." Pub. L. No. 118-147, Div. C § 503(a), 138 Stat. at 614-15. Section 503(a) "shall not apply," however, "if the Committees on Appropriations of the House of Representatives and the Senate are notified at least 30 days in advance of such reprogramming." *Id.* § 503(b), 138 Stat. at 615. Assuming that DHS sent a Section 503 notice to the House of Representatives appropriations committee on or before June 13, 2025, the 30-day waiting period set forth in Section 503(b) expires on July 13. Plaintiffs expect Defendants to re-obligate SSP funds to Florida as soon thereafter as possible.

Any such re-obligation would be unlawful for the reasons described above, as Defendants conceded in other SSP litigation and Defendants' counsel conceded in this litigation. It also would violate Section 503 itself. *See id.* § 503(d), 138 Stat. at 615 ("Notwithstanding subsections (a), (b), and (c), no funds shall be reprogrammed within or transferred between appropriations … to increase or decrease funding for grant programs" or "to create a program… , including any new function or requirement within any program, … not approved by Congress in the consideration of the enactment of this Act."). Nevertheless, Defendants' public statements indicate that Defendants intend to proceed with their plan regardless of the law.

Plaintiffs are uncertain how much de-obligated SSP funding Defendants intend to use for other purposes and when Defendants will re-obligate SSP funds. As for "how much," Congress appropriated $800 million in 2023 "to support sheltering and related activities." Pub. L. No. 117-328, Title II, Div. F, 136 Stat. at 4730. After paying administrative costs, FEMA obligated around $360 million under SSP and distributed the remainder under a related sheltering program. Prather Dec., Ex. 10 at 13, 22, 27. In 2024, Congress appropriated $650 million to SSP, Pub. L. No. 118-

11

47, Div. C, Title II, 138 Stat. at 598, which Plaintiffs believe FEMA obligated in full. Thus, any transfer of SSP funds to pay $600-$625 million to Florida seemingly must come from de-obligated SSP grants.

As for "when," acting FEMA Administrator Richardson stated that as of July 3, 2025, Florida had not yet applied for funding under the Detention Support Grant Program. Prather Dec., Ex. 5 ¶ 4. Plaintiffs do not know whether Florida has applied since that date, or whether Defendants approved any such application. That is precisely why Plaintiffs sought assurances that Defendants will not re-obligate SSP funds, beyond opposing counsel's statements about the legality of doing so, before the Court can resolve Plaintiffs' motion for a preliminary injunction. Defendants' failure to provide those factual assurances necessitates this motion.

### C. The Public Interest and the Equities Favor Temporary Relief.

Plaintiffs' motion for a preliminary injunction explained that the public interest and equities favor immediate relief. Dkt. 28 at 29-30. The new evidence described in this motion further supports Plaintiffs' separation-of-powers claim, and preliminary relief "protecting the separation of powers" is "'always in the public interest.'" *CWIT*, 2025 WL 1114466, at *19. The new evidence also shows that Defendants plan to use SSP funds for illegal purposes, further tilting the equities in Plaintiffs' favor.

### III. CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for a temporary restraining order.

Dated: July 12, 2025　　　　　　　　　Respectfully Submitted,

　　　　　　　　　　　　　　　　　　Mary B. Richardson-Lowry,
　　　　　　　　　　　　　　　　　　Corporation Counsel of the City of Chicago

　　　　　　　　　　　　　　　　　　By: */s/ Lucy Prather*

12

Lucy Prather (lucy.prather@cityofchicago.org)
Rebecca Hirsch (rebecca.hirsch2@cityofchicago.org)
Chelsey Metcalf (chelsey.metcalf@cityofchicago.org)
Stephen Kane (stephen.kane@cityofchicago.org)
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
Tel: 312-744-4294
*Attorneys for Plaintiff City of Chicago*

LAURA CONOVER
PIMA COUNTY ATTORNEY

By: */s/ Samuel E. Brown*
Samuel E. Brown (sam.brown@pcao.pima.gov)
Bobby Yu (bobby.yu@pcao.pima.gov)
Kyle Johnson (kyle.johnson@pcao.pima.gov)
Pima County Attorney's Office, Civil Division
32 N. Stone, Suite 2100
Tucson, Arizona 85701
Tel: (520) 724-5700
*Attorneys for Plaintiff Pima County*

Katie McLoughlin
Acting City Attorney, City and County of Denver

By: */s/ Matthew J. Mulbarger*
Matthew J. Mulbarger
(matthew.mulbarger@denvergov.org)
Denver City Attorney's Office
201 W Colfax Avenue
Denver, CO 80202
Tel: 720-913-8050
*Attorneys for Plaintiff City and County of Denver*