UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 25 C 5463 |
| v. | ) | |
| | ) | Judge Kennelly |
| UNITED STATES DEPARTMENT OF | ) | |
| HOMELAND SECURITY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**Table of Contents**

Table of Authorities ..................................................................................................... ii

Introduction .................................................................................................................. 1

Background ................................................................................................................... 2

    A.   Plaintiffs' Grant Awards Under the Shelter and Services Program (SSP) ................ 2

    B.   FEMA's Withholding of SSP Reimbursement Funds................................................. 4

    C.   FEMA's Termination of Plaintiffs' SSP Grant Awards.............................................. 4

    D.   This Lawsuit............................................................................................................... 5

Argument ...................................................................................................................... 6

    I.     Plaintiffs Make No Showing of Irreparable Harm..................................................... 6

    II.    This Court Lacks Jurisdiction Based on Tucker Act Principles ............................. 12

    III.   Plaintiffs are Not Substantially Likely to Succeed on the Merits .......................... 16

        A.   APA Claims ........................................................................................................ 16

            1.   Grant Funding Decisions Are Committed to Agency Discretion ........... 16

            2.   No Final Agency Action for Withholding Reimbursement Funding ...... 18

            3.   Plaintiffs' APA Claims Lack Merit ......................................................... 19

        B.   Separation of Powers Claim............................................................................... 22

            1.   Plaintiffs' Challenge Fails Under *Dalton* ............................................. 23

            2.   Plaintiffs Cannot Invoke the Court's Equity Powers Because the APA Provides a Path of Judicial Review......................................................... 23

            3.   Separation-of-Powers Claim Fails on the Merits................................... 26

    IV.   The Equities Weight Against Emergency Relief .................................................... 29

Conclusion .................................................................................................................. 30

# Table of Authorities

## Cases

508 U.S. 182 (1993) ............................................................................................ passim

861 F.2d 729 (Fed. Cir. 1988) ................................................................................... 20

2025 WL 1350103 (D.C. Cir. May 2, 2025) .............................................................. 15

*Air Courier Conf. of Am. v. Am. Postal Workers Union*, 498 U.S. 517 (1991) ........................... 19

*Air Espana v. Brien*, 165 F.3d 148 (2d Cir. 1999) .................................................... 18

*Albrecht v. Comm. on Emp. Benefits*, 357 F.3d 62 (D.C. Cir. 2004) ............................ 13

*Am. Ass'n of Colleges for Teacher Educ. v. McMahon*, No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025) ..................................................................................... 16

*Amica Ctr. for Immigrant Rts. v. Dep't of Just.*, No. 25-cv-298 (RDM), 2025 WL 1852762 (D.D.C. July 6, 2025) ......................................................................... 17

*Armstrong*, 575 U.S. ............................................................................................ 24

*Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398 (2d Cir. 2015) .................................. 13

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32 (1991) ........................ 24

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................. 18

*Bevis v. City of Naperville, Illinois*, 85 F.4th 1175 (7th Cir. 2023) ............................. 6

*City & Cnty. Of S.F. v. Trump*, 897 F.3d 1225 (2018) ............................................. 28

*City of Chi. v. Barr*, 961 F.3d 882 (7th Cir. 2020) .................................................. 28

*City of Chi. v.* Sessions, 888 F.3d 272 (7th Cir. 2018) ............................................ 28

*City of Houston, Texas v. Department of Housing & Urban Development,* 24 F.3d 1421 (D.C. Cir. 1994) .......................................................................................... 8, 10

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987) .................................................. 19

*Cnty. of Suffolk v. Sebelius*, 605 F.3d 135 (2d Cir. 2010) ....................................... 10

*Cnty. of Westchester v. U.S. Dep't of Hous. & Urb. Dev.*, 802 F.3d 413 (2d Cir. 2015) ......... 8, 10

*Colorado v. HHS*, 2025 WL 1426226 ...................................................................... 29

*Comm'n v. Texas*, 145 S.Ct. 1762 (June 18, 2025) ................................................... 24

*Commonwealth of Puerto Rico v. United States*, 490 F.3d 50 (1st Cir. 2007) ............................ 25

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024).......................... 18

*Ctr. for Biological Diversity*, 453 F. Supp. 3d ................................................................... 25

*Dalton v. Specter*, 511 U.S. 462 (1994)............................................................................ 23

*Dep't of Educ. v. California*, 145 S.Ct. 966 (Apr. 4, 2025)............................................ 12, 14, 15

*DeVillier v. Texas*, 601 U.S. 285 (2024)........................................................................... 24

*Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Local Lodge 207 v. Ctr. for Biological Diversity,*18 F.4th 38 (1st Cir. 2021)................................................................... 29

*Employers Ins. of Wausau v. Browner*, 52 F.3d 656 (7th Cir. 1995)...................................... 24

*Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756 (D.C. Cir. 2022) ........................ 24, 25

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)................................................................. 16

*Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112 (2d Cir. 2005) ............................................. 7

*Gen. Land Off. of State of Tex. v. Biden*, 722 F. Supp. 3d 710 (S.D. Tex. 2024)........................ 20

*Great-West*, 534 U.S. n.1 ............................................................................................. 14, 15

*Hammer v. United States,* 989 F.3d 1 (D.C. Cir. 2021)........................................................ 12

*Heckler v. Chaney*, 470 U.S. 821 (1985) ...................................................................... 17, 18

*Hometown Connections v. Noem*, No. 25-cv-885, 2025 WL 1103253 (D. Md. Apr. 14, 2025) .. 15

*In re Newport News Shipbuilding & Dry Dock Co.*, 55 Comp. Gen. 812 (1976) ...................... 17

*Ingersoll-Rand Co. v. United States,* 780 F.2d 74 (D.C. Cir. 1985)................................... 14, 15

*Knick v. Township of Scott*, 588 U.S. 180 (2019) ............................................................... 24

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ........................... 21

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ............................................................ 19

*Maine Cmty. Health Options v. United States*, 590 U.S. 296 (2020) ....................................... 8

*Maryland v. King*, 567 U.S. 1301 (2012) ......................................................................... 29

*Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, No. 25-cv-30041, 2025 WL 1225481 (D. Mass. Apr. 14, 2025) ............................................................................... 16

*McGee vs. Mathis*, 71 U.S. 143 (1866) .................................................................................. 12

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ...................................................... 12, 13

*Miccosukee Tribe of Indians of Fla. v. United States*, No. 08-23523-CIV, 2009 WL 10668917 (S.D. Fla. Sept. 30, 2009) ................................................................................................ 20

*Morton v. Ruiz*, 415 U.S. 199 (1974) .......................................................................................... 27

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................................ 6, 29

*Northrop Grumman v. United States*, 46 Fed. Cl. 622 (2000) ...................................................... 28

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) ................................................ 13

*Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) ................................................... 12

*Presidential Gardens*, 175 F.3d ................................................................................................. 14

*Pub. Citizen v. Stockman*, 528 F. Supp. 824 (D.D.C. 1981) ...................................................... 20

*Rocky Ford Hous. Auth. v. U.S. Dep't of Agric.*, 427 F. Supp. 118 (D.D.C. 1977) ................... 20

*Rogers v. United States*, 14 Cl. Ct. 39 (1987) ........................................................................... 20

*Salazar v. King*, 822 F.3d 61 (2d Cir. 2016) ............................................................................. 18

*Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011) ........................................................ 12

*Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985) ................................. 13

*Sustainability Inst. v. Trump,* No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) ............ 15

*Thompson v. N. Am. Stainless, LP*, 562 U.S. 170 (2011) ........................................................... 19

*Trades v. Trump*, 2025 WL 1331743 (N.D. Ill. May 7, 2025) .............................................. 27, 29

*Trump v. Sierra Club*, 140 S. Ct. 1 (2019) .................................................................... 19, 21, 25

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155 (D.D.C. 2025) ........... 15

*Up State*, 198 F.3d ............................................................................................................... 13, 14

*Vera Inst. of Just. v. Dep't of Just.*, No. 25-CV-1643, 2025 WL 1865160 (D.D.C. July 7, 2025) ............................................................................................................................. 13, 15

*Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin.*, 903 F.2d 445 (7th Cir. 1990) .................................................................................................................... 15

*Westchester v. U.S. Dep't of Hous. & Urb. Dev.*, 778 F.3d 412 (2d Cir. 2015) .................... 9, 10

iv

*Widakuswara v. Lake*, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) ............................................. 28

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................ 6, 24

Statutes

5 U.S.C. § 701(a)(2) ................................................................................................ 16

5 U.S.C. § 702 ........................................................................................................ 25

8 U.S.C. § 1225(b) .................................................................................................. 13

8 U.S.C. § 1324(a) .................................................................................................... 4

28 U. S. C. § 1491(a)(1) ......................................................................................... 15

28 U.S.C. §§ 1491(a) .............................................................................................. 12

31 U.S.C. 1501 .......................................................................................................... 8

31 U.S.C. § 1301(a) .................................................................................................. 7

31 U.S.C. § 1301(c) .................................................................................................. 7

31 U.S.C. § 1552(a) .................................................................................................. 9

31 U.S.C. § 1553(a) .................................................................................................. 9

Pub. L. No. 117-328 ................................................................................................. 2

Pub. L. No. 118-47 ................................................................................................... 2

Regulations

2 C.F.R. Part 200 ................................................................................................. 3, 21

2 C.F.R. § 200.339 ............................................................................................. 21, 27

2 C.F.R. § 200.340(a)(2) .......................................................................................... 5

2 C.F.R. § 200.345(a)(1) ........................................................................................ 21

2 C.F.R. § 339 ........................................................................................................ 26

2 C.F.R. § 342 ........................................................................................................ 22

2 C.F.R § 200.340(a) ............................................................................................. 22

C.F.R. § 200.339(a) ................................................................................................. 4

Other Authorities

*Trump v. Sierra Club,* No. 19A60, 2019 WL 3451617 (U.S. July 22, 2019)............................... 21

U.S. Gov't Accountability Off., Principles of Federal Appropriations Law,
GAO-06-382SP, at 6-26 (3d ed. 2006) ................................................................................... 17

**Introduction**

This case is about Chicago's, Denver's, and Pima County's attempts to obtain money from the federal government arising from an alleged breach of contract. FEMA issued grants to plaintiffs under the Shelter and Services Program (SSP), which it created to provide housing and related services for noncitizens released by DHS after crossing the border. The grants were subject to various conditions contained in FEMA's solicitations and awards. Pursuant to the agreements with plaintiffs, FEMA initially withheld grant funds because of noncompliance issues and then terminated the grants because the services being funded were inconsistent with the administration's immigration enforcement policies.

In response, plaintiffs brought this action seeking injunctive relief requiring FEMA to (1) pay plaintiffs' outstanding reimbursement requests for costs incurred under their SSP grants; and (2) reinstate the terminated SSP grants. Plaintiffs invoke the APA and the Constitution as ostensible bases for their claimed right to continue to access to funds from terminated SSP grants. But plaintiffs' claims for relief are entirely dependent on their assertion that the grant agreements provide a right to continued funding, and that the government's withholding of SSP funds and later termination of the grants breached those agreements. In short, this case is a run-of-the mill contract dispute over money.

The pending motion for a preliminary injunction presents an even narrower question, which is whether the case should be resolved in an emergency posture that would upend the status quo. The answer is plainly no. This case presents no emergency and does not warrant any extraordinary remedy. The only thing at issue in the preliminary injunction motion is whether plaintiffs should hold onto the disputed SSP funds during the pendency of the case or they should remain with the government. Plaintiffs can demonstrate no irreparable injury justifying their request to upset the status quo because under fundamental principles of appropriations law, there is no realistic

1

probability that the money will be unavailable to be disbursed to plaintiffs at the conclusion of this lawsuit in the event they ultimately prevail — so there is no harm here. And in any event, the proper venue for any claim to reimbursement plaintiffs have is in the Court of Federal Claims.

Beyond these obstacles, plaintiffs are also unlikely to succeed on the merits of their claims. The APA claims fail at the threshold because both challenged funding decisions are discretionary, and the withholding decisions are not final agency actions. In any event, FEMA's decisions were neither arbitrary and capricious, contrary to law, or procedurally defective — both the withholding and termination decisions were taken pursuant to terms of the grant agreement that plaintiffs executed, and the government's justifications were reasonable and reasonably explained. Plaintiffs' separation of powers claim fails at the threshold because it is not a constitutional claim under *Dalton* and because the APA provides a path for judicial review. In any event, this challenge fails on the merits because both the applicable appropriations act and the SSP grant terms provide sufficient discretion to FEMA to withhold and terminate SSP funding in this case.

## Background

### A. Plaintiffs' Grant Awards Under the Shelter and Services Program (SSP)

Congress appropriated funds in 2023 and 2024 to the Department of Homeland Security (DHS) to support sheltering and related activities provided by non-Federal entities, in support of relieving overcrowding in short-term holding facilities of the U.S. Customs and Border Protection (CBP). Dep't of Homeland Sec. Appropriations Act, 2023, Pub. L. No. 117-328, div. F, 136 Stat. 4459, 4725, 4730 ("DHS FY23 Appropriations"); Dep't of Homeland Sec. Appropriations Act, 2024, Pub. L. No. 118-47, div. C, 138 Stat. 460, 593, 598 ("DHS FY24 Appropriations"). Congress made these funds available as part of the DHS lump-sum appropriations where Congress appropriated an amount to be used for "necessary expenses" of CBP for its operation and support, and directed that FEMA administer the funds. *Id.*

FEMA used these appropriations to create the Shelter and Services Program ("SSP"), through which it awarded federal grants to eligible recipients for costs associated with providing shelter and other eligible services to noncitizen migrants who have been encountered and released by DHS. *See* DHS 2024 SSP Quarterly Report, attached as Exhibit 1.[1] FEMA memorialized these agreements through Notice of Funding Opportunities (NOFOs) and award letters. Prather Decl., Exs. 4-6.[2] Like most federal grants, these grants were subject to the recipient's acceptance of certain terms and conditions. *Id*. Applicants "must comply with applicable statutes, rules and regulations, and policies, this NOFO, and the terms and conditions of the federal award. They must also comply with the Uniform Administrative Requirements, Cost Principles, and Audit Requirements at 2 C.F.R. Part 200.'" *Id.*, Exs. 5-6 (quoting 2024 SSP-A NOFO at 30, 2024 SSP-C NOFO at 16-17). The grants were subject to DHS Standard Terms and Conditions, and applicable laws. *Id.*

Plaintiffs applied for and received SSP funding for both fiscal years 2023 and 2024, receiving a total of $38 million for Chicago, $52 million for Pima County, and $32 million for Denver. Complt. ¶¶ 54-73. **For FY 2023 SSP funds**, FEMA: (1) awarded Chicago $12.5 million and dispersed nearly all of the requested reimbursements (*Id.* ¶ 55); (2) awarded Denver $9 million but only dispersed $7.9 million of the approximately $9 million requested reimbursement (*Id.* ¶ 65); and (3) awarded Pima County $12 million but dispersed none of the almost $9 million requested reimbursement (*Id.*, ¶ 70). **For FY 2024 SSP** funds, FEMA: (1) awarded Chicago

---

[1] Also found at https://www.dhs.gov/sites/default/files/2025-02/2024_1118_fema_shelter_and_services_program_q1.pdf.

[2] "Prather Decl., Ex. __" refers to the exhibits attached to the declaration of Lucy Prather, submitted in support of the memorandum in support of plaintiffs' motion for a preliminary injunction. Dkt. 29. The other declarations referenced in this brief were submitted by plaintiffs as attachments to their memorandum. See Dkt. 28.

approximately $25 million through a series of two grant awards (*Id.* ¶¶ 56-57); (2) awarded Denver approximately $22 million through a series of two grant awards (*Id.* ¶¶ 66-67); and (3) awarded Pima County approximately $39 million through a series of two grant awards (*Id.* at ¶ 71-72).

**B.     FEMA's Withholding of SSP Reimbursement Funds**

On February 10, 2025, FEMA "paused funding for the Shelter and Services Program based on significant concerns that the funding [was] going to entities engaged in or facilitating illegal activities." Complt. ¶ 145.  Then on March 11, 2025, FEMA issued a "Remedy for Noncompliance Letter" to each plaintiff regarding SSP awards for both fiscal years 2023 and 2024.  Complt. ¶ 149. The letters announced that FEMA was temporarily withholding SSP reimbursement payments due to potential noncompliance, pursuant to 2 C.F.R. § 200.339(a), which allows an agency to temporarily withhold payments due to noncompliance.  *Id.* ¶¶ 150-154.  FEMA's withholding was based on DHS's concerns that SSP payments were going to entities that may be guilty of encouraging or inducing an alien to come to, enter, or reside in the United States in violation of 8 U.S.C. § 1324(a).

**C.     FEMA's Termination of Plaintiffs' SSP Grant Awards**

On April 1, 2025, FEMA sent plaintiffs a letter terminating each of their SSP awards, effective immediately.  Complt. ¶ 172.  The letter stated that the termination was because the grants "'no longer effectuate [] the program goals or agency priorities.'"  *Id.* ¶ 174 (quoting 2 C.F.R. § 200.340(a)(2)).  The letter explained DHS's changed priorities and why they were inconsistent with the goals of the SSP program it previously created:

> consistent with President Trump's direction, [DHS] is focused on advancing the essential mission of enforcing immigration laws and securing the border.  Consequently, grant programs that support, or have the potential to support, illegal immigration through funding illegal activities or support for illegal aliens that is not consistent with DHS's enforcement focus do not effectuate the agency's current priorities.

*     *     *

4

The previous agency priorities under the FY's 2023 and 2024 SSP were to provide funding for non-federal entities to provide shelter, food, transportation, acute medical care, and personal hygiene supplies for individuals released from DHS short-term holding facilities. The individuals receiving these services often have no legal status and are in the United States unlawfully, such as those awaiting removal proceedings. This, in turn, provides support for illegal aliens and is not consistent with DHS's current priorities. For these reasons, DHS/FEMA is terminating your awards.

4/1/25 FEMA Ltr. (attached to Guzman Decl). The Termination Letter asserted that FEMA took this action pursuant to the terms and conditions of the grant awards, which were defined to include the applicable NOFOs and 2 C.F.R. § 200.340(a)(2). *Id.* It also directed grantees to submit financial documentation to support SSP costs plaintiffs had incurred in connection with the grant closeout procedures, which will allow DHS to make a determination for final allowable costs under the grant. *Id.*

## D.     This Lawsuit

In May 2025, plaintiffs filed this lawsuit, challenging defendants' decisions to withhold their SSP funding and terminate their SSP grants. Plaintiffs assert three claims under the court's equitable jurisdiction, alleging that these decisions violate the Constitution's Separation of Powers and the Spending Clause (Counts I, II), and exceeded statutory authority as *Ultra* Virus (Count III) because the applicable appropriations acts do not vest DHS with discretion to temporarily withhold grant funds for noncompliance or to terminate grants solely because they do not accord with the administration's current policy goals on immigration. Plaintiffs also assert APA claims, alleging that defendants' actions are arbitrary and capricious (Count IV), contrary to law (Count V) and procedurally deficient (Count VI). Plaintiffs' APA claims are all based on assertions that DHS's actions were conducted in violation of federal statutes and regulations. Plaintiffs seek an order that requires DHS to reinstate the grants and to process all past and future SSP reimbursement requests from their FY 2023 and FY 2024 grants.

On June 20, 2025, plaintiffs filed their motion for a preliminary injunction. Dkt. 27-28.

## Argument

Plaintiffs are not entitled to any emergency relief. A preliminary injunction is "'an extraordinary remedy never awarded as of right.'" *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1188 (7th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). The movant "'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Bevis*, 85 F.4th at 1188 (quoting W*inter*, 555 U.S. at 20). For the first factor, the movant must make a "'strong' showing that reveals how it proposes to prove its case." *Id.* For the second factor, "a mere possibility of irreparable harm will not suffice." *Id.* Finally, when "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs cannot satisfy these requirements.

## I. Plaintiffs Make No Showing of Irreparable Harm.

This case is about money — plaintiffs assert claims to obtain funds they are allegedly due under their SSP grants. But plaintiffs cannot show they will be irreparably injured absent emergency relief to immediately access the disputed funds rather than wait until after their claims are resolved. Another district court in New York addressed this same irreparable harm issue in an almost identical case in which New York City alleged the government unlawfully withheld $80 million in SSP funds, but it denied preliminary injunctive relief based on its finding the city will suffer no irreparable injury because the disputed SSP funds will remain available for five years to resolve the monetary dispute. *City of N.Y. v. Trump,* No. 25-cv-1510, Dkt. 42, at pgs. 35-43 (S.D.N.Y. Feb. 28, 2025).[3] This court should do the same.

_____

[3] The referenced hearing transcript in *City of N.Y. v. Trump*, No. 25-cv-1510, is also attached to plaintiffs' brief at Prather Decl., Ex. 15.

Plaintiffs have failed to "demonstrate . . . irreparable injury that is neither remote nor speculative, but actual and imminent." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (internal quotations omitted). Plaintiffs speculate they will suffer irreparable injury without emergency injunctive relief because the funds at issue may be exhausted, lapse, or used for other for other purposes before this action is decided. *See* PI Mem. at 27-28. That claim lacks merit and conflicts with longstanding appropriations principles.

First, the Purpose Statute, 31 U.S.C. § 1301(a), prevents the funds at issue from being spent on anything other than "the objects for which the appropriations were made." 31 U.S.C. § 1301(a). Therefore, DHS cannot spend the money at issue on anything other than "support[ing] sheltering and related activities provided by non-Federal entities, in support of relieving overcrowding in short-term holding facilities of U.S. Customs and Border Protection." *See* DHS FY23 Appropriations; DHS FY24 Appropriations.

Second, the funds DHS obligated to plaintiffs cannot be re-obligated to another entity or potential grantee. The funds plaintiffs seek were appropriated in fiscal year 2023 and 2024 pursuant to DHS's annual appropriations acts. *Id.* Congress generally limits the availability of appropriations to a one-year period for the fiscal year in which the funds are appropriated, unless it specifies otherwise. *See* 31 U.S.C. § 1301(c). A time-limited appropriation is thus available to incur a new obligation only during the period of time designated by Congress. *See id.* § 1502(a) (stating that "[t]he balance of an appropriation or fund limited for obligation to a definite period is available only for payment of expenses properly incurred during the period of availability").

Here, Congress stated that the funds from the fiscal year 2024 appropriation would be available for obligation only "for the fiscal year ending September 30, 2024." *See* DHS FY24 Appropriations at 461. Acting pursuant to this appropriations authority, FEMA obligated SSP funds to plaintiffs through a series of awards during 2023 and 2024 fiscal years. Because the time

to obligate the funds has expired, DHS cannot re-award those funds to another entity or potential grantee. *See Cnty. of Westchester v. U.S. Dep't of Hous. & Urb. Dev.*, 802 F.3d 413, 417 n.10 (2d Cir. 2015) (stating that expired funds "may not be reallocated to other jurisdictions" because of the statutory restriction on new obligations); *see also* Government Accountability Office, Principles of Federal Appropriations Law at 5-6 (4th ed., 2016 rev.) ("This rule—that time-limited budget authority ceases to be available for incurring new obligations after the last day of the specified time period—has been termed an 'elementary principle' of federal fiscal law.") (quoting *City of Houston, Texas v. Department of Housing & Urban Development,* 24 F.3d 1421, 1426 (D.C. Cir. 1994)).

Plaintiffs mistakenly believe that "de-obligating" funds connected to their SSP grants means these funds have been eliminated or re-obligated to another entity or program. PI Mem. at 27. An obligation is a commitment by a federal agency "that creates a legal liability of the government for the payment of goods and services ordered or received . . . ." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 308 (2020) (internal quotations and citation omitted). When the government incurs an obligation, for example through executing a contract or grant agreement, it is required to record that obligation in the government's financial and accounting systems against the appropriation being used to fund the obligation. *See* 31 U.S.C. 1501. Because the statute that governs the recording of obligations only permits an obligation to be recorded when it is sufficiently definite, amounts must be de-obligated when the government no longer has a definite legal liability to pay. When the government's obligations change, for example through terminating a grant award, it must adjust its recorded obligations. But these are simply accounting activities, which do not change the baseline amount that Congress provided in a given appropriation. That SSP funds were de-obligated reflects the accounting reality that the government terminated plaintiffs' grant awards. Those de-obligated funds remain in the original

FY 2023 and FY 2024 SSP appropriations account — the government has not moved or transferred those funds.

Third, even though the fiscal year 2024 funds at issue are not available for new obligations, DHS retains statutory authority for five years until 2029 to disburse the obligated funds to plaintiffs. With respect to the disbursement of funds that have been obligated to a recipient, time-limited appropriations remain available for an additional five fiscal years beyond their obligation period "for recording, adjusting, and liquidating obligations properly chargeable" to the appropriation. 31 U.S.C. § 1553(a); *see* 31 U.S.C. § 1552(a) ("On September 30th of the 5th fiscal year after the period of availability for obligation of a fixed appropriation account ends, the account shall be closed and any remaining balance (whether obligated or unobligated) in the account shall be canceled and thereafter shall not be available for obligation or expenditure for any purpose"). Because the funds at issue were obligated to plaintiffs during their respective one-year statutory obligation windows, DHS has five additional years—until September 30, 2029—to disburse the challenged funds to plaintiffs (or until September 20, 2028, to disburse challenged funds from fiscal year 2023 appropriations). *See Westchester v. U.S. Dep't of Hous. & Urb. Dev.*, 778 F.3d 412, 417 n.8 (2d Cir. 2015) (concluding that a case was not moot even though the obligation period for challenged funds had expired because the agency had five additional years to pay its obligations). Five years is more than enough time to resolve plaintiffs' claims to the SSP funds without risk that the money will become unavailable during the pendency of this case.

The district court in *NYC v. Trump,* recently addressed this same irreparable injury issue in New York City's challenge to disputed SSP funds and rejected the claim that plaintiff would suffer irreparable injury without emergency relief because the appropriated $80 million in SSP funds may no longer be available. *City of N.Y. v. Trump,* No. 25-cv-1510, Dkt. 42, at pgs. 35-43 (S.D.N.Y. Feb. 28, 2025). That court found that since the FY 2024 appropriations used for the

disputed SSP funds expired on September 30, 2024, it can no longer be used to incur new obligations after the expiration date. It further concluded that these appropriated funds will remain in an expired account for five years after the date of expiration and could only be used during this time to satisfy FY 2024 obligations. *Id.*

For these reasons, plaintiffs miss the mark by relying on *City of Houston v. Department of Housing & Urban Development,* 24 F.3d 1421 (D.C. Cir. 1994). PI Mem. at 27. There, the D.C. Circuit held that the City of Houston's claim to certain grant funds was "moot on two independent grounds." 24 F.3d at 1427. The agency had already obligated certain funds to other grantees and the period of obligation for other funds that Houston claimed had expired before Houston filed suit, such that the court was powerless to override Congress's statutory limitation on the available obligation period. *See id.* at 1426-27; *see also Cnty. of Suffolk v. Sebelius*, 605 F.3d 135, 141 (2d Cir. 2010) (discussing *City of Houston*). Neither of those circumstances is present here. The funds at issue have already been obligated to plaintiffs within the one-year statutory period of availability; this case is not a situation where multiple grantees are fighting over the same limited pot of money. Thus, the dispute here is over *disbursement* of the funds, which can be litigated in the normal course because of the five-year liquidation period. Unlike *City of Houston*, this case does not involve a dispute over unobligated funds approaching their statutory expiration period. Accordingly, there is no danger of this case becoming moot in the near future. As the Second Circuit recognized in *Westchester*, a court does not need to "expeditiously" resolve a case challenging a party's entitlement to expired funds where those funds will remain available to pay the claimant for an additional five years after the conclusion of the obligation period. *See Cnty. of Westchester.*, 802 F.3d at 417 n.10.[4]

---

[4] Plaintiffs also speculate that the disputed funds from FY 2023 and 2024 may not be available to satisfy their claims because DHS may reprogram these funds to pay for other

Plaintiffs' additional claims of irreparable injury based on an alleged violation of the separation of powers and budgetary constraints are nonstarters. PI Mem. at 27-29. As explained below, plaintiffs' separation-of-powers claim fails for several reasons and thus does not constitute irreparable injury. Moreover, plaintiffs' claims of irreparable injury by not receiving the disputed SSP funding *now* rather than waiting to resolve disputes are purely speculative. The declarations from Chicago and Denver supporting this claim provide no detail about what the budgetary impact will be, what "hard choices" they will face, or what employees and programs they must cut if they do not have access to the disputed funds now, pending resolution of this monetary dispute. Although both declarations calculate the number of city employees the disputed funds would support, nowhere do they actually assert they will terminate or forego hiring such staff without the disputed funds. Plaintiffs' vagueness on this point is likely due to the fact that SSP funds go to vendors who provide the sheltering and other services, not to municipal staff. *See* Complt. ¶ 80 (all of Chicago's 2024 SSP grants allocated to pay "vendor" for providing SSP services). Nor do plaintiffs specifically claim they will cut any programs without immediate access to these disputed funds.

Moreover, nowhere in its filings do plaintiffs even contend that they continue to operate shelters that house noncitizen migrants under the SSP program. Indeed, at least Chicago appears to have discontinued the program entirely as of December 2024.[5] Thus, the budgetary injuries

---

programs. PI Mem. at 28. But as explained here and in the government's response to plaintiffs' motion for a temporary restraining order, the government cannot reprogram appropriated funds that have expired — the reprogramming example plaintiffs cite to involves funding from fiscal year *2025*, which is not at issue in this case and is still available for obligation and/or reprogramming. Dkt. 35.

[5] https://www.fox32chicago.com/news/chicago-ends-migrant-shelter-mission-merges-housing-system-all-need;
https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2024/october/Equitable-Transition-to-One-System-Initiative.html.

Chicago and Denver rely on for their irreparable injury claim are, at most, the financial costs associated with carrying additional debt to cover the disputed SSP funds until this litigation is resolved or until DHS makes a final decision regarding the withheld funds, whichever comes first. Such monetary costs do not constitute the type of irreparable injury that warrants emergency injunctive relief, particularly when plaintiffs may request reimbursement of the interest on this debt as part of their relief in this case.

## II.     This Court Lacks Jurisdiction Based on Tucker Act Principles.

Plaintiffs' claims also fail based on Tucker Act principles.  Congress has vested the Court of Federal Claims with exclusive jurisdiction over challenges about federal grant and contract funding through the Tucker Act.  *Dep't of Educ. v. California*, 145 S.Ct. 966 (Apr. 4, 2025).  The Tucker Act vests exclusive jurisdiction in the Court of Federal Claims over claims alleging breach of express or implied contracts seeking over $10,000, 28 U.S.C. §§ 1491(a), 1346(a)(2), "unless such jurisdiction was explicitly withheld or withdrawn by statute," *Slattery v. United States*, 635 F.3d 1298, 1321 (Fed. Cir. 2011) (*en banc*); *see Hammer v. United States,* 989 F.3d 1, 2 (D.C. Cir. 2021).  Regardless of how a claim is styled, this court lacks jurisdiction if it "is in 'its essence' contractual."  *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 603 (D.C. Cir. 2017) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).  Plaintiffs' claims all seek the government to pay money under the terms of their grant agreements and therefore cannot be prosecuted in this forum.

To begin with, a grant upon conditions, and the acceptance of that grant by the recipient, constitutes a contract.  *See McGee vs. Mathis*, 71 U.S. 143, 155 (1866) ("It is not doubted that the grant by the United States to the State upon conditions [for swamp and overflowed government lands], and the acceptance of the grant by the State, constituted a contract. All the elements of a contract met in the transaction, competent parties, proper subject-matter, sufficient

consideration, and consent of minds."). In accepting federal SSP funds, plaintiffs agreed to abide by the grant's conditions. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions."). And the federal government received something of value — plaintiffs agreed to house noncitizens whom DHS would otherwise detain under the immigration laws, *see, e.g.,* 8 U.S.C. § 1225(b), allowing DHS to more efficiently use its limited resources to satisfy its obligations under the immigration laws*. See Vera Inst. of Just. v. Dep't of Just.*, No. 25-CV-1643, 2025 WL 1865160, at *10 (D.D.C. July 7, 2025) (concluding that Justice grants are contracts subject to the Tucker Act based on Federal Circuit precedent), *appeal filed*, No. 25-5248 (D.C. Cir. July 10, 2025).

Further, whether "a claim is in essence a contract claim over which the Court of Federal Claims has exclusive jurisdiction depends on a two-pronged analysis: a court must examine both 'the source of the rights upon which the plaintiff bases [its] claims, and . . . the type of relief sought.'" *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015) (quoting *Up State*, 198 F.3d at 375 (quoting *Megapulse, Inc.*, 672 F.2d at 968)). Starting with the source of the rights, plaintiffs have no colorable claim to any funding absent the grant agreements. Neither the appropriations acts authorizing funding for the grants, the APA, nor the Constitution confers any substantive right on plaintiffs to receive government funding. And deciding whether FEMA lawfully withheld funds and terminated grants "turns *entirely* on the terms of" the grant agreements. *Albrecht v. Comm. on Emp. Benefits*, 357 F.3d 62, 69 (D.C. Cir. 2004). In short, plaintiffs' asserted right to reimbursement for past SSP costs incurred or for continued grant funding "in no sense . . . exist[s] independently of" the grant agreement. *See Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (concluding plaintiff's claim against the government amounted to "a contract dispute" over which a district court lacked jurisdiction

under the APA); *see Ingersoll-Rand Co. v. United States,* 780 F.2d 74, 78 (D.C. Cir. 1985). In other words, if there were no grant, there would be no claim.

The fact that plaintiffs also bring a separation-of-powers challenge does not deprive the Court of Federal Claims from exercising jurisdiction under the Tucker Act. Not only does this purported constitutional claim fail for several reasons, *see infra*, III.B, but recasting a contractual dispute as a separation-of-powers violation does not change the essence of the claim as being one of contract. At the heart of all plaintiffs' challenges, including those involving appropriations act provisions, is plaintiffs' desire to recover past costs incurred under the grants and to ensure continued disbursement of money by preventing termination of their grants.

The relief plaintiffs seek also bolsters the conclusion that their claims are essentially contractual in nature. Plaintiffs seek an order requiring the government to *pay* outstanding reimbursement requests and to reinstate their SSP grants in order to pay future reimbursement requests. Plaintiffs do so pursuant to the only legal instrument that would arguably entitle it to any funding at all — *i.e.*, the grants. Such relief is indistinguishable from the contractual remedy of specific performance, confirming that plaintiffs' claims sound in contract. *Up State*, 198 F.3d at 377 (finding no jurisdiction where the relief requested "would be analogous to a contractual remedy for specific performance because it would enforce an alleged agreement between the parties"). "Actions seeking specific performance of a contract, brought in order to avoid the Tucker Act's limitation on money judgments, are not allowed to be brought against the United States." *Presidential Gardens*, 175 F.3d at 143; *cf. Great-West*, 534 U.S. at 211 n.1 ("[A]ny claim for legal relief can, with lawyerly inventiveness, be phrased in terms of an injunction.").

Moreover, plaintiffs cannot escape the reach of the Tucker Act by explicitly requesting only injunctive relief. In *California*, 145 S.Ct. at 968, for example, the Supreme Court considered a temporary restraining order (a type of injunction) "enjoining the Government from terminating

various education-related grants" and requiring "the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." Even so, the Court held that "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA" because "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U. S. 204, 212 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U. S. C. § 1491(a)(1)). The Court held that the Tucker Act divested the district court of jurisdiction to decide even challenges involving grants that the government had not terminated. *Id.* Finally, the Seventh Circuit has held that the Tucker Act "assigns to the Claims Court all actions seeking equitable relief based on a contract with the United States," including efforts to obtain specific performance. *Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin.*, 903 F.2d 445, 452 (7th Cir. 1990); *see also Ingersoll-Rand*, 780 F.2d at 80.

This court should dismiss plaintiffs' grant-based claims for lack of jurisdiction, which would be consistent with what other courts have done in similar cases involving government grants or contracts in accordance with the Supreme Court's reasoning in *Department of Education*. *See Sustainability Inst. v. Trump,* No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025) (staying injunction where the grants "were awarded by federal executive agencies to specific grantees from a generalized fund"); *Vera Inst. of Just.*, 2025 WL 1865160, at *10-12 (dismissing APA arbitrary-and-capricious grant termination claims); *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025) (denying TRO after concluding that the court lacked the authority to "order the Government to pay money due on a contract"), *dismissed,* 2025 WL 1350103 (D.C. Cir. May 2, 2025*); Solutions in Hometown Connections v.*

*Noem*, No. 25-cv-885, 2025 WL 1103253, at *8-*10 (D. Md. Apr. 14, 2025) (denying plaintiffs' TRO motion challenging the termination of certain U.S. Citizenship and Immigration Services grants and concluding that plaintiffs' APA claims were "in essence contract claims against the United States for which the . . . Court of Federal Claims has exclusive jurisdiction"); *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, No. 25-cv-30041, 2025 WL 1225481 (D. Mass. Apr. 14, 2025) (dissolving TRO because the *Department of Education* order is an "unmistakable directive that, for jurisdictional purposes, the proper forum for this case is the Court of Federal Claims"); *Am. Ass'n of Colleges for Teacher Educ. v. McMahon*, No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025), (staying a district court's preliminary injunction in a case involving education-related grants in light of the Supreme Court's *California* decision).

### III. Plaintiffs Are Not Substantially Likely to Succeed on the Merits.

#### A. APA Claims

##### 1. Grant Funding Decisions Are Committed to Agency Discretion.

In addition to other infirmities to plaintiffs' claims, their APA claims challenge an agency's decision concerning how to allocate and expend funding, which is "committed to agency discretion by law" and this is not subject to APA review. 5 U.S.C. § 701(a)(2). In *Lincoln v. Vigil*, the Supreme Court underscored that the APA, by its own terms, "preclude[s] judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" 508 U.S. 182, 191 (1993) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 817 (1992)). *Lincoln* held that an agency's "allocation of funds from a lump-sum appropriation" is one such "administrative decision traditionally regarded as committed to agency discretion," given that "the very point of a lump-sum appropriation," the Court explained, "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. The Court concluded that the Indian

Health Service's decision to discontinue a program that was (1) funded through the agency's yearly lump-sum appropriations (2) but not otherwise mandated or prescribed by statute was "committed to [the agency's] discretion" and thus "unreviewable" under the APA. *Id.* at 193–94.

That same principle applies to the discretionary grant funding at issue in this case. The terminated grants are not prescribed by any federal statute or regulation in terms of whom the recipients must be. Nor has FEMA received funding through targeted appropriations that require awarding a grant to *plaintiffs*. Although the funds were earmarked ("the portion of a lump-sum appropriation designated for a particular purpose," 2 U.S. Gov't Accountability Off., Principles of Federal Appropriations Law, GAO-06-382SP, at 6-26 (3d ed. 2006)), for costs to support sheltering and related services by non-Federal entities, *Lincoln* still controls. "Although an agency is required to use earmarked funds for their specified purpose, an agency may still exercise discretion within the earmark." *Amica Ctr. for Immigrant Rts. v. Dep't of Just.*, No. 25-cv-298 (RDM), 2025 WL 1852762, at *14 (D.D.C. July 6, 2025) (citing *In re Newport News Shipbuilding & Dry Dock Co.*, 55 Comp. Gen. 812 (1976)).

Further, the appropriations acts at issue provide no standards "against which to judge the agency's exercise of discretion" in choosing how best to spend that money to advance agency priorities. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). The acts appropriate funds to FEMA "to support sheltering and related activities provided by non-Federal entities." DHS FY23 Appropriations; DHS FY24 Appropriations. The broad mandates demonstrate that they authorized FEMA to "meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192–93.

As *Lincoln* made clear, "allocation of funds" from lump-sum appropriations to various programs and priorities "requires 'a complicated balance[e] of a number of factors,'" including whether the agency's "'resources are best spent' on one program or another" and "whether a

particular program 'best fits the agency's overall policies.'"  *Id.* at 193 (quoting *Heckler*, 470 U.S. at 831).  For discretionary grant awards that are funded entirely out of such lump-sum appropriations, any decisions regarding how much funding to allocate to a particular grant recipient within the statutory framework — or whether to continue a grant award at all — are committed entirely to the agency's discretion.  *See id.* at 193–94.  And that discretion includes the authority to terminate grants that no longer advance agency priorities.  Thus, FEMA's "decision to discontinue" funding for plaintiffs' grants is "accordingly unreviewable under § 701(a)(2)" of the APA.  *Id.* at 193.

### 2.     No Final Agency Action for Withholding Reimbursement Funding

"The APA explicitly requires that an agency action be final before a claim is ripe for review."  *Air Espana v. Brien*, 165 F.3d 148, 152 (2d Cir. 1999) (citing 5 U.S.C. § 704).  For an agency action to be final, "'[f]irst, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.'"  *Salazar v. King*, 822 F.3d 61, 82 (2d Cir. 2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  Second, it must be "'one by which rights or obligations have been determined, or from which legal consequences will flow.'"  *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (quoting *Bennett*, 520 U.S. at 177-78).

Here, there is no "final agency action" because defendants have made no final decision on plaintiffs' withheld reimbursement requests.  Indeed, plaintiffs were informed that FEMA was "temporarily withholding" payment for these reimbursement requests.  The March 11 letters from FEMA explicitly requested more information in order to make a final determination.  As defendants have not provided a final decision on plaintiffs' reimbursement claims, their challenges to defendants' allegedly improper withholding funds are not reviewable under the APA for that reason as well.

### 3.    Plaintiffs' APA Claims Lack Merit.

Plaintiffs' APA Claims in Counts IV-VI allege substantive APA violations claiming that defendants cannot withhold and terminate funding from SSP grants appropriated by Congress in violation of the Impoundment Control Act of 1974 (ICA), the DHS FY23 and FY24 Appropriation Acts, and various federal regulations.  These challenges fail to state a justiciable claim because plaintiffs do not have rights under the ICA or the applicable appropriation acts.  They also fail to state a plausible claim for relief because FEMA is entitled under applicable regulations and the terms of the grant to temporarily withhold funds based on a recipient's noncompliance and to terminate a grant based on the DHS's changed immigration enforcement policies.

As a threshold matter, the ICA and DHS Appropriation Acts do not confer rights that may be enforced through an APA suit.  *Cf. Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (granting stay of injunction, including because "the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with" a statute governing the transfer of funds among appropriation accounts).  A plaintiff "must establish that the injury" it complains of "falls within the zone of interests sought to be protected by the statutory provision" at issue.  *Air Courier Conf. of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523-24 (1991) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990)).  That limitation reflects the common-sense intuition that Congress does not intend to extend a cause of action to "plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions" they seek to enforce.  *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011); *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

Plaintiffs are not within the zone of interests of the ICA, which is directed at regulating the relationship between Congress and the Executive Branch.  Nothing in the text or history of the ICA establishes an intent to protect or regulate the budgets of local governments that may incur

costs associated with federal spending policies. For these reasons, many courts have concluded the ICA does not provide a private cause of action. *See Gen. Land Off. of State of Tex. v. Biden*, 722 F. Supp. 3d 710, 734–35 (S.D. Tex. 2024); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981); *Rocky Ford Hous. Auth. v. U.S. Dep't of Agric.*, 427 F. Supp. 118, 134 (D.D.C. 1977); *Rogers v. United States*, 14 Cl. Ct. 39, 50 (1987), *aff'd*, 861 F.2d 729 (Fed. Cir. 1988). The ICA is not concerned with protecting a federal grantee's fisc. *See Stockman*, 528 F. Supp. at 830 n.1 (ICA "enacted to safeguard Congress's interests, not those of private citizens" and the absence of private right of action "pretermit[ted] any contention that plaintiff's interest in preserving the flow of appropriations is within the zone of interests intended to be protected by the ICA").

Plaintiffs also fall outside the zone of interests of the DHS Appropriations Acts. These acts appropriate funds to DHS "to support sheltering and related activities provided by non-Federal entities, including facility improvements and construction, in support of relieving overcrowding in short-term holding facilities of [CBP]." DHS FY23 Appropriations; DHS FY24 Appropriations. These acts regulate and protect the interests of DHS and Congress in the federal spending and appropriations process. Nothing in the text or context of these acts suggests any connection whatsoever to the interests of a city government that asserts that discretionary federal spending decisions harm its fisc. *See Miccosukee Tribe of Indians of Fla. v. United States*, No. 08-23523-CIV, 2009 WL 10668917, at *4 (S.D. Fla. Sept. 30, 2009) (dismissing claims brought under a statute appropriating funds to a federal agency for a construction project on zone-of-interests grounds because the statute protected the agency's interest in receiving funds for the construction project, not an Indian tribe's interests in quiet enjoyment of land near the project). When Congress appropriated the funds, it did not require DHS to consider the potential impact on city governments or limit DHS's discretion to expend funds to protect those interests. The acts govern the

relationship between the Executive and Congress regarding federal spending, and do not confer judicially cognizable rights on city governments to second-guess spending decisions.

This conclusion is reinforced by the Supreme Court's decision in *Trump v. Sierra Club,* No. 19A60, 2019 WL 3451617, at *3–10 (U.S. July 22, 2019). There, the Court stayed an injunction against border wall construction based on a challenge to DoD's compliance with a provision of the DoD Appropriations Act authorizing transfers of funds between budget accounts. The Court concluded that a group of environmental plaintiffs likely "have no cause of action to obtain review of the Acting Secretary's compliance with" the DoD appropriations transfer statute. 140 S. Ct. at 1. The dispute in *Sierra Club* focused on whether the environmental plaintiffs fell within the zone of interests of the appropriations transfer provision they sought to enforce. *See* Reply in Support of Application for a Stay Pending Appeal, *Sierra Club*, 2019 WL 3451617, at *3–10. As the Supreme Court emphasized, "a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (citation omitted). Like the DoD transfer statute at issue in *Sierra Club*, Plaintiffs allege violations of federal appropriations acts that protect congressional control over DHS's appropriations, not the cities' revenue streams.

Finally, plaintiffs allege the government lacked legal authority under federal regulations to withhold and terminate funding under SSP grants. But plaintiffs cannot dispute DHS's general authority to withhold payments from grant recipients based on noncompliance with federal law. Nor could it: the authority of federal agencies to do so is well established in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. Part 200, which broadly recognize agency authority to withhold, terminate, suspend, disallow, or recover federal funding. *See* 2 C.F.R. § 200.339; 2 C.F.R. § 200.345(a)(1) (providing that the closeout of a federal award does not affect the "right of the Federal agency . . . to disallow

costs and recover funds"). The relevant grant agreements, including the terms of which plaintiffs have agreed to abide by, confirm this — they state that if an award recipient is in noncompliance with, among other things, "applicable federal statutes," the agency can "take other remedies," including "actions to disallow costs, recover funds, wholly or partly suspend or terminate the award, initiate suspension and debarment proceedings, withhold further federal awards, or take other remedies that may be legally available." Moreover, FEMA complied with the procedural requirements under 2 C.F.R. § 342, by issuing its March 11 noncompliance letter, which describes the noncompliance and expressly invites plaintiffs to file an administrative appeal.

Nor can plaintiffs dispute DHS's general authority to terminate grants under certain circumstances, including when the award no longer effectuates "agency priorities." The April 1 letter terminating SSP grants relies on 2 C.F.R § 200.340(a), which is incorporated into the grants and allows the agency to terminate awards that "no longer effectuate" . . . "agency priorities." As the letter explains, DHS's policy under the previous administration was to provide funding to provide shelter and related services for individuals crossing the border and released by DHS. But the current administration concluded that these individuals are often in the country unlawfully, and therefore SSP funding provides support for "illegal aliens" and is inconsistent with DHS's "current priorities." Plaintiffs' only response to this clear authority to terminate SSP grants is that this regulatory provision does not mean what it says. This argument does not support their APA claim. Accordingly, plaintiffs are not likely to succeed on their APA claims that DHS's withholding and terminating SSP funding was inconsistent with federal regulations.

### B. Separation of Powers Claim

Plaintiffs' purported separation-of-powers challenge fails because it is not a *constitutional* challenge. But even if the challenge were constitutional and sought no "money damages," it would fail because the APA provides a path of judicial review. Finally, this challenge fails on the merits

because both the appropriations acts and the SSP grant terms provide sufficient discretion to DHS to withhold and terminate SSP funding in this case.

1.      **Plaintiffs' Challenge Fails Under *Dalton***

Plaintiff's "separation of powers" claim is based entirely on the premise that defendants have overridden the careful judgments of Congress by acting without legitimate basis or justification in withholding and terminating funding under the DHS Appropriations Acts. Complt. __. But this is simply a repackaging of their statutory APA claims dressed up in constitutional language. As the Supreme Court has confirmed, "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). In *Dalton*, the Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." Id. at 471. Not "every action by the President, or by another executive official, in excess of his statutory authority is ipso facto in violation of the Constitution." *Id*. at 472. In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id*. (collecting cases). The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the officers rely on an unconstitutional statute. *Id*. at 473 & n.5. Because plaintiffs' constitutional claims focus entirely on their contentions that DHS and FEMA have not acted consistent with their statutory appropriations obligations, such claims are untenable under *Dalton*.

2.      **Plaintiffs Cannot Invoke the Court's Equity Powers Because the APA Provides a Path of Judicial Review.**

Plaintiffs purported separation-of-powers challenge also fails if it were a constitutional challenge and sought no "money damages." In that case, it arises under the court's equity powers and must be dismissed because the APA provides a path of judicial review. *Nuclear Regul.*

*Comm'n v. Texas*, 145 S.Ct. 1762, 1776 (June 18, 2025).

Plaintiffs' challenge seeks non-statutory review under the court's equity powers. But non-statutory review provides a "catch-all remedy" only when "*no statute specifies a path of judicial review*." *Employers Ins. of Wausau v. Browner*, 52 F.3d 656, 662 (7th Cir. 1995) (emphasis added). Because non-statutory review "could become an easy end-run around the limitations" of "judicial-review statutes," the Supreme Court has "strictly limited" it. *Nuclear Regul.*, 145 S.Ct. 1762, 1775. Indeed, a non-statutory review claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Id.* at 1776; *see also Armstrong*, 575 U.S. at 327-28 (the power of federal courts of equity to enjoin unlawful executive action is subject to limitations).

Importantly, the Supreme Court recently held that non-statutory review is "unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review." *Id.* at 15 (quoting *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). This is a usual case where a statutory path of judicial review exists.

First, if plaintiffs bring contractual allegations concerned with "money damages," only the Court of Federal Claims can provide a path of judicial review. *DeVillier v. Texas*, 601 U.S. 285, 293 (2024) (reversing non-statutory exercise of jurisdiction where the plaintiff had an available statutory "cause of action" for compensation that it did not exercise); *Knick v. Township of Scott*, 588 U.S. 180, 201 (2019) (non-statutory equitable relief was unavailable because of availability of a statutory "adequate provision" for obtaining relief under the Tucker Act); *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763-764 (D.C. Cir. 2022).

Second, if plaintiffs bring constitutional allegations seeking no "money damages, plaintiffs

would have a different "means of vindicating its rights without non-statutory review: the APA."[6]

*Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 59-60 (1st Cir. 2007). The APA

allows plaintiffs seeking "relief other than money damages" to seek "judicial review" on whether

final agency action, 5 U.S.C. § 702, and agency action leading up to it, § 704, is "contrary to

constitutional rights," § 706(2)(B). But if "the APA" can "provide adequate relief," as the APA

could here, "an equitable remedy via non-statutory review ought not be available." 33 Fed. Prac.

& Proc. Judicial Review § 8307 (2d ed.) (May 22, 2025 update); *Ctr. for Biological Diversity*, 453

F. Supp. 3d at 48 ("The Court doubts that Plaintiffs can bring an equitable claim when a statutory

cause of action is available to it" under the APA); *Fed. Express Corp.*, 39 F.4th at 763.[7]

Plaintiffs have not shown that either mechanism for review—under the APA or the Tucker

Act—is "constitutionally insufficient" such that it "must have a non-statutory cause of action to

vindicate" its rights. *Puerto Rico*, 490 F.3d at 60.[8]

---

[6] The APA provides a statutory path of judicial review and therefore precludes the exercise of the court's equity jurisdiction, even if plaintiffs cannot prevail on their APA claims for other reasons. As noted above, plaintiffs' APA claims should be rejected, among other reasons, because plaintiffs do not fall within the zone of interests for appropriations acts. But this obstacle to success on plaintiffs' APA claims does not mean the court should allow this claim under its equity jurisdiction. Indeed, the same obstacle prevents plaintiffs succeeding on claims based on appropriations acts regardless of whether they are asserted under the APA or the court's equity jurisdiction.

[7] The Supreme Court indicated that it would support the defendants' foregoing arguments in *Sierra Club*, 140 S.Ct. 1. As explained, the district court in that case preliminarily enjoined the Executive's action to fund a border barrier construction, based on a complaint by nonprofit plaintiffs that the challenged action exceeded the scope of the agency's constitutional and statutory authority by spending money in excess of what Congress allocated for border security and violated separation of powers principle. The Supreme Court stayed the the injunction and found that the government, "made a sufficient showing at this stage that the plaintiffs have *no cause of action* to obtain review of the agency's compliance with the appropriations act, whether under courts' equity powers, the APA, or the act itself. *Id.*

[8] For these same reasons, plaintiffs' Spending Clause claim (Count II) and the *Ultra Vires* claim (Count III) also fail. Moreover, plaintiffs' *Ultra Vires* claim is based on the one-month period when plaintiffs claim their SSP funds were frozen before FEMA issued its March 11

### 3. Separation-of-Powers Claim Fails on the Merits.

Even if this court reaches the merits of plaintiffs' separation-of-powers claim, it should reject it because the appropriations acts funding the SSP grants provides sufficient discretion to DHS to withhold and terminate grants in this case. Plaintiffs identify no specific provision of the pertinent appropriations acts that confers on them the right to receive particular funds. Indeed, the SSP grants are funded out of DHS' annual lump-sum appropriations, which this and other courts have recognized provides the agency with discretion on how to spend it and what programs to create to spend the money. Thus, DHS' decision to withhold and then terminate SSP funding does not violate any congressional directives.

SSP grants are funded by appropriations that provide funds "to support sheltering and related activities provided by non-Federal entities, in support of relieving overcrowding in short-term holding facilities of U.S. Customs and Border Protection." DHS FY23 Appropriations; DHS FY24 Appropriations. This is part of the DHS lump-sum appropriations within the section where Congress appropriated funds to be used for "necessary expenses of U.S. Customs and Border Protection" for its operation and support, and there is nothing in this appropriations act that requires precisely how this money is to be spent, to whom it must be directed, or how much of the appropriations must be spent. *Id.* As explained above in section III.A.1, the Supreme Court has recognized that an agency's funding decisions from a lump-sum appropriations are committed to agency discretion given that "the very point of a lump-sum appropriation," the Court explained, "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192.

---

noncompliance letter. Not only do plaintiffs not allege any harm from this conduct, but it doesn't appear they even knew about it. Walker Decl.; Doheny Decl.; Guzman Decl. In any event, the withheld payments at issue in this case were caused by FEMA's March 11 decision to invoke 2 C.F.R. § 339 under the terms and conditions of the grant agreement.

Indeed, in evaluating a separation-of-powers claim in a separate case, this court recognized this principle of appropriations that Congress does not impose legally binding restrictions on funding from lump-sum appropriations. *Chi. Women in Trades v. Trump*, 2025 WL 1331743 (N.D. Ill. May 7, 2025) at * 16 (citing *Lincoln v. Vigil*, 508 U.S. 182 (1993)). Accordingly, DHS decisions regarding how much funding to allocate to a particular grant recipient or whether to continue a grant award at all are committed entirely to the agency's discretion.

DHS exercised this discretion in this case by creating the Shelter and Services Program and awarding discretionary SSP grants through this program. See DHS 2024 SSP Quarterly Report, attached as Exhibit 1. To clarify and correct plaintiffs' repeated misstatements, by providing the sheltering funding to DHS without further statutory direction or guidance, Congress did not create a specific program, but instead, delegated to DHS the authority to determine how to design and structure a program to best spend the lump-sum appropriation it provided, including the authority to set goals and priorities for the program, select grantees, determine how much funding each grantee would receive, and determine what activities should be funded. *See e.g. Morton v. Ruiz*, 415 U.S. 199, 230-231 (1974) (When Congress provides limited funding to cover services for non-federal entities, the agency administering the funding must, in the absence of statutory direction from Congress, be able to create classifications and eligibility requirements to allocate the limited funding). DHS further exercised its discretion in incorporating express terms and conditions into the SSP grants that both allow it to withhold funding in the event of noncompliance and to terminate the funding if the agency concludes the grants no longer satisfy either the goals of the program or the policies of the Executive. 2 C.F.R. §§ 200.339, 200.340. Simply put, an agency does not violate the separation of powers by temporarily withholding or ultimately terminating grant funding pursuant to the express terms of federal regulations and the

terms of a grant. *Cf. Northrop Grumman v. United States*, 46 Fed. Cl. 622, 626 (2000) ("The Government's right to terminate a contract for convenience is broad.").

In this case, DHS originally exercised its discretion under lump sum funding by creating and funding the SSP. The new administration, however, modified immigration enforcement policies in 2025 and concluded that DHS's original design of the SSP program, including the types of activities and recipients the program prioritized, and the grants issued pursuant to that design, were now in conflict with the DHS's enforcement goals and had the potential to negatively influence DHS's operations. In other words, DHS concluded that the goals and priorities of the SSP program it previously created were now inconsistent with DHS's modified immigration enforcement policies, so it decided to end SSP. This discretionary decision by DHS to change course on how to spend lump-sum appropriations to support sheltering and related activities to relieve overcrowding in CBP facilities does not violate any express or implied restriction from Congress.

Plaintiffs' cases in support of its claim are distinguishable with this case, which involves an agency's decision to terminate grants pursuant to express terms contained in grants funded from lump-sum appropriations. Several of plaintiffs' cases involve Executive attempts to impose *new* conditions on receipt of federal funding. *See* PI Mem. at 16. (citing *City of Chi. v. Sessions*, 888 F.3d 272 (7th Cir. 2018); *City of Chi. v. Barr*, 961 F.3d 882, 887 (7th Cir. 2020); and *City & Cnty. Of S.F. v. Trump*, 897 F.3d 1225 (2018)). And several include termination decisions for funding outside the context of lump-sum funding to agencies, where, instead, Congress mandated specific funding amounts be directed to specific beneficiaries. The court in *Widakuswara v. Lake*, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) held that terminating federal grant funding to radio networks likely violated the separation of powers clause, but those grants were not funded out a lump-sum appropriated to a federal agency, but rather from appropriations where Congress expressly

identified specific amounts that must go to specific networks to allow them to operate.  Similarly, in *Colorado v. HHS*, 2025 WL 1426226 (D.R.I. (May 16, 2025), the court held the government likely violated separation of powers when it unilaterally terminated Covid-relief grants based on the government's conclusion that the Covid crisis was over.  But again, funding for these grants did not come from lump-sum appropriations for an agency to fulfill its duties, but rather from appropriation acts Congress passed to specifically address problems related to the pandemic, and where Congress made clear the funding must be available beyond the pandemic.  *Id.* at *12 (distinguishing the discretion afforded agencies in administering "lump-sum appropriations" from Covid-related appropriations statutes at issue in that case).

## IV.    The Equities Weigh Against Emergency Relief.

Finally, plaintiffs cannot establish that the balance of equities and the public interest favor granting the extraordinary remedy of a preliminary injunction.  These final two factors merge in cases where relief is sought from the government.  Nken, 556 U.S. at 435.

In arguing that the public interest weighs in their favor, plaintiffs primarily rely on the notion that they are likely to prevail on the merits and that there is no public interest in the perpetuating unlawful agency action.  *See* PI Mem. at 29-30.  But that is just a repackaged version of plaintiffs' merits arguments, which are not likely to succeed, and not an independent basis for relief.  This is especially true given plaintiffs' nonexistent showing of irreparable harm.

Meanwhile, contrary to plaintiffs' assertions that defendants will suffer no cognizable harm if a preliminary injunction is granted, "[a]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *see also Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Local Lodge 207 v. Ctr. for Biological Diversity*, 18 F.4th 38, 47 (1st Cir. 2021) (citing same language from *King* in a decision

granting a stay pending appeal of a preliminary injunction against a federal agency rulemaking). This is especially true here, where FEMA has identified a concern that federal funds will be spent to facilitate criminal activity in violation of requirements applicable to the use of those funds. And where the government is legally entitled to make decisions about the disbursement or allocation of federal funds but is nonetheless ordered to release the funding, such funds may not be retrievable afterwards.

## Conclusion

For these reasons, this court should deny plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: s/ Patrick Johnson
THOMAS P. WALSH
PATRICK JOHNSON
Assistant United States Attorneys
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5327
(312) 353-5312
thomas.walsh2@usdoj.gov
patrick.johnson2@usdoj.gov