**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CITY OF CHICAGO, CITY AND COUNTY OF DENVER, and PIMA COUNTY,** )<br>)<br>)<br>**Plaintiffs,** )<br>)<br>**vs.** )<br>)<br>**UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY UNITED STATES FEDERAL EMERGENCY MANAGEMENT AGENCY, and DAVID RICHARDSON, IN HIS OFFICIAL CAPACITY AS ACTING ADMINISTRATOR OF THE UNITED STATES FEDERAL EMERGENCY MANAGEMENT AGENCY,** )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>**Defendants.** )<br> | **Case No. 25 C 5463** |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

This case involves a challenge by the City of Chicago; the City and County of Denver, Colorado; and Pima County, Arizona to the government's decisions to freeze funding for the Shelter and Services Program (SSP) and to ultimately eliminate the program. Under the SSP, Congress appropriated funds to support sheltering and related activities provided by non-Federal entities to relieve overcrowding in short-term holding facilities of U.S. Customs and Border Protection. The plaintiffs moved for a preliminary injunction precluding the defendants—the Department of Homeland Security, the Federal Emergency Management Agency, DHS Secretary Kristi Noem,

and Acting FEMA Administrator David Richardson—from withholding SSP funds, refusing to process SSP requests, and eliminating the SSP as a whole.

The Court finds in favor of the plaintiffs and issues a preliminary injunction enjoining the defendants from freezing SSP funding, based on the Court's finding that the reasons identified in the March 11 and April 1 letters are arbitrary and capricious and that freezing SSP funding based on a policy disagreement with Congress violates the separation of powers.  The Court further enjoins the defendants from eliminating the SSP created in Congress's 2023 and 2024 appropriations for DHS.

## Background

### A.    Shelter and Services Program creation

In 2022, Congress appropriated $800 million to DHS / FEMA "to support sheltering and related activities provided by non-Federal entities, including facility improvements and construction, in support of relieving overcrowding in short-term holding facilities of U.S. Customs and Border Protection."  Consolidated Appropriations Act, Pub. L. No. 117-328, Div. F, Title II, 136 Stat. 4459, 4730 (2022).  The 2023 committee report explaining the DHS Appropriations Act stated that this appropriation provided funding "for a Shelter and Services Program . . . to support [Customs and Border Protection (CBP)] in effectively managing noncitizen processing and preventing the overcrowding of short-term CBP holding facilities."  S. Rep. No. 8553-01, at S8557 (2022).  The committee report went on to explain that the funds were transferred to FEMA "for administration as grants or cooperative agreements with state and local governments and non-governmental organizations (NGOs)."  *Id.*  The committee report also noted that "[o]vercrowding at CBP short-term holding facilities has negative impacts

on noncitizens and makes it more difficult for CBP personnel to carry out their duties. This partnership also serves American taxpayers by minimizing the need to expand the capacity of existing CBP facilities." *Id.* The following year, Congress appropriated another $650 million for the same purpose. Further Consolidated Appropriations Act, Pub. L. No. 118-47, Div. C, Title II, 138 Stat. 460, 598 (2024).

Pursuant to these appropriations, FEMA issued SSP grants to non-Federal entities. Generally, FEMA pre-cleared grantees for specified amounts of funding and permitted only those grantees to apply. FEMA also awarded SSP funds through the 2024 "SSP-Competitive" grant, which permitted any eligible entity to apply. FEMA awarded SSP grants to dozens of states, local governments, and non-profit organizations.

**B.     The plaintiffs' grants**

Chicago received five SSP grants: three direct grants, totaling over $38 million, and two pass-through grants awarded through the State of Illinois, totaling over $28 million. Pima County received three direct grants, totaling over $52 million. Denver received three direct grants, totaling $32 million. From December 2024 through February 2025, the plaintiffs submitted four reimbursement requests and the State of Illinois submitted one on Chicago's behalf under a pass-through grant seeking funding for SSP grants that had been approved by FEMA. The defendants have not reimbursed the plaintiffs for any of these requests.

**C.     DHS / FEMA ends the SSP**

On February 10, 2025, Elon Musk tweeted that FEMA paid millions of dollars "to luxury hotels in New York City to house illegal migrants . . . That money is meant for

3

American disaster relief and instead is being spent on high end hotels for illegals!"  Pls.' Mem., Prather Decl. ¶ 10.  Two hours later, then-Acting FEMA Administrator Cameron Hamilton reposted Musk's tweet, announcing that "these payments have all been suspended from FEMA."  *Id.*  Hamilton followed up by tweeting:  "@USCongress should have never passed bills in 2023 and 2024 asking FEMA to do this work.  This stops now."  *Id.*  On February 10, 2025, FEMA manually de-obligated—i.e., terminated its obligation to pay—all SSP funds in FEMA's financial system.  On February 11, 2025, Hamilton acknowledged in a sworn declaration that FEMA had "paused funding" for SSP.  *Id.*, Ex. 14 ¶ 6.  Appropriations data reviewed by the Government Accountability Office confirms that de-obligations of fiscal year 2023 and 2024 SSP funds exceeded obligations by approximately $887 million, with nearly all de-obligations occurring in February 2025.  Matter of Dep't of Homeland Sec.—Application of the Impoundment Control Act to FEMA Prior Year Fed. Assistance Appropriations, B-337204.2, 19–20 (Sep. 29, 2025).

FEMA sent a "Remedy for Noncompliance Letter" to SSP grantees on March 11, 2025.  The March 11 letter informed grantees that DHS / FEMA was temporarily withholding SSP payments.  To support this action, DHS / FEMA invoked 2 C.F.R. § 200.339(a), a regulation that permits an agency to withhold grant payments when the agency "determines that noncompliance [with federal law] cannot be remedied by imposing specific conditions" upon the grantee.  Pls.' Mem., Ex. 1, Ponce Martinez Decl., Ex. 1.  The letter's findings stated that DHS had "significant concerns that SSP funding was going to entities engaged in or facilitating illegal activities" and cited 8 U.S.C. § 1324(a) ("Bringing in and harboring certain aliens").  *Id.*  The findings did not

4

include any additional information to support these concerns.

On March 20, 2025, Hamilton sent a memo to Secretary Noem recommending that "DHS Review for Termination" all 156 open SSP grants.  Hamilton based his recommendation on two internal memos from Noem.  The first memo directed DHS staff to freeze "all" funding under grants "for which non-profit organizations are eligible" and that "touch in any way on immigration," specifically including SSP.  Pls.' Mem., Prather Decl., Ex. 10.  The second memo directed DHS staff to "cease providing federal funding to sanctuary jurisdictions."  Noem approved Hamilton's recommendation on March 25, 2025.  *Id.*, Ex. 11.

On April 1, 2025, FEMA sent a letter to grantees informing them that SSP grants were terminated effective immediately.  The April 1 letter terminated SSP grants pursuant to 2 C.F.R. § 200.340(a)(2), which permits termination "to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  Pls.' Mem., Ponce Martinez Decl., Ex. 2.  The letter stated that "grant programs that support, or have the potential to support, illegal immigration through funding illegal activities or support for illegal aliens" are not "consistent with DHS's enforcement focus" and "do not effectuate the agency's current priorities."  *Id.*  The April 1 letter directed recipients to "closeout" their grants by submitting specified documentation.  *Id.*

In May 2025, Senator Chris Murphy, the ranking member of the U.S. Senate Appropriations Subcommittee on Homeland Security, publicly stated, during a hearing at which Secretary Noem appeared, that DHS had diverted SSP funds to Immigration and Customs Enforcement.  No new SSP awards have been recorded since February

10, 2025.  Dep't of Homeland Security, B-337204.2 at 20.  In this litigation, DHS maintains that the SSP funds remain in an appropriations account and have not been expended.

**D.     FEMA review of reimbursement requests**

The April 1 letter states that FEMA will "determine the final allowable costs" for the grant awards by "evaluating whether all submitted costs incurred before [the March 11 letters] are necessary, allocable, and reasonable."  Pls.' Mem., Ponce Martinez Decl., Ex. 2.  If "FEMA determines that the total allowable costs exceed the amount paid to date, then FEMA will make a final payment for that difference."  *Id.*  If FEMA determines that "the payments made exceed the final allowable costs," however, then FEMA will require grantees to "promptly refund the difference."  *Id.*  The letters do not include any detail to explain how FEMA will determine whether costs are "necessary, allocable, and reasonable" or "exceed the allowable costs."  To date, the defendants have not provided a final decision on the plaintiffs' past reimbursement claims or their final allowable costs.

**E.     Future reimbursement requests**

The plaintiffs have not yet submitted reimbursement requests for several grants that were awarded through the 2024 SSP grant process.  Specifically, FEMA awarded the State of Illinois a pass-through SSP grant of approximately $9.6 million , for Chicago's benefit, in July 2024.  Pls.' Mem., Ponce Martinez Decl. ¶ 6.  Neither Chicago nor Illinois have submitted reimbursement requests under that grant.  *Id*. ¶ 13.  FEMA also issued a grant of approximately $18.7 million to Pima County in September 2024.  Pls.' Mem., Ex. 2, Ken Walker Decl. ¶ 18.  Pima County has not yet incurred any costs

or submitted any reimbursement requests for expenses related to this award. *Id.* Similarly, Denver received a grant of approximately $12.7 million in September 2024. Pls.' Mem., Ex. 4, Nicole Doheny Decl. ¶ 9. Denver could not submit reimbursement requests under this grant because FEMA has not responded to a budget amendment that Denver submitted. *Id.* ¶ 25.

## F. The present suit

The plaintiffs filed the present suit on May 16, 2025. They asserted six claims. In the first two claims, the plaintiffs sought relief under the Constitution, citing the separation of powers and the Spending Clause, U.S. Const. art. I. § 8, cl. 1, and claiming that the defendants usurped Congress's power of the purse by refusing to spend appropriated funds without following the procedures of the Impoundment Control Act (ICA), 2 U.S.C. §§ 683–84. That Act provides procedures for the President to propose to Congress deferral or recission of obligated funds. In their third claim, the plaintiffs contend that the defendants' actions were ultra vires and outside their legal authority. In their final three claims, the plaintiffs assert that the defendants' actions violated provisions of the Administrative Procedures Act (APA) because they were arbitrary and capricious (5 U.S.C. § 706(2)(A)), contrary to law (5 U.S.C. § 706(2)(C)), and disregarded procedure required by law (5 U.S.C. § 706(2)(D)).

On July 12, 2025, the plaintiffs filed an emergency motion for a temporary restraining order. The same day, the Court granted the motion through July 16, 2025. After a hearing on July 14, 2025, the Court denied the motion for a TRO after determining that it was not likely that the case would be rendered moot by DHS / FEMA moving SSP funds.

The plaintiffs have moved for a preliminary injunction, contending that the defendants' withholding of SSP funds and termination of SSP grants violates the Constitution's separation of powers and the APA and constituted ultra vires action. The plaintiffs ask the Court to enjoin the defendants from: (1) eliminating or terminating SSP, (2) de-obligating SSP funds during the pendency of this litigation, (3) withholding SSP funding for the reasons identified in the March 11 or April 1 letters, and (4) terminating SSP grants for the reasons identified in the March 11 or April 1 letters. After the preliminary injunction hearing, the Court proposed to combine the hearing with trial on the merits and had the parties submit position statements in response.

## Discussion

### A. Consolidation of trial on merits with preliminary injunction hearing

Federal Rule of Civil Procedure 65(a)(2) permits a court to consolidate trial on the merits with a preliminary injunction hearing. Fed. R. Civ. P. 65(a)(2); *Lacy v. Cook County*, 897 F.3d 847, 859 (7th Cir. 2018). Consolidation must not deprive the parties of a full opportunity for discovery and presentation of all of their evidence. *Id.* A court must also "preserve any party's right to a jury trial." Fed. R. Civ. P. 65(a)(2).

During the September 23, 2025, preliminary injunction hearing, the Court advised the parties that, under Rule 65(a)(2), it was considering advancing trial on the merits and consolidating it with the preliminary injunction hearing. The Court asked the parties to file a status report on September 30, 2025, stating what, if any, discovery would be necessary before resolution of the case on the merits and their position on consolidation. The plaintiffs do not believe additional discovery is necessary and do not object to consolidation. Dkt. no. 54. The defendants also do not believe additional

8

discovery is necessary but are opposed to consolidation. *Id*.

The Court would consolidate the preliminary injunction with the trial on the merits but for one factor: neither party has addressed the plaintiffs' Spending Clause claim (Count 2). A final judgment has to deal with all claims, and because Count 2 was not part of the preliminary injunction briefing, the Court does not have the parties' arguments regarding its merits. For this reason, the Court declines at this time to consolidate the preliminary injunction with the trial on the merits pursuant to Rule 65(a)(2).

**B.    Tucker Act**

The parties dispute whether the Court has jurisdiction over the claims in this case. The defendants characterize the plaintiffs' claims as disguised contract claims that belong in the Court of Federal Claims (CFC) based on that court's exclusive jurisdiction under the Tucker Act. The plaintiffs argue that their claims are statutory and constitutional, not based in the terms of the grants, and that they seek equitable relief beyond the CFC's jurisdiction.

The Tucker Act provides the CFC with jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Little Tucker Act provides the district courts with concurrent original jurisdiction over "civil action[s] or claim[s] against the United States, not exceeding $10,000 in amount" over substantially the same set of cases (except for limited exceptions not relevant in this case). *Id*. § 1346(a)(2).

9

As the Federal Circuit has explained, "the obvious implication of these acts is that Congress intended the Court of Federal Claims to have 'exclusive jurisdiction [over] any claim against the United States for money damages exceeding $10,000'" in the aforementioned categories. *Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1332–33 (Fed. Cir. 2004) (quoting *E. Enters. v. Apfel*, 524 U.S. 498, 520 (1998)); *see United States v. Hohri*, 482 U.S. 64, 66 n.1 (1987). *But see Bowen v. Massachusetts*, 487 U.S. 879, 910 n.48 (1988) (stating that the CFC's jurisdiction is "'exclusive' only to the extent that Congress has not granted any other court authority to hear the claims"). The Tucker Act waives sovereign immunity but does not create a cause of action against the government for money damages. *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003). Rather, a claim falls within Tucker Act jurisdiction if the party asserts a right that "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Id.* (quoting *United States v. Testan*, 424 U.S. 392, 398 (1976)). That test is generally both a necessary and a sufficient requirement, *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 322–23 (2020), and it derives from the CFC's lack of power to grant equitable relief, *Richardson v. Morris*, 409 U.S. 464, 465 (1973); *see United States v. King*, 395 U.S. 1, 2–3 (1969). But the money-mandating test is displaced "when the obligation-creating statute provides its own detailed remedies, or when the [APA] provides an avenue for relief." *Me. Cmty.*, 590 U.S. at 323–24 (citing *United States v. Bormes*, 568 U.S. 6, 12–13 (2012)); *Bowen*, 487 U.S. at 900–08.

In this case, the defendants argue that the plaintiffs' claims, styled as APA, ultra vires, and constitutional claims, are disguised contract claims. In general, contract

claims presumptively satisfy the money-mandating requirement for CFC jurisdiction. *Holmes v. United States*, 657 F.3d 1303, 1312–14 (Fed. Cir. 2011). *But see Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1365 (Fed. Cir. 2021) (listing exceptions).

The Supreme Court recently dealt with similar claims in two emergency stay orders involving APA challenges to grant terminations. In *Department of Education v. California*, 604 U.S. 650 (2025) (per curiam), the Court issued an emergency stay of a temporary restraining order "enjoining the Government from terminating various education-related grants [and] requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." *Id.* at 650. The Court commented that "[t]he APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.' 5 U.S.C. § 702. Nor does the waiver apply to claims seeking 'money damages.'" *California*, 604 U.S. at 651. The Court acknowledged that its prior decision in *Bowen v. Massachusetts* established that a "district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* at 651 (quoting *Bowen*, 487 U.S. at 910). It went on to conclude, however, that APA section 702's

> limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States."

*Id.*

A few months later, the Supreme Court addressed another emergency stay petition in *National Institutes of Health v. American Public Health Association*, 145 S. Ct.

11

2658 (2025).  The plaintiffs in *NIH* brought APA, ultra vires, and constitutional challenges to the government's decision to terminate their grants and to internal policy guidance underlying those decisions.  *See Massachusetts v. Kennedy*, 783 F. Supp. 3d 487, 491 (D. Mass. 2025).  After consolidating the suit with another case, the district court entered partial judgment in favor of the plaintiffs on their APA arbitrary and capricious claims and entered orders vacating the challenged policies and any grant terminations based on those policies.  *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, No. 25-10787-WGY, 2025 WL 1822487, at *1–2, *19–21 (D. Mass. Jul. 2, 2025).  It did not address any of the plaintiffs' other claims.  *Id.* at *21.

The First Circuit declined to stay either the order vacating the terminations or the order vacating the internal guidance.  *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 50 (1st Cir. 2025).  Although it believed the former to be a "closer question," it determined that *California* was distinguishable for two reasons.  *Id.* at 51.  First, in its view the order "did not 'enforce a contractual obligation to pay money.' Rather, the court simply declared that the Department unlawfully terminated certain grants.  Such relief does not constitute 'money damages,' nor would such declaratory relief be available in the Court of Federal Claims."  *Id.*  Second, "neither the district court's orders nor the plaintiffs' claims [were] premised upon the individual terms of the grant agreements."  *Id.*

The Supreme Court partially disagreed, splitting 4-1-4.  *NIH*, 145 S. Ct. at 2659.  The four dissenters from *California* voted to deny the government's stay application in full.  Four justices from the majority from *California* voted to grant the stay application in full.  Justice Barrett provided the critical vote, staying the order vacating the grant

terminations but leaving intact the order vacating the internal guidance.  *Id.* at 2661 (Barrett, J., concurring).

In her separate opinion, Justice Barrett explained that the district court "likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims."  *Id.* (citing *California*).  The arbitrary-and-capricious challenge to the internal policies, on the other hand, was a type of challenge "frequently [sought] in district court or directly in the D.C. Circuit."  *Id.*  The fact that the guidance "discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the CFC can hear."  *Id.*  Accordingly, the district court likely had jurisdiction over the APA challenge to the guidance.  *Id.*  Finally, Justice Barrett concluded that requiring two-track litigation was supported by "logic and law," reasoning that vacating the guidance was distinct from reinstating the terminated grants (or voiding the termination decision).  *Id.*  "And if the CFC has exclusive jurisdiction over the grant terminations [citing *California*] the plaintiffs cannot end-run that limit simply by packaging them with a challenge to agency guidance."  *Id.* at 2661–62.

Although *NIH* and *California* were decided in an emergency posture, their "reasoning . . . carries precedential weight [that] binds lower courts."  *Id.* at 2664 (Gorsuch, J., concurring) (internal quotations omitted).  This Court therefore must decipher exactly what that reasoning is and how it applies in this case.

As the First Circuit observed in *NIH*, the Supreme Court's cites to *Bowen* and *Great-West* suggest that these two cases "represent[] two ends of the jurisdictional spectrum."  *NIH*, 145 F.4th at 50.  The Supreme Court in *Bowen* directly addressed the

interaction between the APA and the Tucker Act, dealing with a set of claims similar to those in this case. *Bowen*, 487 U.S. at 890–91. Lower courts, including the First Circuit in *NIH* and *California*, have consistently relied on *Bowen* to uphold district court jurisdiction over grant termination challenges. The plaintiffs in this case similarly argue that *Bowen* permits this Court to exercise jurisdiction over their claims. The Court therefore conducts a close reading of *Bowen* and *Great-West* and a careful inquiry into why *Bowen* did not control the outcome in *NIH* and *California*.

      1.    ***Bowen* and *Great-West***

    *Bowen* involved a suit by the State of Massachusetts to enforce the Medicaid Act against the Secretary of Health and Human Services. *Bowen*, 487 U.S. at 882–87. Understanding the mechanics of the Medicaid Act is important for organizing the reasoning in *Bowen*. Under Medicaid as described in *Bowen*, states—subject to federal standards—developed bespoke health care programs describing eligibility conditions and covered services. *Id.* at 882. The federal government then provided financial assistance to those states through "reimbursements"—quarterly advance payments based on the state's estimated future expenditures, periodically adjusted to reflect actual experience. *Id.* at 883–84. Overpayments were handled by withholding from future advances. *Id.* at 884.

    If the Secretary believed that a state's expenditures were noncompliant with federal law, he had two options. *Id.* at 885. First, he could initiate a compliance proceeding and terminate funding. *Id.* If that decision turned out to be incorrect, the Secretary would "certify restitution . . . of any funds incorrectly withheld or otherwise denied." *Id.* (quoting 42 U.S.C. § 1316(c)). Second, he could "disallow" reimbursement

14

for "any item or class of items." *Id.* (quoting 42 U.S.C. § 1316(d)). That process usually involved "an isolated and highly focused inquiry into a State's operation of the assistance program." *Id.*

The Secretary in *Bowen* used the second option, disallowance, to withhold two sets of funds from Massachusetts. *Id.* at 886–88. Massachusetts sued in federal district court, seeking declaratory and injunctive relief setting aside those disallowance decisions. *Id.* at 887. Massachusetts relied on the sovereign immunity waiver in APA section 702. *Id.* The district court ruled in favor of Massachusetts on the merits and "reversed" the disallowance decisions without specifying any amount of money or ordering payment. *Id.* at 888. The First Circuit upheld the district court's subject matter jurisdiction and agreed that the Secretary's decision violated the Medicaid Act but held that it lacked an evidentiary basis to rule that the disputed services were reimbursable. *Id.* at 890.

The Secretary appealed, arguing that the CFC had exclusive jurisdiction over the state's claim. *Id.* Massachusetts cross-appealed, arguing that the district court had jurisdiction to grant complete relief. *Id.*

The Secretary provided two independent theories for why the CFC had exclusive jurisdiction. *Id.* at 891 ("The State must overcome both arguments in order to prevail."). The first was that Massachusetts's suit fell outside APA section 702's sovereign immunity waiver because it sought "money damages." *Id.*; *see* 5 U.S.C. § 702 (waiving sovereign immunity for "action[s] . . . seeking relief *other than money damages*" (emphasis added)). The second was that APA section 704 barred relief because Massachusetts had an adequate remedy in the CFC. *Bowen*, 487 U.S. at 891; *see* 5

15

U.S.C. § 704 (authorizing judicial review of agency action "for which there is *no other adequate remedy in any court*" (emphasis added)).

The Supreme Court rejected both of the Secretary's theories. *Bowen*, 487 U.S. at 909. Regarding the APA section 702 argument, the Court reasoned that "insofar as the complaints sought declaratory and injunctive relief, they were certainly not actions for money damages." *Id.* at 893. But it further determined that "even the monetary aspects of the relief that the State sought [were] not 'money damages' as that term is used in the law." *Id.* In the Court's view, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.* Rather, it interpreted the term "money damages" in APA section 702 to refer more narrowly to damages "to *substitute* for a suffered loss, whereas specific remedies . . . 'attempt to give the plaintiff the very thing to which he was entitled.'" *Id.* at 895 (quoting *Md. Dep't of Hum. Res. v. Dep't of Health and Hum. Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985)). Based on this distinction, the Court concluded that Massachusetts's "suit to enforce . . . the Medicaid Act" was authorized by the APA because it "is not a suit seeking money in *compensation* . . . ; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money." *Id.* at 901. Put differently, reversing the disallowance decision was a form of specific relief—the "very thing" that Massachusetts claimed to be entitled to— rather than an award of damages to substitute for a loss. *Id.* at 893–901.

Turning to the Secretary's APA section 704 challenge in *Bowen*, the Court determined that judicial review in the CFC would not be "adequate" so as to strip the district court of its jurisdiction. *Id.* at 901. The Court provided two reasons. It first

16

highlighted that the CFC lacked "the general equitable powers of a district court to grant prospective relief." *Id.* at 905. That limitation was particularly significant because, "[a]s the facts of [Medicaid] cases illustrate, the interaction between [states] and the Secretary[] . . . may make it appropriate for judicial review to culminate in the entry of declaratory or injunctive relief that requires the Secretary to modify future practices." *Id.* That "rather complex ongoing relationship between the parties" meant that "a naked money judgment against the United States" would not "categorically" be "an adequate substitute for prospective relief." *Id.*

Moreover, the Court found, the CFC might lack jurisdiction altogether in some cases. *Id.* For example, the Court noted that the CFC would be unable to provide relief even after a final disallowance decision, so long as the government had not yet recouped the funds from the next payment. *Id.* In contrast, a district court could review the disallowance decision and enjoin the government from recouping the funds. *Id.* at 907. The Court also suggested that the Medicaid Act may not pass the Tucker Act's money-mandating test. *Id.* at 905 n.42. Unlike "laws [that] attempt to compensate . . . for past injuries," the Medicaid Act "directs the Secretary to pay money to the State, not as compensation for a past wrong, but to subsidize future state expenditures." *Id.* Thus in the Court's view because "as a *category of case*, alleged 'improper Medicaid disallowances' cannot always be adequately remedied in the Claims Court, as a jurisdictional, or threshold matter, these actions should proceed in the district court . . . [which] can award proper relief." *Id.* at 907 n.43.

Regarding the second reason why review in the CFC was not adequate for APA section 704 purposes, the Court noted that Medicaid disallowance decisions usually

17

involve a "highly focused inquiry into a State's operation of the assistance program." *Id.* at 885. The Court reasoned that district courts and "regional courts of appeals" would be better suited to evaluating those "state governmental activities" than the CFC—"a single tribunal headquartered in Washington." *Id.* at 907–08. Given that difference in institutional competence, the Court concluded that "[i]t would be nothing less than remarkable to conclude that Congress intended judicial review of these complex questions of federal-state interaction to be reviewed in a specialized forum such as the [CFC]." *Id.* at 908.

Having rejected both theories for why the CFC had exclusive jurisdiction, the Court affirmed in full the district court's orders reversing the government's disallowance decisions. In the Court's view, the orders merely told the government "that it may not disallow the reimbursement on the grounds given"; the fact that the government would likely "reimburse Massachusetts the requested sum . . . [was] a mere by-product of [the district] court's primary function of reviewing the Secretary's interpretation of federal law." *Id.* at 909. Moreover, because the orders were for specific relief, the district court had jurisdiction to issue them under the APA without splitting the case in two. *Id.* at 910–11.

In *Great-West & Annuity Insurance Co. v. Knudson*, the Supreme Court held that an action to enforce an insurance plan reimbursement provision was an action at law for money damages that did not qualify under ERISA's cause of action authorizing suit for "equitable relief." *Great-West*, 534 U.S. at 207–09, 218. The Court first determined that the ERISA cause of action adverted to the traditional distinction between equitable and legal relief. *Id.* at 210. In the Court's view, Great-West's claim sought "in essence, to

impose personal liability . . . for a contractual obligation to pay money." *Id.* That claim was "quintessentially an action at law" because "[a]lmost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied." *Id.* (cleaned up).

The Court distinguished *Bowen* by clarifying that "*Bowen* did not turn on distinctions between 'equitable' actions and other actions . . . but rather [on] what Congress meant by 'other than money damages' in the [APA]." *Id.* at 212 (quoting *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999)) (cleaned up). The Court also differentiated between Great-West's claim for "specific performance of a *contractual* obligation to pay *past* due sums" and Massachusetts's suit in *Bowen* which "was not merely for past due sums, but for an injunction to correct the method of calculating payments going forward." *Id.* It concluded, "*Bowen* has no bearing on the unavailability of an injunction to enforce a contractual obligation to pay money past due." *Id.*

## 2. The rationale of *NIH* and *California*

Having identified the relevant portions of *Bowen* and *Great-West*, the Court can infer the Supreme Court's likely rationale in *NIH* and *California*. At first glance, *Bowen* seems to suggest that grant termination challenges belong in district court. An order overturning an agency's decision to terminate a grant, as the district courts in *NIH* and *California* did, resembles the district court order in *Bowen* reversing the Secretary's decision to disallow Medicaid funds. Although both effectively result in the government paying money, that money is specific relief—the "very thing" the plaintiffs claim an entitlement to—not compensatory relief to substitute for a harm. And even though this

19

dichotomy derives from *Bowen*'s interpretation of APA section 702, not the Tucker Act, it would seem to apply to both. *Bowen* interpreted "money damages" to refer to the traditional concept of *compensatory* damages, which in turn mean substitute damages. The Tucker Act's test of whether the cause of action can be fairly interpreted to mandate *compensation*, then, would seem to also refer to substitute damages.

That parallel, however, is superficial. *See Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1121–26 (Fed. Cir. 2007) (dissecting the analysis in *Bowen*). *Bowen*'s interpretation of APA section 702 does not map onto the Tucker Act money-mandating test, for two reasons. First, the Court in *Bowen* clarified in footnote 31:

> There are, of course, many statutory actions over which the Claims Court has jurisdiction that enforce a statutory mandate for the payment of money rather than obtain compensation for the Government's failure to so pay. . . . The jurisdiction of the Claims Court . . . is not expressly limited to actions for "money damages," . . . whereas that term does define the limits of the exception to § 702.

*Bowen*, 487 U.S. at 900 n.31. Justice Scalia, in dissent, took note of this disconnect, asserting that it would be desirable to read APA section 702 *in pari materia* with the Tucker Act. *Id.* at 914 (Scalia, J., dissenting). Second, if the *Bowen* definition of APA section 702 also defined the CFC's jurisdiction under the Tucker Act, then the Court would not have had to separately address the separate APA section 704 argument. The rationale for why the Medicaid disallowance challenges qualified under APA section 702 also necessarily would have meant that the purely monetary relief available in the CFC was not "adequate" to displace the district court's jurisdiction under APA section 704.

Given that the money-mandating test for Tucker Act jurisdiction derives from the

CFC's lack of equitable remedial powers, compensation for purposes of that test refers to legal, as opposed to equitable, relief.  In other words, the Tucker Act money-mandating boundary draws a line between equitable relief (outside the CFC's jurisdiction) and legal relief (within the CFC's jurisdiction, unless displaced).  The equitable / legal distinction, in turn, is defined by *Great-West*:  an order for money past due—even if framed as an injunction—is relief at law, not relief at equity.

This understanding is bolstered by the Court's APA section 704 analysis in *Bowen*, in which the Court relied heavily on the likely need for equitable relief in the Medicaid context to support its determination that the CFC was not an adequate forum for the state's disallowance challenges.  *Id.* at 904–08.  This also helps to explain some additional observations in *Bowen*.  For example, the Court distinguished between the Medicaid Act—"a complex scheme . . . that governs a set of intricate, ongoing relationships between the States and the Federal Government"—and "statutes that provide compensation for specific instances of past injuries or labors [which] do not require the type of injunctive and declaratory powers that the district courts can bring to bear in suits under the Medicaid Act."  *Id.*  at 900 n.31.  Regarding the latter, the Court noted that "to the extent that suits to enforce these statutes can be considered suits for specific relief . . . suits under the Tucker Act in the [CFC] offer precisely the sort of 'special and adequate review procedures' that § 704 requires to direct litigation away from the district courts."  *Id.*

The Court similarly observed in *Bowen* that "[t]he APA is tailored to" "[m]anaging the relationships between the States and the Federal Government that occur over time," whereas the Tucker Act is tailored to "remedy particular categories of past injuries or

labors for which various federal statutes provide compensation." *Id.* at 904 n.39. When the Court suggested that the disallowance challenges may not qualify under the Tucker Act's money-mandating test, it differentiated the Medicaid Act's mandate "to pay money . . . to subsidize future state expenditures" from laws "to compensate . . . for past injuries or labors." *Id.* at 905 n.42. Finally, the Court emphasized that district courts should hear CFC claims "as a jurisdictional, or threshold matter," because "whether injunctive or declaratory relief is appropriate in a given case will not always be apparent at the outset." *Id.* at 907 n.43.

The above analysis also explains the outcomes in *NIH* and *California*. In those cases, the plaintiffs challenged grant terminations that had already taken place. Thus the claims seeking reversal or vacatur of those terminations were retrospective claims for money past due and therefore "quintessentially . . . action[s] at law." *Great-West*, 534 U.S. at 211. The fact that the requests and orders were framed as injunctive or declaratory relief was immaterial because "suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied." *Id.* at 210.

Additionally, none of the special concerns that the Court raised in *Bowen* regarding the Medicaid Act apply with the same force to grant terminations. Unlike the advance-disallowance-recoupment Medicaid scheme, which complicated categorizing claims as prospective or retrospective, grant funds only change hands once between the government and the grantees. Thus claims to compel payment of those funds can be neatly divided: pre-termination challenges are prospective and belong in district

22

court; post-termination challenges are retrospective and belong in the CFC. And whereas Medicaid disallowances were intertwined with questions of state law outside of the CFC's competence, grant terminations are not.

Finally, this interpretation also explains the bifurcated result in *NIH*. In *Bowen*, the Court concluded that the district court could award full relief without splitting the case into a claim to declare the Secretary's basis for disallowance unlawful (in the district court) and a separate claim to order payment (in the CFC). *Bowen*, 487 U.S. at 910. It provided "two independent reasons," each addressed in turn. *Id*. at 909.

First, although the district court reversed a specific disallowance decision, "it did not order that amount to be paid, and it did not purport to be based on a finding that the Federal Government owed Massachusetts that amount, or indeed, any amount of money." *Id*. at 909–10. Instead, the court's order merely told the government "that it may not disallow the reimbursement on the grounds given." *Id*. at 910. To the extent that the order would cause "the Government [to] abide by this declaration and reimburse Massachusetts the requested sum . . . , this outcome is a mere by-product of th[e] [district] court's primary function of reviewing the Secretary's interpretation of federal law." *Id*.

*NIH* and *California* suggest that this rationale does not apply equally to orders reversing or vacating grant terminations. The reason likely is, again, the unique features of the Medicaid program at issue in *Bowen*. Massachusetts's challenge was retrospective with regard to the disallowance decision, but it was prospective with regard to the recoupment of funds—seeking to enjoin the government from acting on its disallowance decision by withholding funds from a future payment. *See id*. at 886, 886

23

n.10. Thus when the district court reversed the disallowance decision, it precluded the government from withholding funds, without separately ordering the government to pay money past due. *See NIH*, 145 S. Ct. at 2661. Moreover, the prospective nature of the order meant that the chance that the government ultimately would have to pay the money was only a possibility. The government could, in theory, still withhold the funds on a different basis at the time for reimbursement. Those features distinguished the relief in *Bowen* from the essentially contractual remedy of specific performance.

In contrast, the district courts in *NIH* and *California* addressed grant terminations that had already occurred, so vacating the underlying basis for the terminations did not automatically reinstate those grants; instead, the district courts separately vacated the grant terminations. *Id.* But those separate orders in *NIH* and *California* vacating completed decisions to withhold money were effectively money judgments enforcing contracts between the parties for past due sums. *See id.*; *California*, 604 U.S. at 651 (alluding to the grant termination challenges as "claims seeking 'money damages'" and 'to enforce a contractual obligation to pay money'"). As another district court has observed, unlike in *Bowen*, "here there is more than a possibility that injunctive relief would result in the disbursement of funds; it is the explicit relief sought by plaintiffs." *New York v. Nat'l Sci. Found.*, No. 25 C 4452, WL 2180478, at *16 (Aug. 1, 2025 S.D.N.Y.) (cleaned up).

The second reason for rejecting a claim-splitting approach in *Bowen* was that the district court had jurisdiction to issue both orders. But this was based on the Court's rejection of both of the Secretary's arguments. As explained above, that analysis— particularly as to the CFC's lack of jurisdiction—does not apply equally to grant

24

terminations. For this reason, in *NIH*, the grant termination challenges were purely retrospective and thus claims at law that belong in the CFC, but the prospective challenges to vacate the guidance—which as Justice Barrett noted, would not automatically vacate the terminations—were equitable claims and belonged in the district court. *NIH*, 145 S. Ct. at 2661–62.

### 3. Application

Turning finally to this case, the above analysis means that the Court lacks jurisdiction over the plaintiffs' claims to the extent that they challenge the termination of their grants. The plaintiffs' grant terminations, like those in *NIH* and *California*, have already happened. Claims that those termination decisions were unlawful, and any remedy (whether by judgment, declaration, or injunction), would ultimately amount to an obligation to pay retrospective claims for money. Those claims, under the Supreme Court's recent emergency orders, belong in the CFC. This Court does have jurisdiction, however, over the plaintiffs' claims to the extent that they challenge the government's decision to freeze funding and terminate the SSP program. Those challenges, if successful, would not require the Court to reverse or vacate past grant terminations, or otherwise require the government to pay money past due. *See Nat'l Sci. Found.*, WL 2180478, at *14–15. Rather, enjoining the government from relying on its stated reasons to withhold payment would be exactly the type of relief that the Supreme Court affirmed in *Bowen*. Finally, to the extent that the findings on those issues implicate the legality of the past grant termination decisions, that is "a mere by-product of [this] court's primary function of reviewing the [government's] interpretation of federal law." *Bowen*, 487 U.S. at 910.

The plaintiffs urge the Court to read *NIH* and *California* narrowly to limit jurisdiction just with respect to their claims alleging arbitrary and capricious actions. Though the plaintiffs do not provide a basis for taking that path, the Court can see three possible justifications for doing so. First, *NIH* and *California* only dealt with claims alleging arbitrary and capricious conduct. Although this is likely attributable to the fact that those were the only claims the district courts had decided and therefore the only claims at issue in the stay petitions, reading *NIH* and *California* as limited to the particular types of claims at issue makes sense in light of the preliminary posture of those decisions and the minimal elaboration in the Supreme Court's opinions. This alone, however, is not a good enough reason without a principled way to distinguish among the plaintiffs' various claims.

Second, the Court could distinguish the plaintiffs' constitutional and ultra vires claims from their APA claims. The parties frame their arguments using the *Megapulse* test. That test, adopted by many lower courts, has been applied primarily to APA claims to sift out disguised contract claims by looking past the pleading to the substance of the claims, based on the source of the right asserted and the remedy sought. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982). To the extent that *NIH* and *California* are based on a *Megapulse*-like analysis, they may not control the question of jurisdiction over constitutional and ultra vires claims, which may come out differently on the *Megapulse* source-of-right factor or involve a different test altogether. The problem with this idea is that the clear focus of *NIH*, *California*, *Bowen*, and *Great-West* is with the ultimate remedy that will flow from a claim. On that front, all of the plaintiffs' claims are indistinguishable from those in *NIH* and *California*.

Third, the CFC's jurisdiction is exclusive only by implication—that is, only to the extent that Congress has not conferred concurrent jurisdiction in the district courts. *NIH* and *California* might be fairly characterized as decisions that there is no concurrent jurisdiction for grant termination challenges under the APA, leaving open the possibility that there is a source of concurrent jurisdiction for non-APA challenges. One district court has adopted this reasoning, distinguishing separation of powers and ultra vires claims similar to those in this case by reading *California* to decide only that the APA's sovereign immunity waiver does not extend to challenges to grant terminations. *Nat'l Sci. Found.*, 2025 WL 2180478, at *23–24. This is a fair reading of *NIH* and *California*, but the Court does not believe that it changes the jurisdictional outcome in this case.

The plaintiffs' constitutional and ultra vires claims need not rely on the APA to bypass sovereign immunity, but they also cannot use the APA exception to the Tucker Act. And to the extent that the plaintiffs can seek reversal of grant terminations through their constitutional and ultra vires claims, those claims are money-mandating, per the above analysis of *Bowen* and *Great-West*. That leaves them with the CFC by default. Nothing in the separation of powers or the ICA—the statute providing the substantive right for the ultra vires claims—suggests congressional intent to displace the Tucker Act. Nor is there a basis for finding that the Court possesses concurrent jurisdiction over such claims.

In sum, though the scope of *NIH* and *California* is less than clear, on balance, the Court believes that those decisions cannot be limited to APA claims alleging arbitrary and capricious action. Rather, the Court lacks jurisdiction over all of plaintiffs' claims to the extent that they seek to overturn past grant terminations or otherwise seek money

past due.  The Court retains jurisdiction over the plaintiffs' claims for equitable relief, in which they ask the Court to unfreeze the SSP, thus reopening the opportunity for the plaintiffs to submit reimbursement requests, and to enjoin the defendants from relying on the reasons in the March 11 and April 1 letters to deny those future requests.  These are all requests for relief that the CFC cannot grant and that therefore belong in district court.  *See Tootle v. Sec'y of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006) ("There cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act.").

Having established the scope of its jurisdiction, the Court proceeds to the merits of the plaintiffs' claims.

## C.    Standard for preliminary injunction

To obtain a preliminary injunction, the movant "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  When, as here, the government is a party to the suit, "assessing the harm to the opposing party and weighing the public interest . . . merge."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The party seeking an injunction "carries the burden of persuasion" on each of these points. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

### 1.    Likelihood of success on the merits

#### a.    Separation of powers

The plaintiffs contend that the defendants violated the separation of powers by

refusing to carry out the SSP, for which Congress specifically appropriated funds. Compl. ¶¶ 193–98. The defendants respond with two arguments suggesting that this claim is not reviewable and then contend that in any event the claim fails on its merits. The Court concludes that the plaintiffs' separation of powers claim is neither barred by *Dalton* nor precluded by the APA and that the defendants' actions likely violated the separation of powers established by the Constitution.

### i. Applicability of *Dalton*

The defendants first argue that the plaintiffs' separation of powers claim is "simply a repackaging of their statutory APA claims dressed up in constitutional language." Defs.' Resp. at 23. The defendants rely on *Dalton v. Specter*, 511 U.S. 462 (1994), which rejected a separation of powers argument that the President's closure of a naval base was "in excess of his statutory authority." *Id.* at 471. The Court concludes that *Dalton* does not bar the plaintiffs' claims.

In *Dalton*, the plaintiffs alleged that the President violated the procedural requirements of the Defense Base Closure and Realignment Act of 1990 by "accepting procedurally flawed recommendations[,]" *id.* at 474, and they sought to enjoin the Secretary of Defense from closing a naval shipyard based on the President's decision. *Id.* at 466. The court of appeals held that the case had a "constitutional aspect" and that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471. The Supreme Court rejected this holding, stating that "[o]ur cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. *Dalton* held that the

29

claim at issue was statutory rather than constitutional, and because the Act "commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." *Id.* at 477. Under *Dalton,* plaintiffs alleging a violation of separation of powers must contend that the Executive acted in the "*absence of any statutory authority,*" not only "that the President acted in excess of such authority." *Id.* at 473; *see also City of Chicago v. Barr*, 961 F.3d 882, 919 (7th Cir. 2020) (describing the two types of claims distinguished in *Dalton*).

Yet *Dalton* did not bar all constitutional claims that also involve violation of a statute. The Court rejected the contention that "*whenever* the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine," *Dalton*, 511 U.S. at 471, but it did so in an effort to ensure that its holding in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), that "[p]residential decisions are reviewable for constitutionality," was not "broadened beyond recognition." *Dalton*, 511 U.S. at 474. The Court was concerned about a flood of constitutional litigation against the President, and its holding was correspondingly narrow: it did not hold that a plaintiff categorically lacks a constitutional cause of action when executive action violates the Constitution as well as a statute. In short, *Dalton* does not preclude fundamentally constitutional claims in situations where the facts could also be characterized as statutory violations.

The Ninth Circuit adopted this reading of *Dalton*, recognizing that its "jurisprudence weighs in favor of justiciability by taking an expansive view of the constitutional category of claims highlighted in *Dalton.*" *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023). Murphy Co. sought injunctive relief, alleging that President

Obama's designation of specific lands as a monument under the Antiquities Act, 54 U.S.C. § 320301, violated another statute providing that the land would be employed for timber production. *Murphy Co.*, 65 F.4th. at 1128. The court held that Murphy Co.'s claim sufficiently implicated the constitutional separation of powers though it also related to whether the President violated a statute. *Id.* at 1131; *see also Sierra Club v. Trump*, 929 F.3d 670, 696–97 (9th Cir. 2019) (holding that *Dalton* did not foreclose a constitutional cause of action, as "Plaintiffs claim that to the extent Defendants did not have statutory authority to reprogram the funds, they acted in violation of constitutional separation of powers principles because Defendants lack any background constitutional authority to appropriate funds—making Plaintiffs' claim fundamentally a constitutional one.").

On the other hand, in weighing a *Dalton* argument in *Global Health Council v. Trump*, a divided panel of the D.C. Circuit held that the plaintiffs lacked a cause of action for constitutional claims arising from unlawful recission of appropriated funds, as their claims could not exist without the relevant appropriations statute. *Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2480618, at *7 & n.11 (D.C. Cir. Aug. 28, 2025) ("[T]his dispute is fundamentally statutory because the alleged constitutional violation is predicated on the underlying alleged statutory violations."). *But see id.* at *28 (Pan, J., dissenting) (agreeing with *Murphy* and noting that the majority created a circuit split). Yet *Dalton* did not hold that a plaintiff lacks a cause of action for a constitutional claim merely because the underlying conduct implicates a statute. "[I]t cannot be right . . . that as long as an official identifies some statutory authorization for his actions, doing so makes any challenge to those actions statutory and precludes

constitutional review."  *Id.* (Pan, J., dissenting) (quoting *Sierra Club*, 929 F.3d at 697).

As the dissenting judge stated, the majority opinion in *Global Health* extends *Dalton*'s

reach and contradicts "binding precedents which hold, in no uncertain terms, that the

Executive has no authority to refuse to execute a duly enacted law—such as the

Appropriations Act—for policy reasons."  *Glob. Health Council v. Trump*, No. 25-5097,

2025 WL 2709437, at *2 (D.C. Cir. Aug. 28, 2025) (Pan, J., dissenting from denial of

petition for rehearing en banc).

The *Global Health* majority critiqued *Murphy* for relying on *Sierra Club v. Trump*,

140 S. Ct. 1 (2019) (mem.), in which the Supreme Court granted a stay because the

government had made "a sufficient showing at this stage that the plaintiffs have no

cause of action."  *See Glob. Health Council*, 2025 WL 2480618, at *9 n.15 (majority

opinion).  But the Supreme Court's brief, unsigned order in *Sierra Club* did not silently

change the scope of *Dalton* or undermine the Seventh Circuit's conclusion in *City of*

*Chicago v. Barr* that "[w]hether deemed a statutory or a constitutional violation, the

executive's usurpation of the legislature's power of the purse implicates an interest that

is fundamental to our government and essential to the protection against tyranny."  *Barr*,

961 F.3d at 919.

The Seventh Circuit has therefore recognized that the Executive Branch's

violation of an appropriations statute may raise constitutional separation of powers

concerns, a conclusion that comports with *Dalton*.  *Dalton* held that a claim that the

President "violated the terms of the 1990 Act by accepting procedurally flawed

recommendations" was a statutory claim, but the 1990 Act committed decision-making

to the President's discretion.  *Dalton*, 511 U.S. at 474, 476.  Unlike this case, *Dalton* did

not implicate broader separation of powers principles but instead concerned the proper procedures under the 1990 Act for an independent commission's recommendation to the President.  At issue in the plaintiffs' separation of powers claim, by contrast, is disregard for Congress's Constitution-based power of the purse:  "the President's violation of the Impoundment Control Act is a sideshow . . . the crux of the separation-of-powers problem is the President's refusal to comply with the Appropriations Act for policy reasons[,]" which creates significant constitutional concerns.  *Glob. Health Council*, 2025 WL 2480618, at *29 (Pan, J., dissenting).  The plaintiffs in the present case do not simply claim that the Executive Branch failed to follow the ICA, and their separation of powers claim implicates the weighty concerns described in *Barr* regarding the balance of power between the executive and legislative branches.  Additionally, the ICA expressly disclaims preclusion of constitutional claims, stating that "[n]othing contained in this Act . . . shall be construed" as "asserting or conceding the constitutional powers or limitations of either the Congress or the President" or "affecting in any way the claims or defenses of any party to litigation concerning any impoundment."  2 U.S.C. § 681(1), (3); *see also U.S. Dep't of State v. AIDS Vaccine Advoc. Coal.*, 606 U.S. ___, No. 25 A 269, 2025 WL 2740571, at *2 (Sept. 26, 2025) (Kagan, J., dissenting) ("*Nothing* in the ICA . . . affects *in any way* the claims of *any* party to litigation about *any* impoundment.").  *Dalton* is therefore inapposite and does not deprive the plaintiffs of a cause of action for their separation of powers claim.

## ii.    Displacement of equitable claims

The defendants also contend that the Court lacks jurisdiction to resolve this claim because either the APA or the Tucker Act provides an avenue for judicial review that

forecloses equitable relief.[1]  Defs.' Resp. at 24.  Setting aside the Tucker Act issue addressed in the jurisdiction section above, here, the plaintiffs' separation of powers claim is not displaced by the APA.

It is well-settled that federal courts may grant injunctive relief against federal officers who violate federal laws, including the Constitution.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).  "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."  *Id.* at 327.  Separation of powers claims, like other constitutional claims, may be brought under a court's equitable jurisdiction.  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (collecting cases); *Collins v. Yellen*, 594 U.S. 220, 245 (2021) ("[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge.").

Congress may expressly or implicitly preclude a court from exercising implied equitable jurisdiction.  But the APA does not expressly foreclose the exercise of inherent equitable power over constitutional claims.  Indeed, courts often grant equitable relief against agency officials, reasoning that "forcing all constitutional claims to follow [the APA's] strictures would bar plaintiffs from challenging violations of constitutional rights in the absence of a discrete agency action that caused the violation[.]"  *Juliana v. United States*, 947 F.3d 1159, 1167–68 (9th Cir. 2020).

It is unlikely that Congress could implicitly preclude judicial review of constitutional claims.  *Webster v. Doe*, 486 U.S. 592, 603 (1988).  Even so, it has not

---

[1] Defendants do not argue that the ICA forecloses equitable relief.

done so under the APA. Congress evinces "'intent to foreclose' equitable relief" when Congress both defines a "judicially unadministrable" right and provides a method of enforcing that right. *Armstrong*, 575 U.S. at 328–29. In *Armstrong,* Medicaid providers sought to enforce section 30(A) of the Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A). The Supreme Court held that Congress foreclosed equitable relief by providing for a remedy of withholding Medicaid funds and laying out a judicially unadministrable balancing standard referencing a variety of metrics for consideration. *Id.* at 328. An APA claim that agency action is contrary to the Constitution—as in this case—in no way resembles the complex balancing required by the Medicaid scheme in *Armstrong* that created a judicially unadministrable right. The Court's exercise of its inherent equitable authority has not been foreclosed.

The defendants contend that equitable constitutional claims are a "Hail Mary pass," but the Supreme Court made this statement in its discussion of ultra vires claims. Defs.' Resp. at 24 (quoting *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025)). "For implied equitable claims under the Constitution, we have imposed neither the requirements for *ultra vires* review nor those for APA review." *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 791 (D.C. Cir. 2025). In this case, the plaintiffs seek relief premised upon a constitutional violation (count 1) and ultra vires action (count 3). *Nuclear Regulatory Commission* and the demanding test it outlines apply only to the ultra vires claim. The APA likely does not displace the plaintiffs' separation of powers claim.

### iii. Merits

The U.S. Constitution provides for separation of powers, the structural division of

"the federal power among the three branches—the Legislative, the Executive, and the Judicial—placing both substantive and procedural limitations on each." *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272 (1991).  The Constitution grants Congress the power to legislate and the power of the purse.  U.S. Const. art. I, §§ 1, 8.  Congress exercises powers granted by the Constitution when it enacts appropriations statutes to allocate federal funding.

It is "settled, bedrock" constitutional law that the "President and subordinate executive agencies" must "follow statutory *mandates* so long as there is appropriated money available and the President has no constitutional objection to the statute." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.).  Congress has provided a means for the President to present policy-based objections to an appropriation.  The President may follow the procedures of the ICA, 2 U.S.C. §§ 683–84, to propose recission or deferral of budgetary authority, but the Executive may not simply decline to spend funds. *Aiken Cnty.*, 725 F.3d at 261 n.1.  These principles extend to congressional appropriations related to immigration.  "The executive branch has significant powers over immigration matters; the power of the purse is not one of them." *Barr*, 961 F.3d at 887.  Unless delegated authority by Congress, the Executive may not "condition the payment of . . . federal funds on adherence to its political priorities." *City of Chicago v. Sessions*, 888 F.3d 272, 283 (7th Cir. 2018).

In this case, the plaintiffs' separation of powers claim is likely to succeed.  The Executive Branch admittedly withheld lawfully appropriated funds to effectuate policy aims without authorization from Congress.  That very likely violates the separation of powers.  And the Court retains jurisdiction over these claims because each plaintiff

36

intends to submit reimbursement requests under the SSP but cannot do so now because the program has been terminated.

Congress appropriated $800 million in 2023 and $650 million in 2024 to DHS / FEMA "to support sheltering and related activities provided by non-Federal entities, including facility improvements and construction, in support of relieving overcrowding in short-term holding facilities of U.S. Customs and Border Protection." 136 Stat. at 4730; 138 Stat. at 598. The plaintiffs are non-Federal entities who were awarded grants pursuant to these appropriations. Those grants were terminated and the funds were de-obligated in FEMA's accounting system, Pls.' Mem., Ex. 3, Comans Decl. ¶ 8, because of a policy disagreement with Congress. FEMA's then-Acting Administrator Cameron Hamilton wrote that Congress "should have never passed bills . . . asking FEMA to do this work. This stops now." *See* Pls.' Mem., Prather Decl. ¶ 12. If the executive branch had a policy objection to the congressional appropriation, the defendants could have asked Congress to rescind the appropriation under the procedures of the ICA. But the President did not issue a special message to propose rescission. Nor has the Executive voiced a constitutional objection to expending these funds, which theoretically might permit de-obligation. *See Aiken Cnty.*, 725 F.3d at 259.

The parties agree that at this point, because the funds at issue were obligated to the plaintiffs in fiscal years 2023 and 2024, they cannot now be obligated to another initiative. Defs.' Resp. at 7; Pls.' Reply at 5. The funds are destined to sit in an account and will not be used "to support sheltering and related activities" as Congress mandated, as the plaintiffs cannot submit reimbursement requests 136 Stat. at 4730; 138 Stat. at 598.. Accordingly, the Executive Branch likely infringed on Congress's

power to legislate and appropriate funds, and it is likely to continue to do so through denials of any future reimbursement requests that the plaintiffs will submit.

The defendants respond that Congress employed a lump-sum appropriation that leaves DHS with discretion over whether and how to spend the funds at issue, so their termination of funding did not infringe on Congress's power. Defs.' Resp. at 26–29. This argument is unavailing given Congress's clear intent to require that funding be provided to a specific class of parties for a narrow purpose.

The defendants principally rely on *Lincoln v. Vigil*, 508 U.S. 182 (1993), in which the Supreme Court explained that Congress made a lump-sum appropriation to an agency to "expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance" of Native Americans and for the "relief of distress and conservation of health." *Id.* at 185 (quoting 25 U.S.C. § 13). The Supreme Court noted that lump-sum appropriations are "traditionally regarded as committed to agency discretion" because their very purpose is to permit flexibility rather than impose binding restrictions. *Id.* at 192. Here, the defendants argue that DHS retains control under the 2023 and 2024 appropriations "regarding how much funding to allocate to a particular grant recipient or whether to continue a grant award at all[.]" Defs.' Resp. at 27.

In this case, however, the language of the appropriations enactments does not give the agency the discretion it would have under a lump-sum appropriation; it is far narrower than the statute in *Lincoln*. In 2023 and 2024, Congress provided that funds "shall be transferred to 'Federal Emergency Management Agency—Federal Assistance' [FEMA] to support sheltering and related activities provided by non-Federal entities, including facility improvements and construction, in support of relieving overcrowding in

short-term holding facilities of U.S. Customs and Border Protection[.]"  136 Stat. at

4730; 138 Stat. at 598.  Unlike the statute in *Lincoln*, which broadly appropriated

funding to benefit Native Americans and support their health, the statute here specifies

funding recipients (non-Federal entities) and a narrow and focused purpose (supporting

sheltering to relieve overcrowding in short-term CBP holding facilities).  *See Train v.*

*City of New York*, 420 U.S. 35, 37, 44 (1975) (holding that the Federal Water Pollution

Control Act Amendments of 1972, 86 Stat. 816, which provided that funds "shall be

allotted by the Administrator" of the EPA, did not confer discretion to withhold funds);

*Cmty. Legal Servs. in E. Palo Alto v. DHS*, 137 F.4th 932, 936, 940–41 (9th Cir. 2025)

(holding that "*Lincoln* has no application" to 8 U.S.C. § 1232(c)(5), which provides that

DHS "'shall ensure, to the greatest extent practicable,' that unaccompanied children in

immigration custody receive legal representation.").  It is perhaps true that Congress

could have been more specific:  it could have specified that funds would be provided to

particular municipalities or that funds could be expended only so long as DHS pursued

a policy of releasing immigrants from short-term holding facilities.  But Congress was

definitive in providing that funds were to be provided to FEMA to support sheltering and

related activities, not simply that the funds would be provided to FEMA, period.

Nowhere did Congress say that DHS could decline to spend the appropriations if it no

longer wished to provide shelter to immigrants released from CBP custody out of a

belief that doing so ran against current agency policy.  In sum, the agency lacked

discretion under the appropriations statute to decline to spend these funds.

The surrounding clauses in the appropriation enactments affirm this reading.  In

other provisions of the same paragraph, Congress used non-mandatory language,

stating that funds "not to exceed" a certain sum should be used for a stated earmarked purpose. 136 Stat. at 4729–30; 138 Stat. at 597–98. This language confers discretion on DHS to spend up to a certain amount in support of the designated purpose. In the clause at issue, however, Congress did not use the phrase "not to exceed"; it stated, unequivocally, that funds "shall be transferred" to FEMA "to support sheltering and related activities[.]" 136 Stat. at 4729–30; 138 Stat. at 597–98. Later in the clause creating the SSP, Congress placed a cap on FEMA's spending on administrative costs through another use of the phrase "not to exceed[,]" once again giving discretion to the agency for that particular aspect of the funding. In short, Congress knew how to confer discretion not to spend funds, and it did so in these other clauses. Yet Congress did not confer discretion when requiring FEMA to support sheltering and related activities in the 2023 and 2024 appropriations acts.

The Court is not persuaded by the defendants' reliance on 2 C.F.R. § 200.340, which states that a federal grant may be terminated "[b]y the federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). The defendants contend that under section 340 or as a matter of common sense, because DHS is no longer releasing immigrants from short-term detention, the appropriations at issue no longer effectuate an agency priority and thus no longer meet a practical need for sheltering immigrants. But section 200.340 does not permit the agency to decline to follow a statute simply because its priorities have changed. "Section 200.340 does not create a default ability by the federal government to terminate an award over the award recipient's objection,

40

whenever an agency determines its priorities have changed." *Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 670 (S.D.N.Y. 2025). Rather, the regulation states that termination may only occur "to the extent authorized by law," and thus it cannot permit agencies to flout statutory mandates. 2 C.F.R. § 200.340(a)(4). Section 200.340 "requires a change in agency priorities to be set forth as a term and condition if the agency wishes to reserve to itself the right to rescind the award based on a change in priority." *Duffy*, 784 F. Supp. 3d at 679; *see* Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024). The defendants have not shown that termination would be consistent with the appropriations acts or that they have taken the requisite steps in the terms and conditions of these grants to allow termination based on a change on priority. In short, DHS cannot refuse to spend lawfully appropriated funds simply because its policy and priorities have changed.

The defendants also maintain that as a matter of common sense, they could not support sheltering after changing policy priorities and declining to release immigrants from short-term detention. They argue that Congress appropriated the funding here to help support cities burdened by DHS's policy of releasing immigrants from short-term detention while that policy existed and without requiring that DHS pursue that policy. Funding was terminated, the defendants say, because they no longer release immigrants from short-term detention or need shelters to house such persons. Congress did not state, however, that it wished to support sheltering only so long as DHS regularly released immigrants from short-term detention. And the plaintiffs have outstanding or future reimbursement requests for grants awarded in the 2024 SSP process. Denver has not submitted reimbursement for an approximately $12.7 million

41

grant awarded in September 2024 because FEMA has not responded to a previously submitted budget amendment. Pls.' Mem., Nicole Doheny Decl., ¶¶ 9, 25. Neither Chicago nor Illinois have submitted reimbursement requests for a $9.6 million pass-through grant awarded in July 2024. Pls.' Mem., Decl. of Jose Ponce Martinez, ¶¶ 6,13. And Pima County has neither incurred costs nor submitted reimbursement requests under an $18.7 million grant awarded in September 2024. Pls.' Mem., Decl. of Ken Walker, ¶ 18. This is not a case where following Congress' directive would be impossible; the plaintiffs seek or will seek reimbursement for activities that would fulfill Congress' mandate and which have already been reviewed by FEMA. Given that the funds can no longer be awarded to other grantees, the defendants' refusal to reimburse the plaintiffs likely runs afoul of the separation of powers.

The plaintiffs make a second argument that the defendants' de-obligation of SSP funds violated 31 U.S.C. § 1553(a), which in combination with 31 U.S.C. § 1552(a) requires that federally appropriated and obligated funds remain in the related appropriations account for up to five years after the obligation period. The defendants maintain that the funds remain available in the proper accounts. Defs.' Resp. at 8–9. The plaintiffs argue that the defendants should have submitted a declaration to this effect and that the essence of the statute was violated through the de-obligation of SSP funds even if those funds remain in the proper account.

The Court need not address this second argument because the plaintiffs' primary separation of powers argument is likely to succeed. Still, the uncontested facts presented in the plaintiffs' second argument bolster their primary argument. The parties agree that because the funds at issue were obligated to the plaintiffs in fiscal years

2023 and 2024, they cannot now be obligated to another initiative. *Id.* at 7; Pls.' Reply at 5. The GAO, which reviews the President's compliance with the ICA and reports impoundments that violate the ICA, similarly explained in a recent decision that "funds deobligated after the expiration of the original period obligational availability are not available for new obligations." Dep't of Homeland Security, B-337204.2 at 20–21. It concluded that "to the extent FEMA has deobligated [2023 and 2024] SSP funds with the intent to [allocate funds to new recipients], the funds have since expired and are unavailable for new obligations." *Id.* As a result, the GAO found "that FEMA has impermissibly withheld and precluded the obligation and expenditure of prior year budget authority for SSP in violation of the ICA." *Id.* at 22. Although the GAO's decision does not "address FEMA's authority to terminate grant agreements nor the process by which it terminated them," it does confirm the Court's understanding of the obligation and de-obligation procedures that prevent re-obligation of SSP funds. *Id.* at 4–5; *cf. Vera Inst. of Just. v. U.S. Dep't of Just.*, No. 25-CV-1643 (APM), 2025 WL 1865160, at *17 (D.D.C. July 7, 2025) (dismissing claims that termination of grants violated separation of powers because defendants intended to re-obligate funds to other grantees and structure of appropriations allowed this).

Because 2023 and 2024 SSP funds that have expired cannot be re-obligated to other awardees, Congress's mandate that FEMA support sheltering will go unfulfilled, all while the plaintiffs have outstanding or not-yet-submitted reimbursement requests. The defendants are correct that Congress did not require DHS to award grants to Chicago, Denver, and Pima County specifically. DHS could have initially awarded the funds to other grantees. But the Constitution does not permit DHS to refuse, based on policy

objections, to spend funds that cannot be re-obligated. The plaintiffs have demonstrated that the defendants' actions likely violated the constitutional separation of powers.

### b. *Ultra vires*

The plaintiffs also seek a preliminary injunction on the basis that the defendants acted ultra vires, in other words, beyond their powers. An ultra vires claim is an implied equitable claim that an executive actor "violated a clear statutory mandate and exceeded the scope of her delegated authority." *Am. Soc'y of Cataract & Refractive Surgery v. Thompson*, 279 F.3d 447, 456 (7th Cir. 2002) (citing *Leedom v. Kyne*, 358 U.S. 184, 188 (1958)). An ultra vires claim is distinct from an implied equitable claim for a violation of the Constitution and must meet a demanding standard. *Vought*, 149 F.4th at 791; *see Barr*, 961 F.3d at 919 (recognizing distinction between implied equitable claims under the Constitution and ultra vires claims). Ultra vires claims succeed "only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute." *Nuclear Regul. Comm'n*, 605 U.S. at 681 (quoting *Ry. Clerks v. Ass'n for Benefit of Non-contract Emps.*, 380 U.S. 650, 660 (1965)). Ultra vires review is not available "if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review." *Id.* (quoting *Bd. of Governors, Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)).

For present purposes, the Court need not address the plaintiffs' ultra vires claim because it rests on the same conduct as the separation of powers claim—on which the

plaintiffs have demonstrated a likelihood of success—and, if successful, would merit the same relief. In their ultra vires claim, the plaintiffs allege that "[d]efendants acted beyond their legal authority by terminating all Shelter and Services Program funding through the February 10 Funding Terminations, freezing and conditioning all Program funding through the March 11 Letters, terminating all Program grants through the April 1 Letters, and terminating the Program." Compl. ¶ 207. The separation of powers count cites the very same actions. Compl. ¶ 199. Given that the plaintiffs are likely to succeed on their separation of powers claim and that the ultra vires claim would not alter the scope of relief, the Court need not adjudicate at this time the plaintiffs' likelihood of success on their ultra vires claim.[2]

### c. Administrative Procedure Act

The plaintiffs contend that the defendants' actions freezing SSP funds and eliminating the SSP violated the APA because these actions were contrary to law and were arbitrary and capricious. The defendants respond by arguing, first, that the DHS appropriations acts do not confer rights on the plaintiffs that may be enforced through

---

[2] The Court declines to address the ultra vires claim in more detail in part because of the ambiguity created by the Supreme Court's stay in *AIDS Vaccine Advocacy Coalition*, 606 U.S. ___, 2025 WL 2740571, at *1. As explained in more detail below, this decision calls into question whether the plaintiffs have a viable contrary to law claim under the APA related to the Executive branch's failure to spend appropriated funds. The defendants in this case argue that the ultra vires claim is foreclosed by the APA, and the plaintiffs' contrary to law claim is the APA claim through which the plaintiffs could obtain meaningful and adequate judicial review. As a result, the defendants' APA displacement argument might require the Court to decide whether the APA itself is displaced by the ICA, a question left uncertain by the stay opinion in *AIDS Vaccine*. Given the fact that the ultra vires claim seeks substantially the same relief for the same conduct as the separation of powers claim, and considering the uncertain state of the law after the Supreme Court's stay, the Court declines to address foreclosure of the ultra vires claim.

an APA suit, that grant funding decisions are committed to agency discretion, and that the March 11 letter was not a final agency action.[3]  On the merits, the defendants broadly argue that DHS has general authority to withhold payments from grant recipients based on noncompliance with federal law and terminate grants when the award no longer effectuates agency priorities.  The defendants' freezing of SSP funds and elimination of the SSP are reviewable final agency actions, and those decisions likely were arbitrary and capricious.

### i.    Impoundment Control Act

The Supreme Court recently stayed a district court's decision to enjoin federal agencies from freezing foreign aid funding because the government "made a sufficient showing that the Impoundment Control Act precludes respondents' suit, brought pursuant to the Administrative Procedure Act, to enforce the appropriations at issue here."  *AIDS Vaccine Advoc. Coal.*, 606 U.S. ___, 2025 WL 2740571, at *1.  The Court cautioned that the "order should not be read as a final decision on the merits."  *Id.*  In the present case, the Court lacks authority to decide the plaintiffs' APA claims if they are precluded by the ICA.  The Court therefore addresses this issue even though the parties have not briefed or argued it.

The stay order in *AIDS Vaccine Advocacy Coalition* is the latest court action stemming from the President's issuance of an executive order in January 2025 that immediately paused all congressionally appropriated foreign aid funding.  *See AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25 C 400, 2025 WL 2537200, at *2

---

[3] The defendants also argue that the ICA does not confer rights on the plaintiffs that may be enforced through an APA suit.  Because the plaintiffs' APA arguments do not rely on the ICA, the Court need not address the defendants' argument on this point.

(D.D.C. Sept. 3, 2025) (discussing history). The district court originally issued a preliminary injunction in favor of the plaintiffs based principally on two claims. *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 133 (D.D.C. 2025). First, the court concluded that the plaintiffs were likely to succeed on the merits of their claim that the agencies' blanket freezing of funds was arbitrary and capricious in violation of the APA. *Id*. at 140. Second, it concluded that the plaintiffs were likely to prevail on their claim that the defendants were violating the separation of powers by unilaterally refusing to spend congressionally appropriated foreign aid funds. *Id*. at 148. In a footnote, the district court rejected the defendants' argument that the plaintiffs could not enforce the ICA through an APA suit. *Id*. at 148 n.17. The defendants appealed the second part of the preliminary injunction; the first part remains in effect. *Id.; Glob. Health Council*, 2025 WL 2480618, at *3.

On appeal, the court reversed the district court on several points. *Id.* Relevant here, the court held the plaintiffs could not assert violations of the ICA through an APA suit. *Id.* The district court, on remand, determined that the APA did not preclude judicial review premised on the appropriations enactment. *AIDS Vaccine Advoc. Coal.*, 2025 WL 2537200, at *2. The recent order from the Supreme Court stayed the district court's decision. *AIDS Vaccine Advoc. Coal.*, 606 U.S. ___, 2025 WL 2740571, at *1.

It is unclear from *AIDS Vaccine Advocacy Coalition* whether all contrary to law APA challenges to an agency's action related to appropriations are precluded by the ICA. First, the Supreme Court expressly cautioned that the stay order should not be treated as a final decision on the merits. Second, the stay order does not provide any detail explaining why the ICA may preclude the plaintiffs' suit.

Because the Supreme Court's recent action potentially impacts the validity of the plaintiffs' contrary to law claims under the APA, the Court does not rely on these claims as a basis for this decision. The plaintiffs' cause of action under the APA based on arbitrary and capricious agency action was not impacted by the stay decision in *AIDS Vaccine Advocacy Coalition*. The Court thus proceeds to assess plaintiffs' APA claims based on DHS / FEMA's allegedly arbitrary and capricious actions of freezing SSP funds and eliminating the SSP.

## ii. Zone of interests

The plaintiffs fall within the zone of interests sought to be protected by the DHS appropriation acts. "To invoke a statutory cause of action, a plaintiff must be within the 'zone of interests' that the statute protects." *FDA v. R. J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1990 (2025). The APA entitles anyone "adversely affected or aggrieved by agency action within the meaning of a relevant statute . . . to judicial review." 5 U.S.C. § 702. The Supreme Court has "interpreted 'adversely affected' broadly, as covering anyone even '*arguably* within the zone of interests to be protected or regulated by the statute . . . in question.'" *R. J. Reynolds Vapor Co.*, 145 S. Ct. at 1991 (quoting *Ass'n of Data Processing Serv. Ors., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). "A plaintiff may sue under the APA unless her 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* (quoting *Clarke v. Sec. Indus. Ass'n.*, 479 U.S. 388, 399 (1987)). The inquiry is "not especially demanding." *Id.* (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014)).

Relying on *Sierra Club*, the defendants argue that the plaintiffs fall outside the

48

zone of interests protected by the appropriations acts. Thus, according to the defendants, the plaintiffs cannot enforce those acts through an APA suit. The plaintiffs respond that they fall within the DHS appropriations acts' zone of interests because they were among the intended beneficiaries and fulfilled Congress' purposes in allocating funds for SSP grants.

In *Sierra Club*, a group of environmental plaintiffs brought suit against the President and Department of Defense seeking to halt border wall construction. *Sierra Club v. Trump*, 963 F.3d 874, 881 (9th Cir. 2020). The plaintiffs challenged the Acting Secretary's transfer of funds from particular agency funds to a different agency fund to support the construction. *Id*. In a stay decision, the Supreme Court concluded that the plaintiffs in *Sierra Club*—bystanders with no direct connection to the funds at issue— likely had no cause of action to obtain review of the Acting Secretary's compliance with the Department of Defense appropriations transfer statute. *Sierra Club*, 140 S. Ct. at 1. Unlike in *Sierra Club*, the plaintiffs in this case were allocated funding via the DHS appropriations acts and allege that the defendants' allegedly improper actions directly harmed them. The plaintiffs' claims are within the zone of interests that the DHS appropriations acts were enacted to protect.

### ii. Agency discretion

The APA does not apply where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exception has been construed "narrowly" to apply only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)

49

(quoting *Lincoln*, 508 U.S. at 191). The Supreme Court has identified certain categories of agency decisions that have traditionally been regarded as committed to agency discretion and are, accordingly, "presumptively unreviewable." *Heckler v. Chaney*, 470 U.S. 821, 832–33 (1985).

The defendants argue that "any decisions regarding how much funding to allocate to a particular grant recipient within the statutory framework—or whether to continue a grant award at all—are committed entirely to the agency's discretion." Defs.' Resp. at 18. The defendants go on to argue that this discretion includes the authority to terminate any grants that no longer advance agency priorities. As with their merits argument on the constitutional claim, the defendants' argument is primarily based on *Lincoln v. Vigil*. In *Lincoln*, Native American children who benefitted from the lump-sum funds appropriated for the "benefit, care, and assistance" of Native Americans filed suit after the agency ended regional support programs in favor of a nationwide treatment program. *Lincoln*, 508 U.S. at 188–89, 193 (quoting 25 U.S.C. § 13). The Supreme Court explained that the decision to allocate funds is committed to agency discretion by law "as long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives." *Id.* at 193.

As discussed, it is well-established that agencies lack discretion when the law requires that the agency "shall" use funds for a given purpose. *See, e.g.*, *Train*, 420 U.S. at 37; *Cmty. Legal Servs.*, 137 F.4th at 936 (holding that DHS lacked discretion under statute stating that DHS "shall ensure, to the greatest extent practicable' that unaccompanied children in immigration custody receive legal representation" (quoting 8 U.S.C. § 1232(c)(5))).

50

Through the DHS appropriations acts, Congress mandated that DHS transfer a specific amount of funds to FEMA for a specific purpose (SSP grants) and identified a specific class of recipients (non-Federal entities). *See* 138 Stat. at 598 ($650 million "shall be transferred to" FEMA "to support sheltering and related activities provided by non-Federal entities, in support of relieving overcrowding in short-term holding facilities of U.S. Customs and Border Protection . . . "). These appropriations did not provide DHS / FEMA the same freedom to decide how to spend the funds that is conferred by a lump-sum appropriation. Thus DHS / FEMA's decisions to freeze SSP funding and eliminate the SSP are not committed to agency discretion by law.

### iii.    Final agency action

DHS / FEMA's freezing of SSP funding in March 2025 and their elimination of SSP in April 2025 were final agency actions. The APA permits review of "final agency action." 5 U.S.C. § 704. An agency action is "final" when it is (1) "the consummation of the agency's decision-making process," and (2) "is an action by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotations omitted). It is undisputed that DHS's April 1 elimination of the SSP was a final agency action.

The defendants do not address the February 10 funding de-obligation. The plaintiffs view the de-obligation as context for the March 11 and April 1 letters. The plaintiffs also argue that any possibility of future payment is relatively meaningless if the funds are de-obligated and there is no method to release funds to the plaintiffs. Based on the record before the Court, it is not clear that legal consequences would flow from DHS's discrete action of de-obligating the funds. Instead, the de-obligation appears to

51

have amounted to an accounting change that occurred before the final agency actions of withholding SSP funds and ending the SSP.

The defendants argue that the March 11 letter freezing funds was not a final agency action because the letter informed SSP grantees that DHS / FEMA was "temporarily withholding" payment for SSP reimbursement requests. Defs.' Resp. at 18. This argument ignores that the April 1 letter informed the plaintiffs that they "were not permitted to incur any additional costs under the awards until further notice from DHS/FEMA" and that the final closeout documentation for the grants "must not include costs incurred after" the March 11 letter. Pls.' Mem., Ponce Martinez Decl., Ex. 2. These were definitive statements that confirmed DHS / FEMA's final action taken on March 11 to freeze SSP funds and to end the SSP as of April 1. Thus DHS / FEMA's decision to freeze SSP funds beginning March 11, 2025 was a final agency action.

DHS / FEMA's March 11 action freezing SSP funding and April 1 action ending SSP are therefore reviewable.

### iv. Arbitrary and capricious

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The agency must show that the new policy is permissible under the statute and that there are good reasons for it. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). When the new policy "rests upon factual findings that contradict those which underlay its prior

policy" or the prior policy "engendered serious reliance interests," "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515–16. Under this standard, the plaintiffs are likely to succeed on their claim that DHS / FEMA's decisions to withhold SSP funds as of March 11 and eliminate the SSP as of April 1 were arbitrary and capricious.

The plaintiffs argue that the defendants' actions withholding SSP funding were arbitrary and capricious because the defendants have not reasonably explained their actions, the explanations that do exist are inconsistent, they did not consider individual SSP grantees' performance before freezing funding and terminating grants, they relied on factors which Congress had not intended them to consider, and they failed to consider the significant reliance interests at stake. Rather than addressing the plaintiffs' arguments, the defendants respond broadly that DHS has "general authority" "to withhold payments from grant recipients based on noncompliance with federal law" and "to terminate grants under certain circumstances, including when the award no longer effectuates 'agency priorities.'" Defs.' Resp. at 21–22.

DHS / FEMA provided no reasoned explanation or factual findings to support the decision to freeze SSP funding. In the March 11 letter, DHS / FEMA stated that DHS had "significant concerns that SSP funding [was] going to entities engaged in or facilitating illegal activities." Pls.' Mem., Ponce Martinez Decl., Ex. 1. The letter went on to state that DHS was "concerned that entities receiving payment under SSP may be guilty of encouraging or inducing" violation of federal criminal immigration laws. *Id.* On the record before the Court, DHS / FEMA provided *no* factual support for the assertion that SSP funding was going to SSP entities in violation of, or that facilitated violation of,

federal law.  Thus plaintiffs are likely to succeed on their claim that DHS / FEMA's decision to freeze SSP funding as of March 11 was arbitrary and capricious.

DHS / FEMA also provided no reasoned explanation or factual findings to support the decision to eliminate the SSP.  DHS / FEMA has changed the explanation used to support its decisions related to SSP funding at least three times from the March 11 letter through the September 22, 2025, hearing in this case.  As discussed, the March 11 letter broadly asserted that the agency had significant concerns that SSP funds went to entities engaged in or facilitating illegal activities.  Then, the April 1 letter stated that the rationale behind the elimination of the SSP was a change in agency policy.  In that letter, the defendants stated that grant programs "that support, or have the potential to support, illegal immigration through funding illegal activities or support for illegal aliens that is not consistent with DHS's enforcement focus do not effectuate the agency's current priorities."  Pls.' Mem., Ponce Martinez Decl. Ex. 1.  In their response filed in the present case, the defendants likewise argued that "the current administration concluded that [individuals benefitting from SSP funds] are often in the country unlawfully, and therefore SSP funding provides support for "illegal aliens" and is inconsistent with DHS's 'current priorities.'"  Defs.' Resp. at 29.  But the defendants shifted their policy argument at the September 22, 2025 hearing, now arguing that the SSP was eliminated because DHS changed its underlying policies and no longer releases immigrants.  Thus, they contend, there are no short-term shelters and SSP funding is no longer needed.

The record is devoid of any support for the defendants' broad conclusions.  As one example, DHS / FEMA provided no detail about when the agency stopped releasing

immigrants.  This would impact the potential need for SSP because non-Federal entities may still be providing shelter and support services for immigrants who were released earlier this year or late last year.  Indeed, the plaintiffs each have significant remaining grant funds that were awarded in 2024.  DHS / FEMA provided no reasoned explanation for why these funds were no longer needed to fulfill the goals of the SSP.  Because it provided no support for the decision, the plaintiffs are likely to succeed on their claim that DHS / FEMA's elimination of the SSP as of April 1 was arbitrary and capricious.

### 2.    Irreparable harm

"To say that an injury is irreparable means that the methods of repair (remedies at law) are inadequate." *Fleet Wholesale Supply Co. v. Remington Arms Co.*, 846 F.2d 1095, 1098 (7th Cir. 1988).  And a remedy at law is inadequate if "it is not practicable to calculate damages to remedy" the kind of harm that the plaintiff has suffered. *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003).

Given the Court's finding that defendants have violated the separation of powers and the APA, plaintiffs have shown that remedies at law are inadequate for addressing this violation.  "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing or irreparable injury is necessary." *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (quoting 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995)).  This is especially true when the right in question "protects . . . intangible and unquantifiable interests." *Id.*  The separation of powers is one such interest.  By protecting against "the concentration of power" that "would allow tyranny to flourish," it is "one of the most vital of the procedural protections of individual liberty found in our Constitution."  *Barr*, 961 F.3d at 892

(quoting *Gundy v. United States*, 588 U.S. 128, 173 (2019) (Gorsuch, J., dissenting)).

Thus no further showing of inadequacy of legal remedies is required.

### 3. Balancing of the harms & public interest

Injunctions protecting the separation of powers are in the public interest. *See*

*Barr*, 961 F.3d at 918 (affirming the lower court's conclusion that "the public interest was

served by an injunction in that it acts as a check on the executive's encroachment of

congressional power that violates the separation of powers"). Accordingly, "the balance

of harms normally favors granting preliminary injunctive relief because the public

interest is not harmed by preliminarily enjoining the enforcement of a statute that is

probably unconstitutional." *Id.* at 589–90. In this case, the plaintiffs have shown that

the Executive Branch's actions likely violated the separation of powers. Enjoining those

actions would therefore serve the public interest.

For these reasons, the balance of harms and public interest weighs in favor of

granting the preliminary injunction.

### Conclusion

For the reasons stated above, the Court grants, in part, the City of Chicago; City

and County of Denver; and Pima County's request for a preliminary injunction [dkt. no.

27]. The Court will separately enter a preliminary injunction order. Plaintiffs' counsel

are directed to promptly (by the close of business on November 3, 2025) provide a

Word version of a draft preliminary injunction to the undersigned judge's proposed order

e-mail address after discussing its form with defendants' counsel. In addition, the

parties are directed to confer regarding what further proceedings are needed to bring

this case to a conclusion and are to file a joint status report with a proposal (or

alternative proposals if they cannot agree) by November 10, 2025. A telephonic status hearing is set for November 14, 2025 at 9:20 a.m., using call-in number 650-479-3207, access code 2305-915-8729.

Date: October 31, 2025

_____
MATTHEW F. KENNELLY
United States District Judge